# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

———————

CITY OF CHICAGO,

Plaintiff-Appellee,

v.

JEFFERSON B. SESSIONS, III, ATTORNEY
GENERAL OF THE UNITED STATES,

Defendant-Appellant.

———————

On Appeal from the United States District Court for the
Northern District of Illinois, No. 17-cv-5720 (Leinenweber, J.)

———————

## BRIEF FOR APPELLANT

———————

JOSEPH H. HUNT
  *Assistant Attorney General*

JOHN R. LAUSCH, JR.
  *United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN
LAURA MYRON
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1838*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION .......................................................................4

STATEMENT OF THE ISSUES...........................................................................4

STATEMENT OF THE CASE ...............................................................................5

      A.     The Immigration and Nationality Act ...........................................5

            1.     Detention and Removal of Aliens ......................................5

            2.     8 U.S.C. § 1373 ................................................................6

      B.     The Byrne JAG Program .................................................................7

      C.     Prior Proceedings..........................................................................11

      1.     Preliminary Injunction District Court Proceedings....................11

      2.     Preliminary Injunction Appellate Proceedings...........................13

      3.     Permanent Injunction Proceedings.............................................14

SUMMARY OF ARGUMENT............................................................................ 16

STANDARD OF REVIEW ................................................................................ 20

ARGUMENT ...................................................................................................... 20

I.     The § 1373 Certification Condition for FY 2017 and § 1373 Itself Are Both Valid.................................................................................................. 20

      A.     The § 1373 Certification Condition Is Statutorily Authorized ................20

      B.     Section 1373 Does Not Violate the Tenth Amendment ..........................23

II.    The Notice and Access Conditions for FY 2017 Are Valid ................................ 32

III. The District Court Improperly Extended the Injunction to Entities Other
Than Chicago ........................................................................................................ 39

    A. Article III Standing Requirements Preclude an Injunction That
    Extends Beyond What Is Necessary to Redress Chicago's Injury ...........40

    B. Traditional Equitable Principles Preclude an Injunction That
    Extends Beyond What Is Necessary to Redress Chicago's Injury ...........46

CONCLUSION .............................................................................................................. 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CIRCUIT RULE 30(d) STATEMENT

STATUTORY ADDENDUM

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.,*
  672 F.3d 492 (7th Cir. 2012) ...................................................................................20

*Alvarez v. Smith,*
  558 U.S. 87 (2009) ...............................................................................................42

*American Sur. Co. of N.Y. v. Marotta,*
  287 U.S. 513 (1933) .............................................................................................37

*Arizona v. United States,*
  567 U.S. 387 (2012) ........................................................................................ 5, 26

*Baxter v. Palmigiano,*
  425 U.S. 308 (1976) .............................................................................................44

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ....................................................................... 19, 46, 48, 52

*Chicago v. Sessions,*
  888 F.3d 272 (7th Cir. 2018) ......................................... 3, 13, 14, 19, 28, 35, 36, 37, 38,
                                                                               43, 45, 49, 50, 52, 53, 54, 55

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) .................................................................................19, 40, 41

*Dalton v. Specter,*
  511 U.S. 462 (1994) .............................................................................................23

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) .............................................. 18, 19, 40, 41, 43, 45, 46

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999) .............................................................................................47

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
  452 U.S. 264 (1981) ...................................................................................... 26, 27

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) ....................................................................... 6

*Lacy v. Cook Cnty., Ill.,*
    897 F.3d 847 (7th Cir. 2018) ...........................................................20

*Laskowski v. Spellings,*
    546 F.3d 822 (7th Cir. 2008) ...........................................................42

*Lewis v. Casey,*
    518 U.S. 343 (1996) .................................................................. 41, 45

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ............................... 47, 48, 49, 52

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ........................................... 19, 46, 51, 52

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ...........................................................40

*McKenzie v. Chicago,*
    118 F.3d 552 (7th Cir. 1997) ............................... 19, 42, 44, 45, 49

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ...........................................................................42

*Murphy v. NCAA,*
    138 S. Ct. 1461 (2018) ........................................... 15, 25, 26, 28

*National Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) .................................................................. 22, 23

*New York v. United States,*
    505 U.S. 144 (1992) .................................................................. 25, 29

*Nken v. Holder,*
    556 U.S. 418 (2009) ...........................................................................51

*Printz v. United States,*
    521 U.S. 898 (1997) ........................................................ 25, 29, 30

*Reno v. Condon,*
528 U.S. 141 (2000) ....................................................................30

*Scherr v. Marriott Int'l, Inc.,*
703 F.3d 1069 (7th Cir. 2013) ...................................................44

*South Dakota v. Dole,*
483 U.S. 203 (1987) ..............................................................22, 23

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ....................................................................41

*Thomas & Betts Corp. v. Panduit Corp.,*
138 F.3d 277 (7th Cir. 1998) ...................................................35

*Town of Chester v. Laroe Estates, Inc.,*
137 S. Ct. 1645 (2017) ................................................................40

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) ...........................................19, 47, 48, 51

*Trump v. International Refugee Assistance Project,*
137 S. Ct. 2080 (2017), *vacated as moot,*
No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017) ...........50, 51

*TRW Inc. v. Andrews,*
534 U.S. 19 (2001) ......................................................................37

*U.S. Dep't of Def. v. Meinhold,*
510 U.S. 939 (1993) ....................................................................46

*United States v. Latham,*
754 F.2d 747 (7th Cir. 1985) ...................................................37

*United States v. Mendoza,*
464 U.S. 154 (1984) ......................................................19, 49, 53

*Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n,*
263 F.3d 379 (4th Cir. 2001) ..............................46, 47, 49, 52

v

*Warth v. Seldin,*
422 U.S. 490 (1975) ....................................................................40

*Zepeda v. U.S. INS,*
753 F.2d 719 (9th Cir. 1983) ......................................................49

**Statutes:**

Immigration and Naturalization Act, 8 U.S.C. § 1101 *et seq.* ..............................1

8 U.S.C. § 1226(a) ..................................................................... 5, 25

8 U.S.C. § 1226(a)(1) ........................................................................5

8 U.S.C. § 1226(a)(2) ................................................................. 5, 26

8 U.S.C. § 1226(c) .........................................................................25

8 U.S.C. § 1226(c)(1) ........................................................................6

8 U.S.C. § 1226(c)(2) ........................................................................6

8 U.S.C. § 1231(a)(1) ........................................................................5

8 U.S.C. § 1231(a)(1)(B)(iii) ...................................................6, 17, 25

8 U.S.C. § 1231(a)(1)(A) ........................................................ 17, 25

8 U.S.C. § 1231(a)(2) ............................................................. 6, 25

8 U.S.C. § 1231(a)(4)(A) ........................................................6, 17, 25

8 U.S.C. § 1373 ...................................................................4, 16, 20

8 U.S.C. § 1373(a) ...............................................................6, 9, 24

8 U.S.C. § 1373(b) ...............................................................7, 9, 24

8 U.S.C. § 1373(c) ...........................................................................7

Violence Against Women and Department of Justice Reauthorization
Act of 2005, Pub. L. 109-162, 119 Stat. 2960 (2006) ...............................32, 36

6 U.S.C. § 251(2) ...........................................................................5

6 U.S.C. § 552(d) ................................................................5

28 U.S.C. § 1291 ................................................................4

28 U.S.C. § 1331 ................................................................4

34 U.S.C. §§ 10101-10102 ..............................................36

34 U.S.C. §§ 10101-10111 ..............................................36

34 U.S.C. § 10102(a)(6) .................... 2, 3, 9, 12, 18, 23, 35, 37, 39, 41

34 U.S.C. § 10110(2) ......................................................39

34 U.S.C. § 10141(b) ......................................................36

34 U.S.C. § 10152(a)(1) ..............................................7, 32

34 U.S.C. § 10153(A) ......................................................7

34 U.S.C. § 10153(A)(4) ..........................................8, 32, 34

34 U.S.C. § 10153(A)(5)(C) .....................................8, 32, 34

34 U.S.C. § 10153(A)(5)(D) ...........2, 4, 8, 12, 16, 20, 21, 32

34 U.S.C. § 10156 ............................................................7

34 U.S.C. § 10442(b) ......................................................38

34 U.S.C. § 10446(e)(3) ..................................................38

42 U.S.C. § 2000d-4a ......................................................9

42 U.S.C. § 5779(a) ........................................................30

49 U.S.C. app. § 1305(a)(1) (1988) ................................28

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................4

Fed. R. Civ. P. 23(a)-(b) ................................................54

**Legislative Material:**

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) .......................................................31

**Other Authorities:**

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
   131 Harv. L. Rev. 417 (2017).............................................................48

*The Federalist No. 78* (Alexander Hamilton) (Clinton Rossiter ed., 1961).......................47

Office of Justice Programs, U.S. Dep't of Justice:

   *About Us*, https://ojp.gov/about/about.htm ................................................36

   *Grant Process Overview*, https://ojp.gov/funding/Apply/GrantProcess.htm ...............9

**INTRODUCTION**

Chicago has adopted local policies that frustrate federal immigration enforcement by restricting information sharing between the City and the federal government regarding aliens in the City's law-enforcement custody. This case involves three conditions that the Department of Justice (Department) has placed on the receipt of FY 2017 law-enforcement grants under the Byrne Justice Assistance Grant (Byrne JAG) program in order to discourage the further frustration of federal law enforcement. The conditions concern the interaction of federal and state regulatory schemes. The federal government regulates aliens under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* The states regulate the same individuals in various ways, including regulation under their criminal laws. Under the INA, aliens in state custody generally cannot be removed until they are released, but prompt federal action is often required when aliens are released, and the Department of Homeland Security (DHS) may arrest and detain aliens pending removal pursuant to administrative warrants. The three Byrne JAG conditions confirm the importance of sharing information to ensure that state regulation of potentially removable aliens does not impair the operation of federal immigration law.

The first condition, referred to as the "§ 1373 certification" condition, requires Byrne JAG applicants to certify that they comply with 8 U.S.C. § 1373, which prohibits state and local governments from restricting their officials from sharing "information regarding . . . immigration status" with DHS. The Department determined, in both the

prior and current Administrations, that this requirement was authorized by Congress when Congress specified that Byrne JAG applicants must certify "in a form acceptable to the Attorney General" that they "will comply with" the Byrne JAG statute "and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D).

The second condition, referred to as the "notice" condition, requires that grant recipients have a policy of informing DHS of the scheduled release date of an alien in criminal custody, after receiving a formal request for notification from DHS. The third condition, referred to as the "access" condition, requires that grant recipients have a policy of allowing federal agents to meet with incarcerated aliens in order to inquire about the aliens' rights to remain in the United States. The Acting Assistant Attorney General for the Office of Justice Programs (OJP), which administers the Byrne JAG program, imposed the notice and access conditions pursuant to his statutory powers, which "includ[e] placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).

Chicago has adopted local policies that violate these three conditions. Subject to limited exceptions, the City's ordinance prohibits its agents and agencies from giving DHS access to any persons in Chicago custody, from allowing DHS to use Chicago facilities for investigative purposes, and from "responding to [DHS] inquiries or communicating with [DHS] regarding a person's custody status or release date," unless the agency or agent is acting pursuant to a law-enforcement purpose that is unrelated to civil immigration enforcement. Short Appendix (SA) 7. The City's interference with

2

the federal government's removal of suspected criminals from the country imperils public safety and is inconsistent with the cooperative law-enforcement framework set forth in the INA.

The City brought this lawsuit raising numerous statutory and constitutional challenges to the Byrne JAG conditions. The district court invalidated the conditions as exceeding statutory authority and in violation of the separation of powers, and it declared that § 1373 violates the Tenth Amendment's anticommandeering principle.

The district court was wrong on the merits. The court concluded that § 1373 was not an "applicable" Federal law for purposes of the Byrne JAG program because the court concluded that § 1373 could not constitutionally be applied as a free-standing regulatory provision, but provided no reason why § 1373 could not be constitutionally applied as a grant condition. And regardless, the court's anticommandeering analysis was flawed because § 1373 is a valid preemption provision that prohibits state and local governments from obstructing the federal government's regulation of aliens and thus constitutes an essential part of the federal regulatory scheme. As for the notice and access conditions, the district court held that 34 U.S.C. § 10102(a)(6) confers no independent authority to impose conditions at all, thus rendering its "special conditions" and "priority purposes" language superfluous. On a prior preliminary-injunction appeal, this Court held that Chicago was likely to prevail on the merits of that interpretation, *Chicago v. Sessions*, 888 F.3d 272, 287 (7th Cir. 2018), but this Court

is not bound by that preliminary determination on appeal from final judgment, and should now reject that interpretation as contrary to § 10102(a)(6)'s text and context.

Compounding these errors, the district court enjoined the Attorney General's imposition of the conditions *nationwide*—even though there is no dispute that an injunction limited solely to Chicago's grant would fully remedy the City's injury. Both Article III and principles of equity forbid injunctions that are broader than necessary to redress a plaintiff's own injuries. Indeed, this Court previously granted rehearing en banc and issued a stay of the nationwide scope of the preliminary injunction—though rehearing was ultimately mooted by the entry of the permanent injunction—and it now should decisively reject improper non-party injunctions.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 over the federal claims asserted here. The district court entered final judgment on August 15, 2018. SA84. The government timely filed its notice of appeal on August 28, 2018. *See* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that 8 U.S.C. § 1373 violates the Tenth Amendment and thus is not an "applicable federal law[]" with which Byrne JAG applicants must certify compliance under 34 U.S.C. § 10153(A)(5)(D).

2. Whether the district court erred in holding that the FY 2017 notice and access conditions exceeded the Department's statutory authority.

3.     Whether the district court at a minimum erred in extending the injunction beyond Chicago to preclude the Department from enforcing the conditions against non-plaintiffs.

## STATEMENT OF THE CASE

### A.     The Immigration and Nationality Act

The federal government has "broad, undoubted power over the subject of immigration and the status of aliens," and Congress has "specified which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 567 U.S. 387, 394, 396 (2012).  As described below, recognizing states' strong interest in enforcing their criminal laws, Congress provided that aliens in state criminal custody generally cannot be removed until they are released.  Congress designed this system based on the premise that states and localities would not interfere with the federal government's detention and removal of aliens once state custody has ended.

### 1.     Detention and Removal of Aliens

In general, when the Secretary of Homeland Security issues a warrant for an alien's arrest, DHS may arrest and detain the alien "pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).[1]  Once an alien is subject to a final removal order, DHS shall remove the alien within 90 days and shall detain the alien during that removal period.  *Id.* § 1231(a)(1), (2).

---

[1] Section 1226(a) refers to the Attorney General, but the relevant functions have been transferred to the Secretary of Homeland Security.  *See* 6 U.S.C. §§ 251(2), 552(d).

When an alien is already in local criminal custody, however, the federal government generally cannot take custody of and remove the alien until he is released. For an alien who is already subject to a final order of removal, DHS shall remove the alien within 90 days of his release from local criminal custody, 8 U.S.C. § 1231(a)(1)(B)(iii), and "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," *id.* § 1231(a)(4)(A). In general, DHS "shall detain the alien" beginning on his release from local custody and throughout the 90-day removal period, and "[u]nder no circumstance" may DHS release an alien during the removal period if he has a qualifying criminal history. *Id.* § 1231(a)(2).

When an alien who is not yet subject to a final order of removal is released from local criminal custody, the Secretary may issue a warrant for the alien's arrest and DHS may arrest and detain the alien under the Secretary's general authority in § 1226(a). If the alien has a certain criminal history or has engaged in certain terrorist activities, however, DHS "shall" take the alien into custody "when the alien is released" from local criminal custody and may not (with a narrow exception) release the alien for the duration of the removal proceedings. 8 U.S.C. § 1226(c)(1), (2); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 846-47 (2018).

### 2. 8 U.S.C. § 1373

Section 1373 seeks to ensure that no obstacles will prevent the sharing of information between federal, state, and local governments that is crucial to operation of the immigration laws. Section 1373(a) provides that "State" and "local government

6

entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government entity or official from sharing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" with federal immigration authorities. Section 1373(b) provides that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[s]ending" to or "requesting or receiving" from federal immigration authorities "information regarding the immigration status, lawful or unlawful, of any individual," "[m]aintaining" such information, or "[e]xchanging" such information with "any other . . . government entity." Section 1373(c) provides, in turn, that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

### B. The Byrne JAG Program

**1.** The Department of Justice, through OJP, administers the Byrne JAG program, which provides federal funds to states and units of local government for broad criminal-justice purposes. 34 U.S.C. § 10152(a)(1). The grant funds are divided among grantees based on a statutory formula, largely premised on population and crime statistics. *Id.* § 10156. States and localities that seek grant funding must submit an application "in such form as the Attorney General may require." *Id.* § 10153(A). Among other requirements, applicants must certify that they "will comply with" the

Byrne JAG statute "and all other applicable Federal laws," that "for each fiscal year covered by an application, the[y] shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies." *Id.* § 10153(A)(4), (5)(C), (D).

In May 2016, prompted by a congressional inquiry, the Department's Office of the Inspector General issued a report raising concerns about compliance with § 1373 by ten jurisdictions receiving Department grants, including Chicago. *See* Appendix (A) 125. As a result, the Department specifically designated that statute as an "applicable Federal law[]" under the Byrne JAG program. A105. And, for the jurisdictions singled out in the report, including Chicago, the Department included a condition in their fiscal year (FY) 2016 Byrne JAG awards requiring them to review their compliance with § 1373 and to submit a letter explaining the jurisdiction's basis for its belief that it complied. A104. Chicago accepted its FY 2016 award subject to that condition, and no jurisdiction challenged the FY 2016 condition.

The Department also published guidance explaining that "all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373." A142. The guidance explained that that application requirement would not affect FY 2016 or prior year Byrne JAG grants, but that OJP expected grant recipients to "examine their policies and procedures to ensure they will be able to submit the required assurances" in their FY 2017 application. *Id.*

**2.** In accordance with this guidance, OJP specified in the FY 2017 solicitation for Byrne JAG applications that applicants would be required to certify their compliance with § 1373 in connection with their applications (the "§ 1373 certification" condition). A167-68. The solicitation included a certification form in which an applicant's Chief Legal Officer certifies that any "program or activity" funded in whole or in part by the grant complies with 8 U.S.C. § 1373(a) and (b). A183.[2]

The Department also added two related conditions. When OJP approves a Byrne JAG application, it sends a grant-award document to the applicant that enumerates, among other things, the conditions applicable to the award. *See* A92 (Chicago FY 2016 grant award); OJP, *Grant Process Overview*.[3] The applicant then typically has 45 days to review the conditions and decide whether to accept the award document. OJP, *Grant Process Overview*. The Assistant Attorney General for OJP imposes such conditions pursuant to his statutory powers, which "includ[e] placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). This authority has previously been used to impose conditions including information technology requirements, A100 (¶¶ 26-27); protections for human research subjects, *id.* ¶ 29; restrictions on the purchase of certain military-style equipment, A102-03 (¶¶ 45-50); requirements regarding body armor purchases, A102

---

[2] The term "program or activity" has the same meaning as that phrase under 42 U.S.C. § 2000d-4a. A65.

[3] https://ojp.gov/funding/Apply/GrantProcess.htm

(¶¶ 38-39); and training requirements, A100 (¶¶ 32-33). Although OJP has required compliance with conditions like these for many years, Congress has never objected to the practice and no jurisdiction has ever challenged OJP's authority to include them.

In this case, however, Chicago challenges both the § 1373 certification condition and two related conditions that were announced in the FY 2017 solicitation. *See* A175. The "notice" condition requires that, with respect to any "program or activity" funded by the grant, the grantee must have a policy designed to ensure that, when DHS provides a formal written request for advance notice of the scheduled release date and time for a particular alien at a particular facility, the facility will "as early as practicable" provide notice to DHS. A89 (¶ 56.1.B). The "access" condition requires that, with respect to any "program or activity" funded by the grant, the grantee must have a policy providing that federal agents will be "given access" to correctional facilities for the purpose of meeting with aliens and to "inquire as to such individuals' right to be or remain in the United States." *Id.* ¶ 56.1.A. The Acting Assistant Attorney General for OJP announced that compliance with these special conditions also "will be an authorized and priority purpose of the award." A175. Like the § 1373 certification condition, these two conditions are designed to ensure that the activities of federal law-enforcement grant recipients do not impair the federal government's ability to ensure public safety and the rule of law by detaining and removing aliens upon their release from local criminal custody.

## C.    Prior Proceedings

Chicago has a "Welcoming City Ordinance" that, subject to limited exceptions, prohibits City agents and agencies from giving DHS access to any persons in Chicago custody, from allowing DHS to use Chicago facilities for investigative purposes, and from "responding to [DHS] inquiries or communicating with [DHS] regarding a person's custody status or release date," unless the agency or agent is acting pursuant to a law-enforcement purpose that is unrelated to civil immigration enforcement. SA6-7. Chicago filed this suit seeking a declaration that the FY 2017 notice, access, and § 1373 certification conditions were unlawful and an injunction against their imposition nationwide.

### 1.    Preliminary Injunction District Court Proceedings

Chicago alleges that complying with these conditions—which are aimed solely at cooperation with respect to removal of aliens the City itself suspected of criminal conduct—would destroy the City's goodwill with the immigrant community. *See* A24. Chicago has not claimed that it is harmed by application of the conditions to other grant applicants. Nevertheless, Chicago sought a nationwide preliminary injunction against imposition of the conditions on all grant applicants. The district court granted in part Chicago's motion.

The court held that Chicago was likely to succeed on the merits of its challenges to the notice and access conditions because, in the court's view, the statute establishing the Byrne JAG Program does not authorize those conditions. The court recognized

that Congress has explicitly authorized the Assistant Attorney General for OJP to "plac[e] special conditions on all grants" and to "determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). But the court concluded that this provision did not apply to the Byrne JAG program and would not provide authority to impose conditions beyond the authority elsewhere vested in the Attorney General. SA9-11. The court asserted that "consequently, the efforts to impose [the conditions] violate the separation of powers doctrine." SA11.

The court also held that Chicago had *not* established a likelihood of success on its challenges to the § 1373 certification condition. SA13. The court found that the condition was authorized by the statutory requirement that Byrne JAG applicants certify that they "will comply with all provisions of this part and all other applicable Federal laws," 34 U.S.C. § 10153(A)(5)(D). SA12. And the court found that § 1373 was constitutional. SA14-17.

Accordingly, the court granted Chicago a preliminary injunction against only the notice and access conditions. SA19. The court made the injunction "nationwide in scope" because there was "no reason to think that the legal issues present in this case are restricted to Chicago or that the statutory authority given to the Attorney General would differ in another jurisdiction." *Id.* In denying the government's motion to stay the injunction as it applies to grant applicants other than Chicago, the court stated that it had broad remedial authority to address a constitutional violation and that "judicial

economy counsels against" requiring other jurisdictions "to file their own lawsuits," particularly because some of them had filed amicus briefs.  A110-12, 117.

### 2.    Preliminary Injunction Appellate Proceedings

The government appealed but Chicago did not.  After denying the government's motion to stay the injunction's nationwide scope, a panel of this Court affirmed the district court's decision that Chicago was likely to succeed on the merits of its claims regarding the notice and access conditions.  *See Chicago v. Sessions*, 888 F.3d 272, 287, 291 (7th Cir. 2018).  The panel concluded that 34 U.S.C. § 10102(a)(6)'s authorization for the Department to adopt special conditions and priority purposes did not provide any powers beyond those specified elsewhere by Congress.  *Id.* at 284-85.

The panel divided, however, on the propriety of the injunction's nationwide scope.  The panel majority affirmed the injunction, reasoning that because "[t]he City had standing to seek injunctive relief," there was no further Article III constraint on "the terms of that injunction."  *Chicago*, 888 F.3d at 289-90.  The majority further concluded that the injunction did not constitute an abuse of the district court's equitable authority.  *See id.* at 293.  Dissenting on this issue, Judge Manion concluded that the majority had erroneously endorsed "a gratuitous application of an extreme remedy" by "bypass[ing] Supreme Court precedent, disregard[ing] what the district court actually concluded concerning the equities in this case, and misread[ing] the effect of providing relief to Chicago only."  *Id.* at 296 (Manion, J., dissenting in part).  Judge Manion emphasized that the nationwide injunction creates a "one-way-ratchet" that

circumvents the class-action rules and the Supreme Court's unequivocal holding that "nonmutual offensive collateral estoppel . . . does not apply against the Government in such a way as to preclude relitigation of issues" in separate suits brought by non-parties to the initial litigation. *Id.* at 296-98.

This Court granted the government's petition for partial rehearing en banc on the scope of the injunction, vacated the portion of the panel opinion and judgment "sustain[ing] the district court's decision to extend preliminary relief nationwide," June 4, 2018 Order, No. 17-2991 (Dkt. No. 128), at *1, and stayed the injunction as it applied beyond Chicago, June 26, 2018 Order, No. 17-2991 (Dkt. No. 134).

### 3. Permanent Injunction Proceedings

While the en banc proceedings were pending, the district court granted summary judgment for Chicago. Reversing itself, the court concluded that the § 1373 certification condition was not statutorily authorized. Although the court again rejected Chicago's argument that "all other applicable Federal laws" refers only to laws that expressly govern grant recipients, SA58-59, the court concluded that § 1373 is not an "applicable Federal law[]" because it is unconstitutional, SA60. Specifically, the court held that § 1373—when viewed independently rather than as a condition on a federal grant—violates the Tenth Amendment's anticommandeering principle. SA35-54. The court primarily focused on the form of § 1373 as a prohibition on state and local laws that restrict government employees from sharing certain information, which it held

14

violated the Tenth Amendment under *Murphy v. NCAA*, 138 S. Ct. 1461 (2018). *See* SA42-46.

The court held that the notice and access conditions were unlawful for the reasons it and this Court had previously stated at the preliminary-injunction stage. *See* SA55-57. And the court dismissed the remaining counts as moot. SA62. The court concluded that a nationwide permanent injunction as to all three conditions was warranted, but stayed the nationwide scope of the injunction out of deference to this Court. SA62-78. This Court subsequently vacated as moot its decision to rehear the appeal of the preliminary injunction's nationwide scope, and then dismissed that appeal once the district court entered final judgment. *See* Aug. 10, 2018 Order, No. 17-2991 (Dkt. No. 154); Aug. 30, 2018 Order, No. 17-2991 (Dkt. No. 159).[4]

The district court's final judgment and order declared that § 1373 violates the Tenth Amendment and that the Attorney General exceeded his authority and violated the separation of powers in imposing the three conditions on the FY 2017 Byrne JAG awards. SA80. The court also permanently enjoined the Attorney General from imposing the conditions on the FY 2017 Byrne JAG funds. SA81. The court made the injunction nationwide, but stayed the injunction as it applied to "all areas of the country

---

[4] In *City of Evanston v. Sessions*, No. 1:18-cv-04853 (N.D. Ill. filed July 16, 2018), the district court granted preliminary injunctive relief to cities that are members of the Conference of Mayors, which purports to represent cities with populations of 30,000 or more. The government has appealed the preliminary injunction, and the case is still pending in district court.

beyond Chicago." SA82. On August 20, 2018, OJP issued Chicago's Byrne JAG award documents.

## SUMMARY OF ARGUMENT

The three grant provisions at issue are entirely proper conditions on the receipt of federal law-enforcement funds. The district court's contrary rulings rest on a series of mistakes about the relevant statutory and constitutional provisions.

**I.** The Department acted within its statutory authority in requiring that FY 2017 grant applicants certify compliance with 8 U.S.C. § 1373. The governing statute requires Byrne JAG applications to include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). Following a congressional inquiry and an Inspector General's report, former Attorney General Lynch, through OJP, determined that 8 U.S.C. § 1373 is an "applicable Federal law[]," and that conclusion, which Attorney General Sessions has reaffirmed through OJP, is entirely consistent with the statutory text.

Indeed, the district court agreed, holding that § 1373 is not an "applicable Federal law[]" *only* because the court concluded that it violates the Tenth Amendment. But that holding is erroneous as a matter of both statutory and constitutional interpretation.

As a statutory matter, the court erred because § 1373 is a "Federal law" that is "applicable" *as a funding condition* regardless of whether it could also constitutionally be applied as a stand-alone regulation. And as a constitutional matter, the court erred

16

because § 1373, even as a stand-alone regulation, does not commandeer states and localities to regulate or enforce a federal regulatory scheme themselves. Rather, it preempts state and local information-sharing restrictions that obstruct the federal government's enforcement of the immigration laws against individual aliens. The INA generally contemplates that aliens taken into criminal custody by states or localities will not, until released, be removed by the federal government. *See, e.g.*, 8 U.S.C. § 1231(a)(4)(A). And the INA often requires prompt action by DHS as soon as release takes place, providing, for example, that within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal, *id.* § 1231(a)(1)(A), (B)(iii). The implicit but necessary premise is that states and localities will not use their priority to frustrate immigration enforcement by refusing to provide the federal government with information regarding an alien's immigration status that is essential to effectuating the removal of aliens. The Supreme Court in *Murphy* confirmed that express preemption provisions such as § 1373 are permissible under the Tenth Amendment, and the district court misread that decision.

**II.** The Department also acted within its statutory authority in including the notice and access conditions on the receipt of FY 2017 Byrne JAG funds. The prior panel opinion, which held only that Chicago had established a likelihood of success on this issue, does not bind this Court to rule in Chicago's favor on summary judgment.

The notice condition requires that grantees have a policy of notifying DHS of the scheduled release date of an alien in criminal custody, after receiving a formal

17

request for notification from DHS.  The access condition requires that grantees have a policy of allowing federal agents to meet with incarcerated aliens in order to inquire about the aliens' rights to remain in the United States.  Like the § 1373 certification condition, these conditions ensure the basic cooperation that the INA envisions when aliens are subject to simultaneous regulation by two sovereigns.

These conditions fall within the Assistant Attorney General for OJP's statutory authority to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).  In concluding otherwise, the district court gutted this provision, finding that it provides no independent authority and misunderstanding the Assistant Attorney General's role in administering the Department's grant programs.  The court's separation-of-powers holding adds nothing beyond its statutory-authority holding, and thus also fails.

**III.**  At a minimum, it is necessary to limit the scope of the injunction to Chicago—the only plaintiff in the case.  There is no dispute that an injunction limited solely to Chicago's grant would fully remedy the City's injury.  Accordingly, the injunction should be vacated insofar as it extends beyond the City because the entry of an injunction broader than necessary to remedy the plaintiff's injury exceeds a court's authority under both Article III standing requirements and fundamental principles of equity.

As the Supreme Court recently reaffirmed, "'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v.*

*Whitford*, 138 S. Ct. 1916, 1934 (2018) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)). And that controlling precedent simply confirms what this Court had, until the vacated panel opinion in this case, long recognized: "plaintiffs lack standing to seek—and the district court therefore lacks authority to grant—relief that benefits third parties." *McKenzie v. Chicago*, 118 F.3d 552, 555 (7th Cir. 1997).

Equity dictates the same result. It is a black-letter rule that injunctions "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Nationwide injunctions departing from this rule, as Justice Thomas recently emphasized, "did not emerge until a century and a half after the founding," and they "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). Moreover, as Judge Manion recognized in his panel dissent, such injunctions create an inequitable "one-way[] ratchet" under which any prevailing plaintiff obtains relief on behalf of all others, but a victory by the government would not preclude other potential plaintiffs from "run[ning] off to the 93 other districts for more bites at the apple." *Chicago v. Sessions*, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., dissenting in part); *cf. United States v. Mendoza*, 464 U.S. 154, 158-62 (1984) (holding

that non-parties to a decision may not preclude the federal government from continuing to defend the issue in subsequent litigation).

## STANDARD OF REVIEW

This Court reviews "de novo the district court's decision to grant summary judgment." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). This Court reviews the "grant of injunctive relief for an abuse of discretion," but reviews the district court's "underlying legal conclusions de novo." *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 867 (7th Cir. 2018). "Where a permanent injunction has been issued," this Court determines, among other things, whether the plaintiff has shown "success, as opposed to a likelihood of success, on the merits." *ADT Sec. Servs.*, 672 F.3d at 498.

## ARGUMENT

## I.     The § 1373 Certification Condition for FY 2017 and § 1373 Itself Are Both Valid

### A.     The § 1373 Certification Condition Is Statutorily Authorized

**1.**  Byrne JAG applications must include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of [the Byrne JAG Program] and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). In accordance with the prior Administration's determination that 8 U.S.C. § 1373 is an "applicable Federal law[]" for purposes of the statutorily required certification, *see* A105 (July 7, 2016 mem.); A142 (Oct. 6, 2016 guidance), beginning in

FY 2017 OJP required that grant applicants explicitly certify compliance with § 1373 as part of their Byrne JAG applications.  *See* A167-68 (2017 solicitation); A183 (2017 certification form).

The § 1373 certification condition is consistent with the statutory text, as the district court correctly held.  *See* SA12-14, 59.  The phrase "applicable Federal laws" plainly covers laws that apply to Byrne JAG applicants, and § 1373 indisputably applies to Chicago—subsection (a) applies to any "local government entity or official," and subsection (b) applies to any "person or agency."  8 U.S.C. § 1373.  The district court correctly rejected the City's argument that "all other applicable Federal laws" refers to "the narrow body of law governing federal grant-making."  SA12.  That reading is inconsistent with the plain text of the statute, and if Congress had intended to limit the certification to "all laws applicable to Federal grantees," it could have done so expressly.

**2.**  The district court erred, however, in holding that § 1373 is not an "applicable Federal law[]" within the meaning of 34 U.S.C. § 10153(A)(5)(D) because it is unconstitutional.  Even setting aside the court's erroneous constitutional holding that § 1373 violates the Tenth Amendment's anticommandeering principle, *see infra* pp. 24-31, the court committed a statutory error in holding that, if § 1373 is unconstitutional as a stand-alone regulation, it "automatically drops out of the possible pool of 'applicable Federal laws' described in the Byrne JAG statute."  SA60.  The statutory question is whether Congress intended to make Byrne JAG applicants certify compliance with § 1373 as an "applicable Federal law[]."  The answer to that question

21

is yes. Even if the district court were correct that the Tenth Amendment bars § 1373 from being applied directly to states and localities as a stand-alone regulation, that would in no way undermine Congress's choice to include § 1373 as an "applicable Federal law[]" where it is constitutionally applied as a funding condition on Byrne JAG applicants.

Relatedly, the district court's conclusion depends on the flawed premise that § 1373 is a facially unconstitutional nullity. Even accepting the court's Tenth Amendment analysis, § 1373 would not cease to be a "Federal law[]" merely because some of its applications are unconstitutional, and, indeed, it would remain "applicable" in precisely these circumstances. Section 1373 does not have an independent enforcement mechanism, and it is entirely constitutional to enforce it as a condition on federal funds. Indeed, the court correctly recognized that "the anticommandeering doctrine does not limit the conditions agencies may attach to federal grants." SA61; *see* SA38; *South Dakota v. Dole*, 483 U.S. 203, 210 (1987); *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012). Accordingly, even under the district court's reasoning, when § 1373 is applied as a condition on federal funds, it is an "applicable federal law[]" because that application of the statute is constitutional.

In addition, as explained below, *see infra* pp. 32-39, it was permissible for the Acting Assistant Attorney General for OJP to require grant recipients to maintain compliance with § 1373 pursuant to his powers to place "special conditions" on all

grants and "determin[e] priority purposes" for formula grants, 34 U.S.C. § 10102(a)(6). *See* A64-66 (¶¶ 52-53).

**3.** Even if imposition of the § 1373 certification condition exceeded the Department's statutory authority, that would not support the district court's holding that the condition violates the separation of powers. *See* SA62. An error in grant administration would not further constitute a violation of the structural limitations on the three branches of government. *See Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution.").

## B. Section 1373 Does Not Violate the Tenth Amendment

**1.** At the outset, there was no need for the district court to decide whether § 1373 is consistent with the Tenth Amendment as a stand-alone statute because Chicago challenged only the § 1373 certification condition, not § 1373 itself. As discussed, the question whether Congress authorized the § 1373 certification condition does not depend on whether § 1373 itself violates the Tenth Amendment. *See supra* pp. 21-22. And the constitutionality of the § 1373 certification condition is governed by the Spending Clause (which it plainly satisfies). *See Dole*, 483 U.S. at 210; *National Fed'n of Indep. Bus.*, 567 U.S. at 537; SA38, 61.

The district court erred in asserting that Chicago's complaint raises a "challenge to the law *itself*, not to the law as a condition imposed on the grant." SA38. Chicago's

argument that § 1373 violates the Tenth Amendment was made only in support of its contention that the § 1373 certification condition is unconstitutional. The complaint states: "Section 1373 is therefore facially unconstitutional and cannot be validly imposed on Byrne JAG recipients as 'applicable Federal law[].'" A39 (¶ 133). The complaint repeatedly refers to the "three immigration-related conditions," "unconstitutional conditions," and "unconstitutional grant conditions." A38, 40 (¶¶ 126, 134). And critically, the relief Chicago sought in the relevant count of the complaint was expressly limited to the grant conditions: "Plaintiff is entitled to a declaration that the three immigration-related grant conditions the Department has sought to impose on FY 2017 Byrne JAG program participants violate the Tenth Amendment as well as an injunction preventing those conditions from going into effect." A40 (¶ 135); *see also* A45 (Prayer For Relief) ("Declare that all three immigration-related conditions for the FY 2017 Byrne JAG are unlawful and that Chicago complies with 8 U.S.C. § 1373."). This alone is sufficient reason for this Court to set aside the district court's holding and declaration that § 1373 violates the Tenth Amendment.

**2.** In any event, § 1373 is entirely consistent with the Tenth Amendment. As noted, the statute provides that "State" and "local government entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government entity or official from sharing with federal immigration authorities "information regarding the citizenship or immigration status" of any individual. 8 U.S.C. § 1373(a); *see also id.* § 1373(b) (similar).

24

The statute does not require jurisdictions to regulate in a particular area, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. NCAA*, 138 S. Ct. 1461 (2018). Nor does it require jurisdictions to enforce a federal regulatory scheme, as in *Printz v. United States*, 521 U.S. 898 (1997). Rather, § 1373 is a permissible information-sharing requirement that preempts state and local governments from hindering the federal government's enforcement of the immigration laws against individual aliens.

As applied here, § 1373 addresses the effects of state and local criminal custody on the INA's regulatory scheme concerning the removal and detention of individual aliens. The INA provides that DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). But within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.* § 1231(a)(1)(A), (B)(iii). During this removal period, DHS "shall detain" the alien, and, if the alien has a qualifying criminal history, "[u]nder no circumstance[s]" shall DHS release the alien during the removal period. *Id.* § 1231(a)(2). Similarly, when an alien is not yet subject to a final order of removal, DHS may execute a warrant to arrest and detain the alien under § 1226(a) when he is released from local criminal custody and, if the alien has a qualifying criminal history, DHS "shall" take the alien into custody "when the alien is released," *id.* § 1226(c).

In this context, a requirement that localities provide DHS with information regarding immigration status (such as an alien prisoner's release date, which is essential

to determining when and how the alien can be removed)—or § 1373's narrower requirement that localities *may not restrict* their officers from sharing such information with DHS—merely prevents localities from using the criminal-law authority over aliens that Congress has allowed them to retain in a manner that frustrates the operation of the parallel federal regulatory scheme for potential removal or detention upon aliens' release from local custody. Even if Congress had not enacted § 1373, that would follow from basic principles of obstacle preemption. *See Arizona v. United States*, 567 U.S. 387, 399 (2012). Congress did not create a scheme in which the federal government shall take custody of aliens upon their release from state criminal custody without having any mechanism for ascertaining when the alien would be released. The INA's allowance for state criminal custody to be completed before removal is premised on the assumption that the federal government will be able to learn such aliens' release dates and seamlessly take them into federal custody in a safe and orderly manner.

*Murphy* expressly did not disturb the bedrock principle that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." 138 S. Ct. at 1479. That principle could not save the statute at issue in *Murphy*, which did not "impose any federal restrictions on private actors," but instead sought to prohibit States from authorizing sports gambling schemes. *Id.* at 1481. By contrast, where, as here, both sovereigns regulate private individuals, the issue is not whether the federal government has commandeered a state, but whether the state's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. *See Hodel v.*

*Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-90 (1981) (It "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce.").

Indeed, especially given its exclusive authority over immigration, Congress could have provided for immediate removal of aliens regardless of pending local criminal prosecutions. Allowing local criminal custody to continue while requiring that localities help to effect (or at least not interfere with) an orderly transfer to federal officers at the end of such custody does not in any sense "commandeer" the locality into enforcing federal law, but merely places conditions on the locality's exercise of its own regulatory authority. *See Hodel*, 452 U.S. at 290-91 ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role."). In sum, so long as Congress is expressly (or implicitly) preempting a locality from interfering with federal regulation of private parties, it is not impermissibly regulating the locality directly.

**3.** The district court misunderstood the relevant analysis when it concluded that § 1373 was unconstitutional because, like the statute at issue in *Murphy*, it "does not evenhandedly regulate activities in which both private and government actors engage" and purportedly amounts to a "prohibition on certain local lawmaking." SA42, 44. As the Supreme Court admonished in *Murphy*, "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States"—even in a non-evenhanded way—but in substance

27

merely prevent the States from obstructing federal regulation of private parties. 138 S. Ct. at 1480; *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)). That is exactly what § 1373 does: it preempts states and localities from hindering the INA's regulation of aliens.

Nor is the analysis affected by the district court's observations that § 1373 addresses how local officials act on the job with respect to information they possess in their official capacities. SA42-43. Congress does not lose its ability to preempt localities from obstructing a federal regulatory scheme merely because the obstruction is caused by the locality's regulation of its own workforce.

Although the district court recognized that § 1373 is "part of a comprehensive federal statutory scheme to regulate immigration," SA39, it stated that this Court had already rejected the argument that non-compliance with the conditions would thwart federal law enforcement. SA49. In the preliminary-injunction appeal, the panel stated that this case does not involve "affirmative *interference* with federal law enforcement," and the "only conduct at issue here is the refusal of the local law enforcement to aid in civil immigration enforcement." *Chicago*, 888 F.3d at 282. That language was not necessary even to the panel's resolution of the sole question before it—concerning the statutory authority for the notice and access conditions—and the panel's dicta should be given no weight on the distinct constitutional question presented here whether § 1373 is a valid preemption provision.

Rather than just idly standing on the sidelines, Chicago has affirmatively restricted the ability of otherwise-willing local officials to provide the minimal cooperation needed for federal officials to exercise their duties. Furthermore, Chicago is refusing to help with the problems created by its own exercise of regulatory authority over persons who are also subject to federal regulatory authority. The district court thus got matters backwards in asserting that § 1373 "prevents Chicago from extricating itself from federal immigration enforcement" and forecloses Chicago's "option of non-participation in a federal program." SA46. By affirmatively asserting criminal custody over aliens whom the federal government seeks to detain and remove, Chicago's scheme will impair the exercise of the parallel federal scheme unless Chicago terminates custody in a manner that does not hinder the federal government in assuming custody. It is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause authorizes Congress to prohibit a locality from using its authority to create an obstacle to the functioning of the federal scheme.

The district court was fundamentally mistaken to object that § 1373 reduces "political accountability" by "mak[ing] it difficult for citizens to distinguish between state and federal policy in the immigration context." SA46-47. The federal government is not requiring Chicago to enforce federal law by arresting particular individuals or extending their custody. *See Printz*, 521 U.S. at 926 (citing *New York*, 505 U.S. at 188). Instead, it is the federal government that seeks to assume custody, and only of those aliens whom Chicago has already decided, for its own reasons, to take into custody

29

pursuant to state criminal law. The federal government bears sole responsibility for the actions it takes with respect to private persons pursuant to its regulatory authority.

**4.** Moreover, even if § 1373 could properly be analyzed apart from the INA's general regulatory scheme, a requirement to respond to, or not interfere with, a federal inquiry about an alien's release date or other information regarding immigration status would in no sense be "commandeering" local officials to execute federal law. In *Printz*, although the Court held that local law-enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law, it distinguished statutes that "require only the provision of information to the Federal Government," as they "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." 521 U.S. at 918. The Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)); *see Reno v. Condon*, 528 U.S. 141, 151 (2000) (Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of data bases").

The district court dismissed these passages from *Printz* as dicta, but it provided no explanation why they are incorrect. SA48-49. And while the court asserted that § 1373 is "more than just an information-sharing provision" because it prohibits

"certain rule making by state policymakers," SA51, the fact that § 1373 prohibits restrictions on information sharing rather than affirmatively mandating information sharing makes the statute *less intrusive* because it allows local and state officials to individually refuse to provide information to DHS. The same flaw plagues the district court's objection that § 1373 shifts power from "local policymakers" to "line-level employees." SA45.

Finally, contrary to the district court's suggestion that Congress was trying to evade the Tenth Amendment in structuring § 1373 as a prohibition on information-sharing restrictions rather than as a mandate to share information, SA43, § 1373's structure reflects the historical context that gave rise to its enactment. Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status" as a response, in part, to laws enacted by "[v]arious localities" that "prevent[ed] local officials from disclosing the immigration status of individuals to INS." H.R. Rep. No. 104-725, at 391 (1996) (Conf. Rep.). The House Conference Report explained that the statute was intended to "give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens." *Id.* at 383; *see id.* (the provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS"). In sum, § 1373 is valid under the Tenth Amendment both because it is limited to information sharing and because it is a valid preemption provision.

## II.    The Notice and Access Conditions for FY 2017 Are Valid

**A.**  The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes.  34 U.S.C. § 10152(a)(1).  Among other requirements set out specifically in the Byrne JAG statute, applicants must certify that they "will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(A)(5)(D), and agree to undertake various activities to advance law-enforcement goals.  For example, applicants must provide an assurance that they will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies."  *Id.* § 10153(A)(4), (5)(C).

Importantly, the Byrne JAG Program is also subject to the general authority of the Assistant Attorney General for OJP.  In particular, he may "exercise such other powers and functions as may be vested in [him] pursuant to [Chapter 101 of Title 34, which includes the Byrne JAG Program] or by delegation of the Attorney General, *including* placing *special conditions* on all grants, and determining *priority purposes* for formula grants."  34 U.S.C. § 10102(a)(6) (emphases added).  Notably, the phrase conferring this general authority to impose special conditions and priority purposes was added in the Violence Against Women and Department of Justice Reauthorization Act of 2005, the same law that created the current version of the Byrne JAG Program.  Pub. L. No. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006).  Special conditions established

32

by the Assistant Attorney General in past years have included: information technology requirements, A100 (¶¶ 26-27); protections for human research subjects, *id.* ¶ 29; restrictions on the purchase of certain military-style equipment, A102-03 (¶¶ 45-50); requirements regarding body armor purchases, A102 (¶¶ 38-39); and training requirements, A100 (¶¶ 32-33). None of these special conditions has ever been questioned by Congress or challenged as *ultra vires* by any grant recipient, including Chicago.

The Assistant Attorney General acted within his statutory authority in imposing the FY 2017 notice and access conditions, which are modest requirements designed to ensure information sharing, appropriate law-enforcement coordination to enhance public safety, and detention of aliens in state or local criminal custody in a manner that does not pose an obstacle to the orderly enforcement of the immigration laws.

In accepting the "notice" condition, the applicant agrees that, for any "program or activity" funded by the grant, it will have a policy of informing DHS of the scheduled release date of an alien in criminal custody after receiving a formal written request from DHS. A89 (¶ 56.1.B). In accepting the "access" condition, an applicant agrees that, with respect to any "program or activity" funded by the grant, it will have a policy providing that federal agents will be "given access" to correctional facilities for the purpose of meeting with aliens and to "inquire as to such individuals' right to be or remain in the United States." *Id.* (¶ 56.1.A).

In agreeing to these conditions, applicants simply agree that their law-enforcement activities will not impair the federal government's law-enforcement activities against suspected or convicted criminals. As discussed, *see supra* p. 25, the structure of the INA contemplates that states and localities may prosecute and incarcerate for criminal offenses aliens who may be removable and, indeed, aliens as to whom a removal order has already issued, but that federal custody of such aliens will commence upon their release. It is crucial to this cooperative law-enforcement framework that localities and states respond to requests for release-date information and permit federal agents to engage in voluntary interviews before releasing aliens from custody.

The propriety of the notice and access special conditions is underscored by the provisions in the Byrne JAG statute that authorize the Attorney General to "reasonably require" "programmatic" information about the funded program, 34 U.S.C. § 10153(A)(4), and to demand "appropriate coordination" with affected agencies, *id.* § 10153(A)(5)(C). Notice of an alien's release from local custody constitutes reasonable information about the law-enforcement and corrections programs funded by the grants. And access to an alien in local custody constitutes appropriate coordination with federal immigration authorities affected by those programs' custody over the alien.

**B.** The district court held that the notice and access conditions were unlawful for the reasons previously stated by it and this Court at the preliminary-injunction stage.

SA55-57; *see Chicago*, 888 F.3d at 284-87; SA8-11. Those reasons need not and should not be adopted here.

As a threshold matter, the preliminary-injunction opinion does not control here, because a higher standard applies at summary judgment than the mere "likelihood of success" standard that applied at the preliminary-injunction stage. *See, e.g., Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291-92 (7th Cir. 1998) (holding that court was not bound by determinations made in preliminary-injunction appeal when reviewing final judgment). The only question that was properly presented and decided by the prior panel opinion was whether the district court "err[ed] in determining that the City established a likelihood of success on the merits." *Chicago*, 888 F.3d at 287. Any broader statements were unnecessary to the panel's decision affirming the preliminary injunction and should not be controlling here.

On the merits, the reasons the district court and the panel gave are wrong and, indeed, would effectively read out Congress's express addition of general authority for the Assistant Attorney General to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).

To begin, the district court mistakenly concluded that § 10102(a)(6) is inapplicable to the Byrne JAG program because it was codified in a different subchapter than the Byrne JAG program. A9; *see also id.* (finding "no textual reference that applies this section to the rest of the chapter or specifically to the Byrne JAG program"). The fact that the Assistant Attorney General's general powers are set out in a subchapter

that creates the Office of Justice Programs and provides that the Assistant Attorney General heads the office, *see* 34 U.S.C. §§ 10101-10102, while the grant programs are set out in separate subchapters, does not alter the fact that the Assistant Attorney General for OJP oversees those grant programs, *see id.* § 10141(b); OJP, *About Us*, https://ojp.gov/about/about.htm (OJP organizational chart), or that he is the authorizing official who signs the Byrne JAG award documents imposing the disputed conditions, *see* A50. The statute that provides his general powers thus applies to his actions in administering the Byrne JAG program.

Contrary to the prior panel's suggestion, *Chicago*, 888 F.3d at 285, § 10102 was a natural place for Congress to list the special-conditions and priority-purposes powers precisely because they apply to all grant programs overseen by the Assistant Attorney General. And contrary to the district court's assertion that the Byrne JAG program was "later in time" than the provision assigning powers to the Assistant Attorney General, A9, Congress enacted the provision that is now § 10102(a)(6) in the same bill that created the Byrne JAG program. *See* Pub. L. No. 109-162, §§ 1111, 1152(b), 119 Stat. at 3094, 3113.

Indeed, if the district court were correct that § 10102(a)(6) does not apply outside of Subchapter I, then the power to "determin[e] priority purposes for formula grants" would have no meaning because Subchapter I does not establish any formula grants. *See* 34 U.S.C. §§ 10101-10111. Likewise, the panel was mistaken to suggest that Congress's addition of language that the Assistant Attorney General's powers "includ[e]

placing special conditions on all grants, and determining priority purposes for formula grants," 34 U.S.C. § 10102(a)(6), did not add to the Assistant Attorney General's authority at all, but merely identified pre-existing powers. *Chicago*, 888 F.3d at 284-85. The panel's interpretation renders Congress's express "inclu[sion]" of the power to "plac[e] special conditions on all grants" meaningless. *See American Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933) ("In definitive provisions of statutes and other writings, 'include' is frequently, if not generally, used as a word of extension or enlargement rather than as one of limitation or enumeration."); *United States v. Latham*, 754 F.2d 747, 750 (7th Cir. 1985).

Of course, it is a cardinal principle of statutory interpretation that "no clause, sentence, or word shall be [rendered] superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). This is all the more so given that Congress expressly *added* the "special conditions" and "priority purposes" authority, which would have been entirely unnecessary if it merely referred to pre-existing authority. And this Court should be particularly wary of interpreting the language to be a nullity because doing so would render invalid other conditions that past Assistant Attorneys General have imposed. *See supra* pp. 32-33.

The district court also erred in finding that if § 10102(a)(6) applied to the Byrne JAG program, it would render superfluous the statutory provision that authorizes the Director of the Bureau of Justice Assistance to determine terms and conditions for certain discretionary grants. SA9-10. Even as applied to discretionary grants,

§ 10102(a)(6)'s grant of authority to the Assistant Attorney General *himself* does not render superfluous the separate grant of authority to the Director, his *subordinate* official. Moreover, § 10102(a)(6) gave the Assistant Attorney General broader authority than the Director's authority because it authorizes the Assistant Attorney General to place special conditions not just on discretionary grants, but on "all grants," including "formula" grants like the Byrne JAG awards.

The district court likewise erred in concluding that giving effect to § 10102(a)(6) would be at odds with Congress's express statement that the Attorney General can impose "reasonable conditions" when administering a particular grant program designed to combat violence against women. SA10 (citing 34 U.S.C. § 10446(e)(3)); *see Chicago*, 888 F.3d at 287. That program is not administered by the Assistant Attorney General for OJP, but instead is administered by the Violence Against Women Office, which is a "separate and distinct office" headed by a Director "who shall report to the Attorney General." 34 U.S.C. § 10442(b). That Congress used different language in connection with that distinct program has no bearing on the issue presented here.

The district court was similarly mistaken to find it "suspect to ground the Attorney General's authority" in "the power Congress conferred on the *Assistant* Attorney General." SA10-11. The Assistant Attorney General—a high-ranking Senate-confirmed officer—imposed the grant award conditions here. *See* A50. Moreover, Congress provided that the Attorney General "shall have final authority over all

functions, including any grants . . . made, or entered into, for the Office of Justice Programs." 34 U.S.C. § 10110(2).

In all events, any attempts to limit the Assistant Attorney General's power to impose "special conditions" ignore his complementary power to "determin[e] priority purposes for formula grants" like the Byrne JAG program. *See* A175 (announcing that that compliance with the notice and access conditions "will be an authorized and priority purpose of the award"). And the panel's statement that the authority to impose special conditions is inconsistent with formula grants is plainly inconsistent with the statutory text, which authorizes "special conditions on *all* grants," not just non-formula grants. 34 U.S.C. § 10102(a)(6) (emphasis added).

In sum, none of the district court's or the panel's reasons refutes the plain-text conclusion that the Assistant Attorney General had statutory authority to impose the notice and access conditions.

## III. The District Court Improperly Extended the Injunction to Entities Other Than Chicago

At a minimum, any injunction should be limited to Chicago. Despite this Court's earlier grant of en banc review of the nationwide scope of the preliminary injunction entered by the district court and affirmed by the panel majority, the district court insisted that it "will not depart from its earlier analysis," SA75, and entered a permanent injunction that again improperly extends relief to non-parties.

A.   **Article III Standing Requirements Preclude an Injunction That Extends Beyond What Is Necessary to Redress Chicago's Injury**

**1.**   To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quotation marks omitted). "[S]tanding is not dispensed in gross," and the plaintiff must establish standing "separately for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotation marks omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion.").

The Supreme Court recently reaffirmed these principles in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), concluding that a set of voters had not demonstrated standing to challenge alleged statewide partisan gerrymandering of Wisconsin legislative districts. The plaintiffs alleged that voters who shared their political views were disadvantaged by the way district lines were drawn statewide, and that they were therefore entitled to challenge the entire state map. *Id.* at 1924-25.   But the Court concluded that a "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in

fact,'" and that a voter's "harm [from] the dilution of [his] vote[] . . . is district specific" because it "results from the boundaries of the particular district in which he resides." *Id.* at 1930 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Accordingly, the Court held that "the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district," not the broader remedy of "restructuring all of the State's legislative districts." *Id.* at 1930-31. And the Court "caution[ed]" that "'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934 (quoting *Cuno*, 547 U.S. at 353); *accord id.* at 1933 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").

Likewise, in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Supreme Court held that the plaintiffs lacked standing to challenge Forest Service regulations after the parties had resolved the controversy regarding the application of the regulations to the project that had caused the plaintiffs' alleged injury. Noting that the plaintiffs' "injury in fact with regard to that project ha[d] been remedied," *id.* at 494, the Court held that to allow the plaintiffs to challenge the regulations "apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Id.*; *see also Lewis*, 518 U.S. at 357 ("The actual-injury requirement would hardly serve [its] purpose . . . if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration.").

These cases make clear that where no class has been certified, no justiciable controversy exists once the injury to the actual plaintiffs has been remedied. Thus, in *Alvarez v. Smith*, 558 U.S. 87 (2009), the plaintiffs lacked standing to seek declaratory and injunctive relief against a state's practice of keeping property in custody without a prompt post-seizure hearing because the plaintiffs had already received the seized property or forfeited their claims to it. *Id.* at 92. The Supreme Court explained that since class certification had been denied, the "only disputes relevant here are those between these six plaintiffs and the State's Attorney . . . and those disputes are now over." *Id.* at 93; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (the plaintiffs "d[id] not represent a class, so they could not seek to enjoin [an agency] order on the ground that it might cause harm to other parties").

Prior to the panel majority's decision (which was vacated), this Court's precedents have adhered to these settled principles. This Court has properly recognized that "plaintiffs lack standing to seek—and the district court therefore lacks authority to grant—relief that benefits third parties." *McKenzie v. Chicago*, 118 F.3d 552, 555 (7th Cir. 1997). As this Court has emphasized, "[t]he general rule is that a plaintiff has standing to sue only for injuries to his *own* interests that can be remedied by a court order." *Laskowski v. Spellings*, 546 F.3d 822, 825 (7th Cir. 2008).

**2.** The brief discussion of Article III standing by the panel majority and the district court at the preliminary-injunction stage disregarded these principles. The panel majority concluded that because "[t]he City had standing to seek injunctive relief," there

was no further Article III constraint on "the terms of that injunction." *Chicago*, 888 F.3d at 289. The district court similarly concluded that, having found what it termed a "constitutional violation"—though the holding was, in fact, a statutory one—"[it] is the nature and scope of the constitutional violation that defines the remedy for this violation, not the particular plaintiff." A110-11 (quotation marks omitted). That reasoning is irreconcilable with the precedent of the Supreme Court and this Court.

In *Gill*, as discussed above, the Supreme Court emphasized that "standing is not dispensed in gross" and that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." 138 S. Ct. at 1934 (quotation marks omitted). The Court thus held that the proper remedy in a vote-dilution challenge brought by an individual voter entails "revising only such districts as are necessary to reshape the voter's district" rather than "restructuring all of the State's legislative districts," *notwithstanding* that the alleged policy of partisan gerrymandering was "statewide in nature" rather than limited to each plaintiff's particular district. *Id.* at 1930-31. That holding makes absolutely clear that it is the scope of the plaintiff's injury, and not the scope of the defendant's policy, that governs the permissible scope of an injunction under Article III.

Likewise, in *McKenzie*, which the panel majority did not even address, this Court summarily reversed an injunction that precluded Chicago from operating a demolition program with respect to entities other than the plaintiffs. This Court noted the district court's conclusion "that it was appropriate to enjoin the entire program, despite the lack of class certification, in order to prevent the City from violating the Constitution."

*McKenzie*, 118 F.3d at 555.  As this Court explained, the district court's rationale "assume[d] an affirmative answer to the question at issue: whether a court may grant relief to non-parties.  The right answer is no." *Id.*  This Court held that "the injunction exceeded the district judge's powers under Article III of the Constitution." *Id.* at 555 n.*.  It reasoned that the plaintiffs' "interests c[ould] be protected by an injunction that prevents the City from demolishing their properties," so the district court was wrong to "enjoin the entire program, despite the lack of class certification." *Id.* at 555.  As this Court explained, where "a class has not been certified, the only interests at stake are those of the named plaintiffs." *Id.* (citing *Baxter v. Palmigiano,* 425 U.S. 308, 310 n.1 (1976)).  The Article III requirements that Chicago properly invoked as a defendant apply with equal force when it is a plaintiff.

Similarly, in *Scherr v. Marriott International, Inc.*, 703 F.3d 1069 (7th Cir. 2013), this Court held that the plaintiff did not have standing to seek an injunction that went beyond remedying her personal injury, even though the defendant allegedly committed the same legal violation more broadly. *Id.* at 1075.  This Court reasoned that although the plaintiff had established that she faced an imminent injury from the defendant's use of spring-hinged door closers at one particular hotel, she had not established that she would be imminently injured by the defendant's use of the same door closers at the defendant's other hotels, and thus she did not have standing to pursue injunctive relief relating to other hotels. *Id.*

The panel majority asserted that past cases "have not found a lack of jurisdiction solely because a nationwide injunction was imposed in the absence of a class action," *Chicago*, 888 F.3d at 290, but that assertion is misguided for two reasons. *First*, as this Court recognized in *McKenzie*, broad injunctions are sometimes necessary to provide "effective relief to the plaintiffs," such as in cases involving "reapportionment and school desegregation." 118 F.3d at 555; *accord Gill*, 138 S. Ct. at 1930. The appropriate scope of relief varies from case to case depending on what is necessary to fully redress the plaintiff's own injury. For example, in *Gill*, it would not have been improper to redraw the plaintiffs' own districts if they had been unconstitutionally gerrymandered even though that would incidentally benefit other similarly situated voters within those districts, but it was impermissible to go beyond redressing the plaintiffs' own asserted vote-dilution injuries by entertaining a challenge to the entire state map. 138 S. Ct. at 1930-31. Here, the panel majority did not and could not contend that a nationwide injunction is necessary to remedy Chicago's own injury, which can be fully addressed by an injunction limited solely to its own grant. *Second*, even if some cases affirmed overbroad injunctions without addressing Article III's standing requirements, "the existence of unaddressed jurisdictional defects has no precedential effect." *Lewis*, 518 U.S. at 352 n.2. The panel majority did not cite any case in which the Supreme Court or this Court has held that Article III permits an injunction to go beyond what is necessary to redress the plaintiff's own injury, and the government is not aware of any such precedent conflicting with the cases cited above.

In short, because a court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," *Gill*, 138 S. Ct. at 1933, Chicago does not have standing to seek an injunction broader than necessary to remedy its own injury. And Chicago properly does not claim that an injunction that extends to all grant applicants is necessary to remedy its claimed harm from the imposition of the challenged grant conditions. Thus, having granted permanent injunctive relief to Chicago, the district court had no authority to extend its injunction to jurisdictions across the country.

**B.      Traditional Equitable Principles Preclude an Injunction That Extends Beyond What Is Necessary to Redress Chicago's Injury**

**1.** Even apart from Article III's jurisdictional constraints, injunctions that go beyond a plaintiff's own injuries exceed the power of a court sitting in equity. Several equitable principles cut decisively against such injunctions.

*First*, paralleling the rule under Article III, the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (granting stay of military-wide injunction except as to individual plaintiff). For example, in *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379 (4th Cir. 2001), the Fourth Circuit vacated an injunction that precluded an agency from enforcing, against any entity, a regulation found to have violated the First

46

Amendment. The court explained that an injunction covering the plaintiff "alone adequately protects it from the feared prosecution," and that "[p]reventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]." *Id.* at 393. Likewise, in *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011), although the Ninth Circuit held that an agency's regulation was facially invalid, it vacated the district court's injunction insofar as it barred the agency from enforcing the regulation against entities other than the plaintiff. *Id.* at 664 ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification.") (alteration in original; quotation marks omitted)).

*Second*, longstanding historical practice confirms that injunctions are limited to what is necessary to remedy the plaintiff's injury. It is well established that the scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2427-28 (Thomas, J., concurring) (quoting *The Federalist No. 78*, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id.* at 2428. It is thus unsurprising that injunctions like the one here "are a recent development,

emerging for the first time in the 1960s and dramatically increasing in popularity only very recently." *Id.* at 2426.

The absence of nationwide injunctions was certainly not for lack of opportunities to seek such relief against federal enactments or policies that were facially invalid. To give a particularly stark counter-example, in the 1930s, courts issued roughly 1600 injunctions against enforcement of a single federal statutory provision. Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 434 (2017). While in some cases before traditional courts of equity, small groups of plaintiffs could join together to bring a "bill of peace" on behalf of an affiliated group, this "kind of proto-class action" was not extended to equitable relief against federal action on behalf of entirely absent, unrepresented parties. *See id.* at 426-27.

*Third*, nationwide injunctions "take a toll on the federal court system— preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring); *see also* A119 ("Nationwide injunctions may increase forum shopping, lead to conflicting injunctions, and stymie the development of the law within the Circuits prior to Supreme Court review."). In "'foreclosing adjudication by a number of different courts and judges,'" nationwide injunctions "deprive[] the Supreme Court of the benefit it receives from permitting multiple courts of appeals to explore a difficult question before it grants certiorari." *Los Angeles Haven Hospice*, 638 F.3d at 664 (quoting *Yamasaki*, 442 U.S. at

702); *see also Virginia Soc'y for Human Life*, 263 F.3d at 393 (permitting a court to issue a nationwide injunction "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue'" (quoting *United States v. Mendoza*, 464 U.S. 154, 160 (1984))). And as the panel majority and the district court both acknowledged, the availability of nationwide injunctions gives rise to "potential forum shopping by plaintiffs." *Chicago*, 888 F.3d at 288; A119.

*Fourth*, issuing injunctions that provide relief to non-parties subverts the class-action mechanism provided under the Federal Rules of Civil Procedure. *See McKenzie*, 118 F.3d at 555; *Zepeda v. U.S. INS*, 753 F.2d 719, 727-28 (9th Cir. 1983). The availability of nationwide injunctions without class certification creates a fundamentally inequitable asymmetry, whereby non-parties can claim the benefit of a single favorable ruling, but are not bound by a loss and can thus go "run[ning] off to the 93 other districts for more bites at the apple." *Chicago*, 888 F.3d at 298 (Manion, J., dissenting in part). In other words, if Chicago prevails, the court issues the relief that might have been appropriate had it certified a class of all grant applicants; but if the federal government prevails, it gains none of the benefits of prevailing in a class action.

*Finally*, and relatedly, an injunction that extends beyond a plaintiff's injury to cover potential plaintiffs nationwide undermines *Mendoza*'s holding "that nonmutual offensive collateral estoppel simply does not apply against the government." 464 U.S. at 162. That bar on non-parties' invocation of issue preclusion against the federal government is largely meaningless if the first party to obtain a favorable ruling against

49

the government can obtain an injunction that extends to all non-parties who would otherwise be forced to relitigate the issue under *Mendoza*.

**2.** The preliminary-injunction opinions of the panel majority and the district court failed to provide any persuasive justification for their disregard of these equitable principles.

**a.** Both opinions relied heavily on the Supreme Court's decision to grant in part but deny in part a stay of the injunction in *Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (per curiam) (*IRAP*), *vacated as moot*, No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017). *See Chicago*, 888 F.3d at 288-90; A113-15. Although the *IRAP* per curiam opinion did not explicitly address the merits of entering injunctive relief broader than necessary to redress a plaintiff's own injuries, the panel majority inferred that a majority of the Court must have implicitly rejected the government's argument simply because the dissenting Justices "raised the same objections . . . but those arguments did not carry the day." *Chicago*, 888 F.3d at 289; *see IRAP*, 137 S. Ct. at 2090 (Thomas, J., dissenting).

This inference was inappropriate. The Supreme Court's partial denial of a stay did not likely, let alone necessarily, connote a sub silentio repudiation of the established principle that injunctive relief should be tailored to remedy a plaintiff's injury. In conducting a discretionary assessment of whether a stay was appropriate, the Court was under no obligation to reach the merits of every question presented, and indeed it emphasized instead solely its discretion in balancing the equities. *IRAP*, 137 S. Ct. at

2087-88. In particular, the Justices who joined the per curiam opinion could have decided to deny the stay in part on equitable grounds regardless of whether there was a likelihood of reversal on the merits. *See Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (outlining standard for a stay). Alternatively, those Justices could have decided that the broad injunction in *IRAP* was necessary to fully redress plaintiffs' own injuries.

The latter possibility is bolstered by a dissent later issued in *Trump v. Hawaii*. Justice Sotomayor, joined by Justice Ginsburg, noted that she would have affirmed a nationwide injunction issued against a successor to the executive order at issue in *IRAP*, based on her view that, "[g]iven the nature of the Establishment Clause violation and the unique circumstances of [the] case, the imposition of a nationwide injunction was 'necessary to provide complete relief to the plaintiffs.'" *Hawaii*, 138 S. Ct. at 2446 n.13 (Sotomayor, J., dissenting) (quoting *Madsen*, 512 U.S. at 765). Thus, far from rejecting the standard advanced by the government here and in *IRAP*, two Justices of the six-member *IRAP* per curiam expressed their view that the government's standard was simply satisfied in *Hawaii*. Regardless of whether those Justices were correct (or whether their view can be attributed to other members of the *IRAP* per curiam), their reasoning highlights the error in attributing a rationale to the Supreme Court that did not appear in its opinion. Even before Justices Sotomayor and Ginsburg clarified their views, there was no basis for presuming that the Supreme Court resolved the issue without discussing it, much less with the clarity necessary for this Court to overrule its decision in *McKenzie*.

**b.** The panel majority and the district court likewise erred in justifying the breadth of the injunction on the theory that this case "presents purely a narrow issue of law" that "will not vary from one locality to another." *Chicago*, 888 F.3d at 290-91; *accord* SA19; A111-12. This reasoning conflates the scope of Chicago's legal argument on the merits with the scope of relief necessary to remedy Chicago's alleged injury from the violation, and it is inconsistent with each of the equitable principles outlined above.

Nothing in the basic equitable rule that injunctions should "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen*, 512 U.S. at 765 (quoting *Yamasaki*, 442 U.S. at 702), suggests that the rule is limited only to cases that turn on their facts rather than resolving purely legal questions. As other courts have recognized, that a challenge is facial does not change the operation of the basic principle. Thus, in *Los Angeles Haven Hospice*, the Ninth Circuit agreed with the plaintiff that an agency regulation was arbitrary and capricious, 638 F.3d at 661, but reversed the district court's determination that "the facial invalidity of the . . . regulation" permitted a nationwide injunction, *id.* at 665. The Fourth Circuit took the same approach in *Virginia Society for Human Life*, narrowing a nationwide injunction issued against an agency regulation it found unconstitutional where preventing enforcement of the regulation "against other parties in other circuits does not provide any additional relief" to the plaintiff. 263 F.3d at 393. The lack of historical support for the injunction issued here further underscores the point—courts have long ruled on pure issues of law without suggesting that such a ruling permits nationwide relief.

Likewise, the panel majority's suggestion that purely legal questions do "not present the situation in which the courts will benefit from allowing the issue to percolate through additional courts and wind its way through the system in multiple independent court actions," *Chicago*, 888 F.3d at 291, is inconsistent with the Supreme Court's teachings. *Mendoza* emphasizes that the government is likely to be involved in multiple suits which "involve the same legal issues," and it highlights the negative effects on judicial decisionmaking of a ruling that "freez[es] the first final decision rendered on a particular legal issue." 464 U.S. at 160. And as Judge Manion pointed out, the panel majority's approach would suggest that "a nationwide injunction is appropriate in every statutory-interpretation case. That cannot be the law." *Chicago*, 888 F.3d at 297 (Manion, J., dissenting in part).

Similarly, the panel majority's suggestion that "duplicative litigation" supports the entry of a nationwide injunction, *Chicago*, 888 F.3d at 292, turns *Mendoza* on its head. The point of *Mendoza* is that the Supreme Court "benefit[s] . . . from permitting several courts of appeals" to consider "important questions of law," 464 U.S. at 160, and the Court specifically concluded that the "economy interests underlying a broad application of collateral estoppel" to questions of "legal doctrine" are outweighed by concerns "peculiarly affect[ing]" litigation against the government, *id.* at 163. Indeed, if anything, such percolation is more valuable, not less, for pure legal questions as opposed to fact-bound issues; appellate courts exercising de novo review of a pure legal question can gain insights by comparing differing analyses of a common question, whereas appellate

comparison of decisions arising in fact-heavy contexts is less useful precisely because of the varying factual record in each case and the deferential appellate review of factual findings.

The conflict with class-action rules is also starker with respect to pure questions of law. Such questions are most amenable to class-action treatment, *see* Fed. R. Civ. P. 23(a)-(b) (requiring, *inter alia*, commonality and predominance of questions), and thus it is most inequitable for plaintiffs to end-run that procedure through a "one-way-ratchet . . . nationwide injunction." *Chicago*, 888 F.3d at 298 (Manion, J., dissenting in part). This case is a perfect illustration of the problem, as other jurisdictions have attempted to take advantage of Chicago's injunction by filing amicus briefs rather than their own lawsuits—and even worse, the panel majority treated this litigation gamesmanship as a *benefit* of a nationwide injunction. *Id.* at 292. In any event, there is no basis for presuming that all of the nearly 1,000 applicants for Byrne JAG funds share Chicago's opposition to the conditions as a matter of either law or policy.

**c.** Finally, the panel majority's belief that "the structure of the Byrne JAG program itself" supports entry of a nationwide injunction was incorrect. *Chicago*, 888 F.3d at 292. The panel majority assumed that Byrne JAG funds would be redistributed from jurisdictions that lost funding, but it failed to explain how that redistribution required a nationwide injunction to protect Chicago's interests; an injunction limited to Chicago would protect it from any harm. Indeed, as Judge Manion pointed out, even assuming that funds withheld from other jurisdictions would be redistributed in a way

54

that would affect the City, "Chicago would *benefit* by getting more money." *Id.* at 299 (Manion, J., dissenting in part).

In sum, the settled equitable limits on the statutory authority to issue injunctive relief—which complement Article III's constitutional limits in awarding any relief—apply with full force here and require vacatur of the permanent injunction's extension to non-plaintiffs.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed or at least limited to Chicago.

Respectfully submitted,

JOSEPH H. HUNT
  *Assistant Attorney General*

JOHN R. LAUSCH, JR.
  *United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK B. STERN

  *s/ Daniel Tenny*
DANIEL TENNY
KATHERINE TWOMEY ALLEN
BRAD HINSHELWOOD
LAURA MYRON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1838*
  *daniel.tenny@usdoj.gov*

OCTOBER 2018

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Circuit Rule 32(c) because it contains 13,990 words. This brief also complies with the typeface and type-style requirements of Circuit Rule 32(b) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Daniel Tenny*
Daniel Tenny

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I further certify that I will cause 15 paper copies of this brief to be received by the Clerk within seven days of the Notice of Docket Activity generated upon acceptance of the brief, in compliance with 7th Circuit Rule 31(b) and ECF Procedure (h)(2).

Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ Daniel Tenny*
Daniel Tenny

# CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in the appendix.


*s/ Daniel Tenny*
Daniel Tenny

**STATUTORY ADDENDUM**

**TABLE OF CONTENTS**

34 U.S.C. § 10102 ...................................................................................A1

34 U.S.C. § 10152 ...................................................................................A2

34 U.S.C. § 10153 ...................................................................................A4

8 U.S.C. § 1373 ......................................................................................A7

**34 U.S.C. § 10102**

## § 10102. Duties and functions of Assistant Attorney General.

(a) Specific, general and delegated powers

The Assistant Attorney General shall--

(1) publish and disseminate information on the conditions and progress of the criminal justice systems;

(2) maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;

(3) provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;

(4) maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;

(5) coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and

(6) exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

(b) Annual report to President and Congress

The Assistant Attorney General shall submit an annual report to the President and to the Congress not later than March 31 of each year.

**34 U.S.C. § 10152**

**§ 10152. Description.**

(a) Grants authorized

(1) In general

From amounts made available to carry out this part, the Attorney General may, in accordance with the formula established under section 10156 of this title, make grants to States and units of local government, for use by the State or unit of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of the following programs:

(A) Law enforcement programs.

(B) Prosecution and court programs.

(C) Prevention and education programs.

(D) Corrections and community corrections programs.

(E) Drug treatment and enforcement programs.

(F) Planning, evaluation, and technology improvement programs.

(G) Crime victim and witness programs (other than compensation).

(H) Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

(2) Rule of construction

Paragraph (1) shall be construed to ensure that a grant under that paragraph may be used for any purpose for which a grant was authorized to be used under either or both of the programs specified in section 10151(b) of this title, as those programs were in effect immediately before January 5, 2006.

(b) Contracts and subawards

A State or unit of local government may, in using a grant under this part for purposes authorized by subsection (a), use all or a portion of that grant to contract with or make one or more subawards to one or more--

(1) neighborhood or community-based organizations that are private and nonprofit; or

(2) units of local government.

(3) Repealed. Pub.L. 109-271, § 8(h)(3), Aug. 12, 2006, 120 Stat. 767

(c) Program assessment component; waiver

(1) Each program funded under this part shall contain a program assessment component, developed pursuant to guidelines established by the Attorney General, in coordination with the National Institute of Justice.

(2) The Attorney General may waive the requirement of paragraph (1) with respect to a program if, in the opinion of the Attorney General, the program is not of sufficient size to justify a full program assessment.

(d) Prohibited uses

Notwithstanding any other provision of this Act, no funds provided under this part may be used, directly or indirectly, to provide any of the following matters:

(1) Any security enhancements or any equipment to any nongovernmental entity that is not engaged in criminal justice or public safety.

(2) Unless the Attorney General certifies that extraordinary and exigent circumstances exist that make the use of such funds to provide such matters essential to the maintenance of public safety and good order--

(A) vehicles (excluding police cruisers), vessels (excluding police boats), or aircraft (excluding police helicopters);

(B) luxury items;

(C) real estate;

(D) construction projects (other than penal or correctional institutions); or

(E) any similar matters.

(e) Administrative costs

Not more than 10 percent of a grant made under this part may be used for costs incurred to administer such grant.

(f) Period

The period of a grant made under this part shall be four years, except that renewals and extensions beyond that period may be granted at the discretion of the Attorney General.

(g) Rule of construction

Subparagraph (d)(1) shall not be construed to prohibit the use, directly or indirectly, of funds provided under this part to provide security at a public event, such as a political convention or major sports event, so long as such security is provided under applicable laws and procedures.

**34 U.S.C. § 10153**

## § 10153. Applications

(A) In general

To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application to the Attorney General within 120 days after the date on which funds to carry out this part are appropriated for a fiscal year, in such form as the Attorney General may require. Such application shall include the following:

(1) A certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities.

(2) An assurance that, not fewer than 30 days before the application (or any amendment to the application) was submitted to the Attorney General, the application (or amendment) was submitted for review to the governing body of the State or unit of local government (or to an organization designated by that governing body).

(3) An assurance that, before the application (or any amendment to the application) was submitted to the Attorney General--

(A) the application (or amendment) was made public; and

(B) an opportunity to comment on the application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure makes such an opportunity available.

(4) An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require.

(5) A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), that--

(A) the programs to be funded by the grant meet all the requirements of this part;

(B) all the information contained in the application is correct;

(C) there has been appropriate coordination with affected agencies; and

(D) the applicant will comply with all provisions of this part and all other applicable Federal laws.

(6) A comprehensive Statewide plan detailing how grants received under this section will be used to improve the administration of the criminal justice system, which shall--

(A) be designed in consultation with local governments, and representatives of all segments of the criminal justice system, including judges, prosecutors, law enforcement personnel, corrections personnel, and providers of indigent defense services, victim services, juvenile justice delinquency prevention programs, community corrections, and reentry services;

(B) include a description of how the State will allocate funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title;

(C) describe the process used by the State for gathering evidence-based data and developing and using evidence-based and evidence-gathering approaches in support of funding decisions;

(D) describe the barriers at the State and local level for accessing data and implementing evidence-based approaches to preventing and reducing crime and recidivism; and

(E) be updated every 5 years, with annual progress reports that--

(i) address changing circumstances in the State, if any;

(ii) describe how the State plans to adjust funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title;

(iii) provide an ongoing assessment of need;

(iv) discuss the accomplishment of goals identified in any plan previously prepared under this paragraph; and

(v) reflect how the plan influenced funding decisions in the previous year.

(b) Technical assistance

(1) Strategic planning

Not later than 90 days after December 16, 2016, the Attorney General shall begin to provide technical assistance to States and local governments requesting support to develop and implement the strategic plan required under subsection (a)(6). The Attorney General may enter into agreements with 1 or more non-governmental organizations to provide technical assistance and training under this paragraph.

(2) Protection of constitutional rights

Not later than 90 days after December 16, 2016, the Attorney General shall begin to provide technical assistance to States and local governments, including any agent thereof with responsibility for administration of justice, requesting support to meet the obligations established by the Sixth Amendment to the Constitution of the United States, which shall include--

(A) public dissemination of practices, structures, or models for the administration of justice consistent with the requirements of the Sixth Amendment; and

(B) assistance with adopting and implementing a system for the administration of justice consistent with the requirements of the Sixth Amendment.

(3) Authorization of appropriations

For each of fiscal years 2017 through 2021, of the amounts appropriated to carry out this subpart, not less than $5,000,000 and not more than $10,000,000 shall be used to carry out this subsection.

## 8 U.S.C. § 1373

## § 1373. Communication between government agencies and the Immigration and Naturalization Service

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

# SHORT APPENDIX

# TABLE OF CONTENTS

**Page**

Memorandum Opinion and Order, 264 F. Supp. 3d 933
  (N.D. Ill. 2017) (Dkt. No. 78) ...............................................................1

Memorandum Opinion and Order (July 27, 2018) (Dkt. No. 198)................................21

Final Judgment and Order (Aug. 15, 2018) (Dkt. No. 211) .............................................79

Judgment (Aug. 15, 2018) (Dkt. No. 212) ..........................................................84

(3) Terry Baker's Motion to Dismiss, R. 46, is granted, and Baker is dismissed without prejudice for lack of personal jurisdiction; and

(4) Craig Stelzer's Motion to Dismiss, R. 37, is denied.

IT IS SO ORDERED



**The CITY OF CHICAGO, Plaintiff,**

**v.**

**Jefferson Beauregard SESSIONS, III, Attorney General of the United States, Defendant.**

**Case No. 17 C 5720**

United States District Court, N.D. Illinois, Eastern Division.

Signed 09/15/2017

**Background:** City brought action against Attorney General, challenging on constitutional grounds "sanctuary cities" conditions imposed for annual federal grants from Edward Byrne Memorial Justice Assistance Grant Program for funding of law enforcement initiatives, which conditions required additional cooperation and information-sharing with federal immigration officials. City filed motion for preliminary injunction.

**Holdings:** The District Court, Harry D. Leinenweber, J., held that:

(1) city was likely to succeed on merits of claim that Congress did not delegate authority to impose conditions relating to notice of and access to detainees in local correctional facilities who were suspected of immigration violations;

(2) city was not likely to succeed on merits of challenge to condition requiring certification of compliance with federal statute prohibiting local government and law enforcement officials from re-

stricting the sharing of information with Immigration and Naturalization Service (INS) regarding citizenship status of any individual;

(3) city was not likely to succeed on merits of Tenth Amendment challenge to federal statute prohibiting restrictions on sharing of information with INS;

(4) city demonstrated irreparable harm, as element for issuance of preliminary injunction with respect to notice and access conditions; and

(5) preliminary injunction would be nationwide.

Motion granted in part and denied in part.

**1. Injunction** ⚖1092

To warrant the entry of a preliminary injunction, the movant must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in its favor, and that an injunction is in the public interest.

**2. Injunction** ⚖1109

When determining whether to grant a preliminary injunction, the court must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one.

**3. Constitutional Law** ⚖2406, 2407

Under constitutional separation of powers, Congress may permissibly delegate authority and discretion to the Executive Branch through statute, and the contours of the Executive Branch's authority are circumscribed by statute because the power to act is authoritatively prescribed by Congress.

**4. Statutes** ⚖1109

If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that lan-

guage must ordinarily be regarded as conclusive.

**5. Statutes ☞1151, 1152**

The language and design of the statute as a whole may guide the court in determining the plain meaning of the text.

**6. United States ☞314(2)**

Congress did not delegate authority to the Executive Branch to impose substantive conditions on formula grants under the Edward Byrne Memorial Justice Assistance Grant Program, which grants provide state and local law enforcement efforts with additional funds for personnel, equipment, training, and other criminal justice needs. 34 U.S.C.A. § 10151 et seq.

**7. Statutes ☞1377**

Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.

**8. Statutes ☞1371, 1377**

The court does not lightly assume that Congress has omitted from its adopted text in a statute requirements that it nonetheless intends to apply, and the court's reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.

**9. Injunction ☞1496**

City was likely to succeed on merits, as element for issuance of preliminary injunction in action against Attorney General, of constitutional challenge to "sanctuary cities" conditions, relating to notice of and access to detainees in local correctional facilities who were suspected of immigration violations, imposed for annual federal grants from Edward Byrne Memorial Justice Assistance Grant Program that were relied on by city for law enforcement initiatives; Congress did not delegate authori-

ty to Executive Branch to impose those conditions on formula grants under the program, so that Attorney General's efforts to impose those conditions violated constitutional separation of powers and were ultra vires. 34 U.S.C.A. § 10151 et seq.

**10. Injunction ☞1496**

City was not likely to succeed on merits, as would be required for issuance of preliminary injunction in action against Attorney General, of constitutional challenge to one of the "sanctuary cities" conditions imposed for annual federal grants from Edward Byrne Memorial Justice Assistance Grant Program that were relied on by city for law enforcement initiatives, which condition required certification of compliance with federal statute prohibiting local government and law enforcement officials from restricting the sharing of information with Immigration and Naturalization Service (INS) regarding citizenship status of any individual; statute governing program required grant applicants to comply with all applicable federal laws, and while it was plausible to construe applicable laws as the narrow body of law governing federal grant-making, it was more consistent with statute's plain language to construe applicable law as including the separate federal statute prohibiting restrictions on information sharing. 8 U.S.C.A. § 1373; 34 U.S.C.A. § 10153(a)(5)(D).

**11. United States ☞314(2)**

A condition to a federal grant to a state or locality must bear some relation to the purpose of the federal funds.

**12. States ☞4.16(3)**

Although Congressional power is substantial, Congress may not simply commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory pro-

gram, and it also cannot require states to govern according to Congress' instructions or circumvent the anti-commandeering rule by conscripting the State's officers directly.

**13. States ⟜4**

Under principles of federalism ingrained in the constitutional system, both the national and state governments have elements of sovereignty the other is bound to respect.

**14. States ⟜18.3**

Under the Supremacy Clause, as long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States and may legislate in areas traditionally regulated by the States. U.S. Const. art. 6, cl. 2.

**15. Constitutional Law ⟜990**

The presumption attached to every statute is that it is a constitutional exercise of legislative power.

**16. Aliens, Immigration, and Citizenship ⟜101**

Congress has plenary power to legislate on the subject of aliens.

**17. Aliens, Immigration, and Citizenship ⟜101**

**United States ⟜203**

Immigration regulation and enforcement are federal functions.

**18. States ⟜4.16(3)**

City was not likely to succeed on merits, as would be required for issuance of preliminary injunction, of Tenth Amendment challenge to federal statute, enacted by Congress under Spending Clause, prohibiting state or local governmental entity or officials from restricting the sharing of information with Immigration and Naturalization Service (INS) regarding citizenship status of any individual, which challenge arose in context of city's challenge to Attorney General's "sanctuary cities" conditions for annual federal grants from Ed-

ward Byrne Memorial Justice Assistance Grant Program that were relied on by city for law enforcement initiatives, one of which conditions required certification of compliance with the challenged federal statute. U.S. Const. art. 1, § 8, cl. 1; U.S. Const. Amend. 10; 8 U.S.C.A. § 1373; 34 U.S.C.A. § 10153(a)(5)(D).

**19. States ⟜4.16(1)**

Congress acts constitutionally under the Tenth Amendment when it determines that localities may not prevent local officers from voluntarily cooperating with a federal program or discipline them for doing so. U.S. Const. Amend. 10.

**20. Injunction ⟜1496**

City demonstrated irreparable harm, as element for issuance of preliminary injunction, in action challenging, as exceeding delegated authority from Congress, Attorney General's "sanctuary cities" conditions for annual federal grants from Edward Byrne Memorial Justice Assistance Grant Program that were relied on by city for law enforcement initiatives, which conditions related to notice of and access to detainees in local correctional facilities who were suspected of immigration violations; city alleged that in absence of injunction, it would be forced to choose between foregoing the grants it had specifically earmarked for life-saving technology that detects when and where gunshots were fired, or accede to the conditions and suffer the collapse of trust between local law enforcement and immigrant communities that was essential to ferreting out crime. 34 U.S.C.A. § 10151 et seq.

**21. Injunction ⟜1106**

In assessing irreparable harm, as element for issuance of preliminary injunction, courts must analyze whether the harm cannot be prevented or fully rectified by the final judgment after trial.

**22. Injunction ⇔1496**

Balancing of equities and the public interest, as factors for determining whether to issue a preliminary injunction, favored neither party, in city's action challenging, as exceeding delegated authority from Congress, Attorney General's "sanctuary cities" conditions for annual federal grants from Edward Byrne Memorial Justice Assistance Grant Program that were relied on by city for law enforcement initiatives, which conditions related to notice of and access to detainees in local correctional facilities who were suspected of immigration violations; while city emphasized studies and other evidence showing that sanctuary cities were safer than their counterparts, as well as benefits flowing from immigrant communities freely reporting crimes and acting as witnesses, Attorney General emphasized the need to enforce federal immigration law. 34 U.S.C.A. § 10151 et seq.

**23. Injunction ⇔1496**

Preliminary injunction would be nationwide in scope, in city's action challenging, as exceeding delegated authority from Congress, Attorney General's "sanctuary cities" conditions for annual federal grants from Edward Byrne Memorial Justice Assistance Grant Program that were relied on by city for law enforcement initiatives, which conditions related to notice of and access to detainees in local correctional facilities who were suspected of immigration violations; there was no reason to think that the legal issues present in the case were restricted to the city or that the statutory authority given to Attorney General would differ in another jurisdiction. 34 U.S.C.A. § 10151 et seq.

———————

Andrew W. Worseck, Edward N. Siskel, City of Chicago, Department of Law, Chicago, IL, Ari Holtzblatt, Ari J. Savitzky, David W. Ogden, Debo P. Adegbile, Jamie S. Gorelick, Molly Jennings, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, Bridget Fahey, Washington, DC, Harnaik Singh Kahlon, Laura A. Kleinman, Matthew Charles Crowl, Ronald S. Safer, Riley Safer Holmes & Cancila, LLP, Chicago, IL, for Plaintiff.

Arjun Garg, Stephen Joseph Buckingham, U.S. Department of Justice, Washington, DC, AUSA, United States Attorney's Office, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

Harry D. Leinenweber, Judge, United States District Court

This case involves the intersection between federal immigration policies and local control over policing. Defendant Jefferson Beauregard Sessions III, the Attorney General of the United States, seeks to impose new conditions on an annual federal grant relied on by the City of Chicago for law enforcement initiatives. These conditions require additional cooperation with federal immigration officials and directly conflict with Chicago's local policy, codified in its Welcoming City Ordinance, which restricts local officials' participation in certain federal immigration efforts. Chicago claims its policies engender safer streets by fostering trust and cooperation between the immigrant community and local police. Chicago's policies are at odds with the immigration enforcement priorities and view of public safety espoused by the Attorney General.

Against this backdrop, the City of Chicago claims that these new conditions are unlawful and unconstitutional, and implores this Court to grant a preliminary injunction enjoining their imposition. For the reasons described herein, the Court grants in part, and denies in part, the City

of Chicago's Motion for a Preliminary Injunction.

## I.   FACTUAL BACKGROUND

### A.   The Edward Byrne Memorial Justice Assistance Grant Program

The federal grant at issue is awarded by the Edward Byrne Memorial Justice Assistance Grant Program (the "Byrne JAG grant"). *See*, 34 U.S.C. § 10151 (formerly 42 U.S.C. § 3750). Named after a fallen New York City police officer, the Byrne JAG grant supports state and local law enforcement efforts by providing additional funds for personnel, equipment, training, and other criminal justice needs. *See*, 34 U.S.C. § 10152 (formerly 42 U.S.C. § 3751). The Byrne JAG grant is known as a formula grant, which means funds are awarded based on a statutorily defined formula. *See*, 34 U.S.C. § 10156 (formerly 42 U.S.C. § 3755). Each state's allocation is keyed to its population and the amount of reported violent crimes. *Ibid.* The City of Chicago (the "City") has received Byrne JAG funds since 2005, including $2.33 million last year on behalf of itself and neighboring political entities. (*See*, Decl. of Larry Sachs, ¶¶ 3, 11–12.) The City has used these funds to buy police vehicles and to support the efforts of non-profit organizations working in high crime communities. (*See*, *id.* ¶ 4.)

### B.   New Conditions on the Byrne JAG Grant

In late July 2017, the Attorney General announced two new conditions on every grant provided by the Byrne JAG program. (*See*, Byrne JAG Program, FY 2017 Local Solicitation, Ex. 11 to Def.'s Br.) The two new conditions require, first, that local authorities provide federal agents advance notice of the scheduled release from state or local correctional facilities of certain individuals suspected of immigration violations, and, second, that local authori-

ties provide immigration agents with access to City detention facilities and individuals detained therein. Additionally, a condition on Byrne JAG funds was added last year that requires the City to certify compliance with a federal statute, 8 U.S.C. § 1373, which prohibits local government and law enforcement officials from restricting the sharing of information with the Immigration and Naturalization Service ("INS") regarding the citizenship status of any individual. (*See*, FY 2016 Chicago/Cook County JAG Program Grant Award, dated Sept. 7, 2017, at 2–13, Ex. C to Decl. of Alan Hanson ("Hanson Decl.").) The condition to certify compliance is also imposed on 2017 Byrne JAG funds. (*See*, Byrne JAG Program, FY 2017 Local Solicitation, Ex. 11 to Def.'s Br.) The exact text of the three conditions is as follows:

(1) A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable—provide the requested notice to DHS.

(2) A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given to access any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

(3) The applicant local government must submit the required 'Certification of

Compliance with 8 U.S.C. 1373' (executed by the chief legal officer of the local government).

(Byrne JAG Program Grant Award for County of Greenville, Special Conditions ("Byrne Conditions"), ¶¶ 53, 55–56, Ex. A to Hanson Decl.; *see also* Hanson Decl., ¶ 6.) These conditions will be referred to respectively as the notice condition, the access condition, and the compliance condition. The City claims all three conditions are unlawful and unconstitutional, even though it acquiesced to the compliance condition when accepting the 2016 Byrne JAG funds.

The compliance condition requires the City to certify compliance with Section 1373. (Byrne Conditions ¶ 53.) Section 1373 is titled "Communication between government agencies and the Immigration and Naturalization Service" and provides as follows, 8 U.S.C. § 1373:

**(a)   In General**

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b)   Additional Authority of Government Entities**

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

**(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

**(2)** Maintaining such information.

**(3)** Exchanging such information with any other Federal, State, or local government entity.

**(c)  Obligation to Respond to Inquiries**

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**C.   The City's Welcoming Ordinance**

Chicago's Welcoming City Ordinance (the "Ordinance") is a codified local policy that restricts the sharing of immigration status between residents and police officers. *See*, Chicago, Illinois, Municipal Code § 2–173–005 *et seq.* The explicit purpose of the Ordinance is to "clarify what specific conduct by City employees is prohibited because such conduct significantly harms the City's relationship with immigrant communities." *Id.* § 2–173–005. The Ordinance reflects the City's belief that the "cooperation of the City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City" and that the "assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all its residents." *Ibid.* Since the mid-1980s, the City has had in place some permutation of this policy, typically in the form of executive orders that prohibited City agents and agencies from requesting or disseminating information about individuals' citizenship. (*See*, Executive Order 85–1, 89–6, Exs. A–B to Pl.'s Br.) First codified in Chicago's Municipal Code in 2006, the Ordinance was augmented in 2012 to refuse immigration agents

access to City facilities and to deny immigration detainer requests unless certain criteria were met. *See*, Chicago, Illinois Municipal Code § 2–173–005. An immigration detainer request is a request from Immigration and Customs Enforcement ("ICE"), asking local law enforcement to detain a specific individual for up to 48 hours to permit federal assumption of custody.

The Ordinance prohibits any "agent or agency" from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or immigration status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision." *Id.* § 2–173–020. It goes on to forbid any agent or agency from "disclos[ing] information regarding the citizenship or immigration status of any person." *Id.* § 2–173–030. The Ordinance specifically characterizes "[c]ivil immigration enforcement actions" as a "[f]ederal responsibility," and provides as follows:

a. Except for such reasonable time as is necessary to conduct the investigation specified in subsection (c) of this section, no agency or agent shall:

1. arrest, detain or continue to detain a person solely on the belief that the person is not present legally in the United States, or that the person has committed a civil immigration violation;

2. arrest, detain, or continue to detain a person based on an administrative warrant entered into the Federal Bureau of Investigation's National Crime Information Center database, or successor or similar database maintained by the United States, when the administrative warrant is based solely on a violation of a civil immigration law; or

3. detain, or continue to detain, a person based upon an immigration detainer, when such immigration detainer is based solely on a violation of a civil immigration law.

b.

1. Unless an agency or agent is acting pursuant to a legitimate law enforcement purpose that is unrelated to the enforcement of a civil immigration law, no agency or agent shall:

A. permit ICE agents access to a person being detained by, or in the custody of, the agency or agent;

B. permit ICE agents use of agency facilities for investigative interviews or other investigative purpose; or

C. while on duty, expend their time responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date.

2. An agency or agent is authorized to communicate with ICE in order to determine whether any matter involves enforcement based solely on a violation of a civil immigration law.

c. This section shall not apply when an investigation conducted by the agency or agent indicates that the subject of the investigation:

1. has an outstanding criminal warrant;

2. has been convicted of a felony in any court of competent jurisdiction;

3. is a defendant in a criminal case in any court of competent jurisdiction where a judgment has not been entered and a felony charge is pending; or

4. has been identified as a known gang member either in a law enforcement agency's database or by his own admission.

*Id.* § 2–173–042. The Ordinance is thus irreconcilable with the notice and access conditions the Attorney General has imposed on the 2017 Byrne JAG grant.

After receiving notice of the Attorney General's new conditions on the Byrne JAG grant program, the City filed suit alleging that the conditions were unconstitutional and unlawful. Throughout this litigation, the City has strenuously argued for its prerogative to allocate scarce local police resources as it sees fit—that is, to areas other than civil immigration enforcement—and for the soundness of doing so based on the integral role undocumented immigrant communities play in reporting and solving crime. (*See*, Pl.'s Br. at 2–4.) Before the Court is the City's Motion for a Preliminary Injunction, requesting the Court enjoin the Attorney General from imposing the three above-described conditions on FY 2017 Byrne JAG funds.

The Court grants the City a preliminary injunction against the imposition of the notice and access conditions on the Byrne JAG grant. The Court declines to grant the preliminary injunction with respect to the compliance condition.

## II. ANALYSIS

### A. Legal Standard

**[1, 2]** To warrant the entry of a preliminary injunction, the City "must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in its favor, and that an injunction is in the public interest." *Higher Soc'y of Indiana v. Tippecanoe Cty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). Where the Government is the opposing party, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Further, under Seventh Circuit precedent, the Court must also "weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one." *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017).

### B. Likelihood of Success on the Merits

This case presents three questions: Did Congress authorize the Attorney General to impose substantive conditions on the Byrne JAG grant? If so, did Congress have the power to authorize those conditions under the Spending Clause? And finally, does Section 1373 violate the Tenth Amendment? We take these questions in turn.

#### 1. Executive Authority under the Byrne JAG Statute

**[3–5]** Whether the new conditions on the Byrne JAG grant are proper depends on whether Congress conferred authority on the Attorney General to impose them. Congress may permissibly delegate authority and discretion to the Executive Branch through statute. *See*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The contours of the Executive Branch's authority are circumscribed by statute because the "power to act ... [is] authoritatively prescribed by Congress." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297–98, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013). Accordingly, we must look to the statute to determine the authority of the Attorney General to impose conditions on the Byrne JAG grant. In determining the scope of a statute, we look first to its language. *See*, *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). "If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Russello v. Unit-*

*ed States*, 464 U.S. 16, 20, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (internal quotations omitted). The language and design of the statute as a whole may guide the Court in determining the plain meaning of the text. *Berkos*, 543 F.3d at 396.

**[6]** The Byrne JAG program was created in 2006 and is codified at 34 U.S.C. §§ 10151–10158 (formerly 42 U.S.C. §§ 3750–3757). These provisions are housed in Subchapter V of Chapter 101 entitled "Justice System Improvement." Subchapter V enumerates the various "Bureau of Justice Assistance Grant Programs" in three parts: Part A covering the Byrne JAG program, Part B covering "Discretionary Grants," and Part C discussing "Administrative Provisions." The authority explicitly granted to the Attorney General within the Byrne JAG statute is limited. The Attorney General is authorized to: determine the "form" of the application, 34 U.S.C. § 10153(a); "reasonably require" "the applicant [to] maintain and report . . . data, records, and information (programmatic and financial)," 34 U.S.C. § 10152(a)(4); and "develop[ ] guidelines" for "a program assessment" "in coordination with the National Institute of Justice," 34 U.S.C. § 10152.

In light of the limited express authority the statute confers on the Attorney General, the City argues that Congress did not authorize the Attorney General to place substantive conditions on the Byrne JAG grant. The fact that Congress *did* authorize the Attorney General to place substantive conditions on *other* grants, the City contends, indicates an express reservation of that authority. *See*, 34 U.S.C. § 10142 (formerly 42 U.S.C. § 3742). By failing to direct the Court to any textual authority within the Byrne JAG statute itself, the Attorney General appears to concede the point.

However, the Attorney General argues that Congress expressly authorized impo-

sition of the challenged conditions through a provision of Subchapter I establishing the Office of Justice Programs, which provision allows the Assistant Attorney General to "plac[e] special conditions on all grants" and to "determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6) (formerly 42 U.S.C. § 3712(a)(6)). The difficulty with the Attorney General's reading of the statute is that this grant of authority to the Assistant Attorney General is located in an entirely different subchapter governing Office of Justice Programs, whereas Congress codified the later-in-time Byrne JAG program under the aegis of Bureau of Justice Assistant Grant Programs. The statute contains no textual reference that applies this section to the rest of the chapter or specifically to the Byrne JAG program. In fact, Chapter 101 comprises 38 subchapters implicating a broad swath of federal programs and subject matter, ranging from grants for residential substance abuse treatment, *see*, 34 U.S.C. §§ 10421–10426, to criminal child support enforcement, *see*, 34 U.S.C. §§ 10361–10367.

Even assuming that § 10102(a) applies to the Byrne JAG grant, reading the statute as the Attorney General advises results in multiple incongruities within the text.

First, it renders superfluous the explicit statutory authority Congress gave to the Director to impose conditions on *other* Bureau of Justice Assistance grants housed within the same subchapter as the Byrne JAG statute. Congress explicitly provides the Director of the Bureau of Justice Assistance with authority to "determine[ ]" "terms and conditions" for the discretionary grants itemized in Part B of the statute:

The Director shall have the following duties:

[ . . . ]

(2) *Establishing programs in accordance with part B of subchapter V of this chapter* and, following public announcement of such programs, awarding and allocating funds and technical assistance in accordance with the criteria of part B of subchapter V of this chapter, *and on terms and conditions determined by the Director to be consistent with part B of subchapter V of this chapter.*

34 U.S.C. § 10142 (emphases added). As noted earlier, the Byrne JAG grant is a formula grant located in Part A of Subchapter V. The most natural reading of the statute, then, is that Congress endowed the Director with authority to impose conditions on the discretionary grants under Part B, but specifically withheld that authorization for the formula grant, the Byrne JAG grant, in Part A. *See, ibid.* The Attorney General's reading of the statute therefore ignores the ostensibly clear decision by Congress to withhold comparable authority in the Byrne JAG provisions. *See, N.L.R.B. v. SW General, Inc.*, —— U.S. ——, 137 S.Ct. 929, 940, 197 L.Ed.2d 263 (2017) (noting the *expressio unius* canon's application when "circumstances support a sensible inference that the term left out must have been meant to be excluded") (quotations and alterations omitted). Regardless, it would be quite odd for Congress to give the Attorney General authority to impose conditions on the discretionary grants if it had already provided the Attorney General authority to impose conditions on *all* grants through Section 10102(a)(6). *See*, 34 U.S.C. § 10102(a)(6). This reading would render superfluous the explicit statutory grant of authority to impose conditions on the discretionary grants in Part B. *See, Marquez v. Weinstein, Pinson & Riley, P.S.*, 836 F.3d 808, 811 (7th Cir. 2016) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (quotations and citations omitted).

**[7, 8]** This conclusion is supported by the fact that Congress specifically conferred authority to impose conditions on other grants housed in the same chapter. Where Congress did so, it did so clearly. For example, Subchapter XIX of Chapter 101 provides federal funds for efforts designed to combat violence against women. *See*, 34 U.S.C. § 10446–10453 (formerly 42 U.S.C. §§ 3796gg–0 to 3796gg–11). There, Congress expressly authorized the Attorney General to impose conditions when administering the grant:

> *In disbursing grants under this subchapter, the Attorney General may impose reasonable conditions on grant awards* to ensure that the States meet statutory, regulatory, and other program requirements.

34 U.S.C. § 10446(e)(3) (emphasis added). Further, Congress expressly limited its delegation of authority to apply only to funds awarded under that specific subchapter. *Ibid.* "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello*, 464 U.S. at 23, 104 S.Ct. 296. What is more, "[w]e do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005).

Second, even if there were a basis for importing § 10102(a) into the Byrne JAG statute, it is suspect to ground the Attor-

ney General's authority to impose the challenged conditions via the power Congress conferred on the *Assistant* Attorney General. *See*, 34 U.S.C. § 10102(a)(6); *Whitman*, 531 U.S. at 468, 121 S.Ct. 903 ("Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). Furthermore, § 10102(a)(6) provides that the Assistant Attorney General shall exercise "such other powers and functions as *may* be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General." 34 U.S.C. § 10102(a)(6) (emphasis added). The language of the statute, including its use of the term "may," implies that any authority of the Assistant Attorney General to place special conditions on grants must flow either from the statute itself or from a delegation of power independently possessed by the Attorney General. *See*, *Jama*, 543 U.S. at 346, 125 S.Ct. 694 ("The word 'may' customarily connotes discretion."). Yet the Attorney General in this litigation has pointed to no provision other than § 10102(a)(6) to ground its purported authority to condition Byrne JAG grants.

The Attorney General's reliance on 34 U.S.C. § 10102(a)(6) is persuasive only to the extent one scrutinizes the provision without the illumination of the rest of the statute. *See*, *Gonzales v. Oregon*, 546 U.S. 243, 273, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (statutes "should not be read as a series of unrelated and isolated provisions"). Viewed in its context, however, § 10102(a)(6) is better understood as allowing the Attorney General to delegate powers to the Assistant Attorney General to aid in administering the Office of Justice Programs—whereas the Byrne JAG grant is a Bureau of Justice Assistance Program that is both housed in a distinctly different subchapter of Chapter 101 and isolated from other discretionary grants within its

own subchapter. Reading § 10102(a)(6) to authorize the Attorney General to impose substantive conditions on all grants under the entire chapter is discordant with the specific and clear grants of authority in other sections of the statute.

This conclusion rests on principles of statutory interpretation. It does not imply that Congress *cannot* impose the conditions at issue. *See*, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("[O]ur cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States."). On the contrary, Congress may well have Spending Clause power to impose the conditions or delegate to the Executive Branch the power to impose them, including the notice and access condition, but it must exert that power through statute. The Executive Branch cannot impose the conditions without Congressional authority, and that authority has not been conferred through Section 10102.

**[9]** The notice and access conditions therefore exceed statutory authority, and, consequently, the efforts to impose them violate the separation of powers doctrine and are *ultra vires*. The City has shown a likelihood of success on the merits as to these conditions. We do not reach the question whether the notice and access conditions violate the Spending Clause because, regardless, Congress did not authorize the Attorney General to impose them.

**[10]** The Attorney General points to one other statutory provision, 34 U.S.C. § 10153 (formerly 42 U.S.C. § 3752), for the authority to impose the compliance condition specifically. Section 10153(a) lays out the Byrne JAG application requirements, which read in relevant part:

(A) In general

To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application to the Attorney General within 120 days after the date on which funds to carry out this part are appropriated for a fiscal year, in such form as the Attorney General may require. *Such application shall include the following:*

[ . . . ]

(5) *A certification, made in a form acceptable to the Attorney General* and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), *that—*

[ . . . ]

(D) *the applicant will comply with* all provisions of this part and *all other applicable Federal laws.*

34 U.S.C. § 10153(a) (emphases added). Specifically, the Attorney General argues that § 10153(a)(5)(D) furnishes the authority to require a Byrne JAG applicant's compliance with federal law, including Section 1373. *See, ibid.* Undeniably, Section 1373 is a federal law that, by its terms, is applicable to the City. The City responds that "all other applicable Federal laws" merely refers to compliance with the narrow body of law governing federal grantmaking. *See, e.g.*, 42 U.S.C. § 2000d; 29 U.S.C. § 794(a); 42 U.S.C. § 6102. Both positions are plausible, but for the reasons discussed below, the Attorney General's position is more consistent with the plain language of the statute.

We, as always, begin with the plain language of the statute. *See, Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016). We "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). "If the statutory language is

unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Russello*, 464 U.S. at 20, 104 S.Ct. 296.

The statutory language at issue here is "all other applicable Federal laws." Black's Law Dictionary defines "applicable" as "[c]apable of being applied; fit and right to be applied" or "affecting or relating to a particular person, group, or situation; having direct relevance." *Black's Law Dictionary* (10th ed. 2014). This definition embraces both parties' interpretations. However, the prefatory term in § 10153(a)(5)(D), "all other," implies a broader meaning than that tolerated by the City's interpretation. Furthermore, if Congress intended to have the applicant only certify compliance with a limited body of Federal grant-making law, it could have so stated. The City seeks to read into § 10153(a)(5)(D) references to specific federal statutes that are not there.

The City argues that the word "applicable" must have a narrowing effect. (Pl.'s Brief at 19.) However, it is equally reasonable to read "applicable" as referring to the noun, in other words, to refer to the federal laws applicable to the *applicant* — in this case, Chicago. 34 U.S.C. § 10153(a)(5)(D).

The Court will not stretch the natural meaning of the text, especially here where the City offers no case law or other authority to support its straitjacketed interpretation of "all other applicable Federal laws." 34 U.S.C. § 10153; *see also, Sandifer v. U.S. Steel Corp.*, — U.S. —, 134 S.Ct. 870, 876, 187 L.Ed.2d 729 (2014) ("It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.") (quotations omitted).

The Court found no directly analogous case, but when interpreting similar constructions, the Supreme Court has broadly interpreted the term "applicable laws." *See, e.g., Dep't of Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 930, 110 S.Ct. 1623, 108 L.Ed.2d 914 (1990) (interpreting the statutory term "applicable laws" as "laws outside the Act"); *see also, Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (noting that "all applicable laws" is "not reasonably or fairly susceptible to an interpretation that does not encompass compliance with state and federal tax laws"); *United States Dep't of Health & Human Servs. v. F.L.R.A.*, 844 F.2d 1087, 1094–95 (4th Cir. 1988) (finding statutory requirement that Executive Branch managers follow "applicable laws" to exclude Office of Management and Budget circulars but to encompass a broad panoply of statutory law); *United States v. Odneal*, 565 F.2d 598, 600 (9th Cir. 1977) (reference to "all applicable laws" relating to admiralty grants "very broad statutory authority").

With no authority to support a more narrow reading of "applicable . . . laws" in a statutory context, and some authority (albeit in a different context) to support a broad reading of the phrase, combined with the plain meaning of the language, the Court finds that "all other applicable Federal laws" encompasses Section 1373 as applicable to the Byrne JAG applicant—in this case, the City of Chicago. Here, it is the City's burden as the movant to show otherwise, and it fails to meet that burden on this record. *See, Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.").

[11] This interpretation leads to a rational reading of the statute, as Congress could expect an entity receiving federal funds to certify its compliance with federal law, as the entity is—independent of receiving federal funds—obligated to comply. At oral argument, the City argued that this interpretation is limitless, allowing the Attorney General to pick from the United States Code like a menu at a restaurant. For several reasons, the City's consternation can be assuaged. First, the default assumption is that states and localities *do* comply with all federal laws. Second, the discretion to demand certifications of compliance is not limitless. The limitations on federal grant conditions announced in *South Dakota v. Dole*, 483 U.S. 203, 207–08, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), require that a particular condition, such as a compliance certification, bear some relation to the purpose of the federal funds. And further, as noted at oral argument, any condition attached to federal grants that is too burdensome defeats itself because a state or local government could reject the funds and thus undermine the Attorney General's attempt to induce compliance with the condition.

The City argues that previous conditions have all been tethered to statutes that by their terms apply to federal grant recipients. This may be true, but the fact that the Attorney General has not exercised authority does not necessarily speak to whether he possesses it, especially where the statutory terms embrace such an authorization.

The City has not met its burden to show a likelihood of success on the merits regarding the lack of statutory authority for the compliance condition. The most natural reading of the statute authorizes the Attorney General to require a certification of compliance with all other applicable federal laws, which by the plainest definition

includes Section 1373. The City offers no statutory or case law authority to support its narrower reading. Because the lack of authority supporting a narrower interpretation and the plain language of the statute counsel against the City's interpretation of "all other applicable Federal laws," the Court finds that the Attorney General has statutory authority to impose the compliance condition on the Byrne JAG grant.

**2.  *Constitutionality of Section 1373***

Even with Congressional authorization, the compliance condition must be proper under the Spending Clause, and Section 1373 must pass constitutional muster. As the City has not argued that the compliance condition violates the Spending Clause, the Court now turns to the Section 1373 question.

**[12, 13]**  Although Congressional power is substantial, Congress may not simply "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Travis v. Reno*, 163 F.3d 1000, 1003 (7th Cir. 1998). It also cannot require states "to govern according to Congress' instructions" or circumvent the rule by "conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); *New York v. United States*, 505 U.S. 144, 162, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). These prohibitions derive from principles of federalism ingrained in our constitutional system, under which "both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012); *see also, Gregory v. Ashcroft*, 501 U.S. 452, 459, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("In the tension between federal and state power lies the promise of liberty.").

**[14, 15]**  With the existence of two sovereigns comes occasional conflict. The Supremacy Clause provides the clear rule that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States [and] . . . may legislate in areas traditionally regulated by the States." *Gregory*, 501 U.S. at 459–60, 111 S.Ct. 2395. Further, the presumption attached to every statute is that it is a constitutional exercise of legislative power. *Reno v. Condon*, 528 U.S. 141, 148, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). We start there, attaching the presumption of constitutionality to Section 1373. Section 1373, in relevant part, provides that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service; (2) Maintaining such information; (3) Exchanging such information with any other Federal, State, or local government entity." 8 U.S.C. § 1373(b).

**[16–18]**  It is undisputed that Congress has plenary power to legislate on the subject of aliens. *See, Takahashi v. Fish and Game Commission*, 334 U.S. 410, 419, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization."). Indeed, immigration regulation and enforcement are federal functions. *See, Arizona*, 567 U.S. at 396–97, 132 S.Ct.

2492. Nonetheless, the City argues that Section 1373 violates the Tenth Amendment because it "requires state and local officers to provide information that belongs to Chicago and is available to them only in their official capacity" and requires "state officials to assist in the enforcement of federal statute by regulating private individuals." (Pl.'s Brief at 20 (internal quotations omitted).) Specifically, the City contends that Section 1373 commandeers state and local governments by "controlling the actions of their employees." *Ibid.*

The constitutionality of Section 1373 has been challenged before. The Second Circuit in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), addressed a facial challenge to Section 1373 in similar circumstances. By executive order, New York City prohibited its employees from voluntarily providing federal immigration authorities with information concerning the immigration status of any alien. *Id.* at 31–32. The city sued the United States, challenging the constitutionality of Section 1373 under the Tenth Amendment. *Id.* at 32.

The Second Circuit found that Section 1373 did not compel state or local governments to enact or administer any federal regulatory program or conscript local employees into its service, and therefore did not run afoul of the rules gleaned from the Supreme Court's *Printz* and *New York* decisions. *City of New York*, 179 F.3d at 35. Rather, the court held that Section 1373 prohibits local governmental entities and officials only from directly restricting the voluntary exchange of immigration information with the INS. *Ibid.* The Court found that the Tenth Amendment, normally a shield from federal power, could not be turned into "a sword allowing states and localities to engage in passive resistance that frustrates federal programs." *Ibid.* The Second Circuit concluded that Congress may forbid state and local gov-

ernments from outlawing their officials' voluntary cooperation with the INS without violating the Tenth Amendment. *Ibid.* As such, the court nullified New York City's executive order mandating non-cooperation with federal immigration authorities to the extent it conflicted with Section 1373. *Id.* at 37.

The City argues that *City of New York v. United States* contravenes the Seventh Circuit's decision in *Travis v. Reno*, 163 F.3d 1000 (7th Cir. 1998), by impermissibly applying a balancing analysis to encroachments on federalism. We agree with the City that balancing the weight of a federalism infringement is inappropriate, not only under this Circuit's precedent in *Travis*, 163 F.3d at 1003, but Supreme Court precedent as well. *See, Printz*, 521 U.S. at 932, 117 S.Ct. 2365 (noting that, where "it is the whole object of the law to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty, such a 'balancing' analysis is inappropriate ... [N]o comparative assessment of the various interests can overcome that fundamental defect.") (emphasis omitted). However, the logic of *City of New York*'s holding is not indebted to an impermissible balancing test. Rather, *City of New York* relies on the distinction between an affirmative obligation and a proscription:

> In the case of Sections 434 and [1373], Congress has not compelled state and local governments to enact or administer any federal regulatory program. Nor has it affirmatively conscripted states, localities, or their employees into the federal government's service. These Sections do not directly compel states or localities to require or prohibit anything. Rather, they prohibit state and local governmental entities or officials only from directly restricting the voluntary exchange of immigration information with the INS.

*City of New York*, 179 F.3d at 34–35 (citation omitted). The improper balancing the City highlights occurs where the Second Circuit addressed a secondary question yet found the record insufficient to supplant its prior analysis. *Id.* at 36–37. The prior analysis was its holding—free from any inappropriate balancing—that states do not have the power "to command passive resistance to federal programs." *Id.* at 37. Granted, *City of New York* does not fully address or answer two arguments that are presented in this case: first, that the federal government cannot demand information belonging to the state; and second, that it cannot (even indirectly) control the scope and nature of the duties of state and local employees. *Id.* at 36. The Second Circuit merely deemed the record insufficient on both scores. *Ibid.* Regardless, Supreme Court precedent does not command a different result.

The City relies on *Printz*, but there, the statute at issue required state officers to perform mandatory background checks on prospective handgun purchasers—an affirmative act foisted on local officials by Congress. *See*, 521 U.S. at 933, 117 S.Ct. 2365. The Supreme Court held that the statute violated the Tenth Amendment, because the federal government cannot "command the States' officers . . . to administer or enforce a federal regulatory program." *Id.* at 935, 117 S.Ct. 2365. However, Section 1373 does not require the "forced participation" of state officers to "administer or enforce a federal regulatory program." *Id.* at 917–18, 117 S.Ct. 2365. It merely precludes a state or local government from "prohibit[ing], or in any way restrict[ing], any . . . official" from sending, requesting, maintaining, or exchanging "information regarding the immigration status . . . of any individual." 8 U.S.C. § 1373. In other words, it prohibits prohibitions on local officials' voluntary participation.

For similar reasons, other cases cited by the City do not advance the ball either.

*See, e.g.*, *Reno*, 528 U.S. at 151, 120 S.Ct. 666 (finding the Driver's Privacy Protection Act constitutional because "[i]t does not require the [state] Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals"); *New York*, 505 U.S. at 188, 112 S.Ct. 2408 (finding a "take title" provision on nuclear waste unconstitutional because it forced a state to "enact or administer a federal regulatory program" by affirmatively requiring it to legislate a certain way or take ownership of nuclear waste); *F.E.R.C. v. Mississippi*, 456 U.S. 742, 765, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (finding no Tenth Amendment violation in provisions of the Public Utilities Regulatory Policies Act permitting states to regulate public utilities on the condition that they entertain federal proposals, as the statute contained nothing "directly compelling" states to enact a legislative program).

[19]   At its core, this case boils down to whether state and local governments can restrict their officials from voluntarily cooperating with a federal scheme. The Court has not been presented with, nor could it uncover, any case holding that the scope of state sovereignty includes the power to forbid state or local employees from voluntarily complying with a federal program. Like the statute at issue in *Reno*, Section 1373 "does not require" the City "to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno*, 528 U.S. at 151, 120 S.Ct. 666. Without a doubt, Section 1373 restricts the ability of localities to prohibit state or local officials from assisting a federal program, but it does not *require* officials to assist in the enforcement of a federal program. This distinction is meaningful. In this distinction, Section

1373 is consistent with the constitutional principles enunciated in *New York* and *Printz. See, Printz*, 521 U.S. at 935, 117 S.Ct. 2365; *New York*, 505 U.S. at 161–63, 112 S.Ct. 2408. Because no case has gone so far as to prohibit the federal government from restricting actions that directly frustrate federal law, the Court finds that Congress acts constitutionally when it determines that localities may not prevent local officers from *voluntarily* cooperating with a federal program or discipline them for doing so.

It is worth noting, however, that this case poses a unique and novel constitutional question. The characterization of Section 1373 as a prohibition that requires no affirmative state action accurately conveys the literal text of the statute, but it does not accurately portray its practical import. Section 1373 mandates that state and city employees have the option of furnishing to the INS information on individuals' immigration status while the employee is acting in his or her capacity as a state or local official. The corollary is that local governments cannot both comply with Section 1373 and discipline an employee for choosing to spend his or her time assisting in the enforcement of federal immigration laws. If a state or local government cannot control the scope of its officials' employment by limiting the extent of their paid time spent cooperating with the INS, then Section 1373 may practically limit the ability of state and local governments to decline to administer or enforce a federal regulatory program. In this way, Section 1373 may implicate the logic underlying the *Printz* decision more than it does the *Reno* rationale. *See, Printz*, 521 U.S. at 929–30, 117 S.Ct. 2365.

Read literally, Section 1373 imposes no affirmative obligation on local governments. But, by leaving it up to local officials whether to assist in enforcement of federal immigration priorities, the statute may effectively thwart policymakers' ability to extricate their state or municipality from involvement in a federal program. Under current case law, however, only affirmative demands on states constitute a violation of the Tenth Amendment. Here, we follow binding Supreme Court precedent and the persuasive authority of the Second Circuit, neither of which elevates federalism to the degree urged by the City here. A decision to the contrary would require an expansion of the law that only a higher court could establish.

Accordingly, the City has not shown a likelihood of success on the merits on the constitutionality of Section 1373.

## C. Irreparable Harm

[20, 21] The City has demonstrated the second factor of the preliminary injunction analysis—irreparable harm. In assessing irreparable harm, courts must analyze whether the "harm . . . cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is deemed irreparable. *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012). Here, the City contends that, in the absence of an injunction, it must either forego the Byrne JAG grant funds it has specifically earmarked for life-saving technology that detects when and where gunshots are fired (P.I. Hrg. Tr. at 31:8–32:9) or accede to the new conditions the Attorney General has placed on the funds and suffer the collapse of trust between local law enforcement and immigrant communities that is essential to ferreting out crime.

Two recent cases have dealt with preliminary injunctions regarding facts similar to those before the Court. Though the legal issues presented in these cases are different than those at bar, the harms alleged

are sufficiently analogous. In both cases, the district court found that the plaintiff established irreparable injury. In *City of El Cenizo v. State*, the court entered a preliminary injunction and credited the plaintiff's assertion that it would suffer two forms of irreparable harm: (1) "Trust between local law enforcement and the people they serve, which police departments have worked so hard to promote, will be substantially eroded and result in increased crime rates"; and (2) "Local jurisdictions face severe economic consequences . . . including . . . the loss of grant money." *City of El Cenizo v. State*, No. SA-17-CV-404-OLG, 264 F.Supp.3d 744, 811, 2017 WL 3763098, at *39 (W.D. Tex. Aug. 30, 2017). In *County of Santa Clara v. Trump*, the court found that the plaintiff established a "constitutional injury" and irreparable harm "by being forced to comply with an unconstitutional law or else face financial injury." *County of Santa Clara v. Trump*, No. 17-CV-00485-WHO, 250 F.Supp.3d 497, 537, 2017 WL 1459081, at *27 (N.D. Cal. Apr. 25, 2017), *reconsideration denied*, No. 17-CV-00485-WHO, 267 F.Supp.3d 1201, 2017 WL 3086064 (N.D. Cal. July 20, 2017).

The harm to the City's relationship with the immigrant community if it should accede to the conditions is irreparable. Once such trust is lost, it cannot be repaired through an award of money damages, making it the type of harm that is especially hard to "rectif[y] by [a] final judgment." *Roland Mach.*, 749 F.2d at 386.

The Attorney General minimizes the impact of the relatively modest Byrne JAG funds on public safety and argues that the City could, by simply declining the funds, avoid any loss of trust between local law enforcement and the immigrant communities. However, a "Hobson's choice" can establish irreparable harm. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157

(1992). In *Morales*, the Supreme Court held that a forced choice between acquiescing to a law that the plaintiff believed to be unconstitutional and violating the law under pain of liability was sufficient to establish irreparable injury. *Ibid.* In the same way, forcing the City either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of "Hobson's choice" that supports irreparable harm. Further, a constitutional violation may be sufficient to establish irreparable injury as a matter of law. *See*, 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *see also*, *Ezell v. City of Chicago*, 651 F.3d 684, 698–700 (7th Cir. 2011); *Doe v. Mundy*, 514 F.2d 1179, 1183 (7th Cir. 1975).

The lack of injury afflicting the Attorney General in the absence of an injunction buttresses the City's showing of irreparable harm. The Seventh Circuit has described this factor as follows:

In deciding whether to grant a preliminary injunction, the court must also consider any irreparable harm that the defendant might suffer from the injunction—harm that would not be either cured by the defendant's ultimately prevailing in the trial on the merits or fully compensated by the injunction bond that Rule 65(c) of the Federal Rules of Civil Procedure requires the district court to make the plaintiff post. The cases do not usually speak of the defendant's *irreparable* harm, but the qualification is implicit; if the defendant will not be irreversibly injured by the injunction because a final judgment in his favor would make him whole, the injunction will not really harm him. But since the defendant may suffer irrepa-

rable harm from the entry of a preliminary injunction, the court must not only determine that the plaintiff will suffer irreparable harm if the preliminary injunction is denied—a threshold requirement for granting a preliminary injunction—but also weigh that harm against any irreparable harm that the defendant can show he will suffer if the injunction is granted.

*Roland Mach.*, 749 F.2d at 387 (emphasis in original). Although harm to federal interests should not be diminished, a delay in the imposition of new conditions that have yet to go into effect will likely not cause any harm akin to that alleged by the City. The Attorney General has put forth no comparable claim that a delay in imposition of the new Byrne JAG conditions would permanently harm community relationships or any other interest that would be difficult to remedy through money damages. *See, Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (noting that maintaining the status quo was unlikely to affect a substantial public interest in the short time of the injunction).

Thus, the Court finds that the City has established that it would suffer irreparable harm if a preliminary injunction is not entered.

### D. Balancing of Equities and the Public Interest

**[22]** The remaining two factors in the preliminary injunction analysis merge where the Government is a party. *Nken*, 556 U.S. at 435, 129 S.Ct. 1749. These two factors are not outcome-determinative here. Both sides can claim that concerns of public safety justify their positions.

The City and *amici* strongly emphasize the studies and other evidence demonstrating that sanctuary cities are safer than their counterparts. Although both parties before the Court have emphatically stressed the importance of their policy choice to decrease crime and support law enforcement—with Chicago emphasizing the benefits that flow from immigrant communities freely reporting crimes and acting as witnesses, and the Attorney General emphasizing the need to enforce federal immigration law—choosing between competing public policies is outside the realm of judicial expertise and is best left to the legislative and executive branch. *See, Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (noting that the courts are "vested with the authority to interpret the law; [they] possess neither the expertise nor the prerogative to make policy judgments").

Accordingly, the final two factors favor neither party. Both parties have strong public policy arguments, the wisdom of which is not for the Court to decide. Accordingly, the Court finds that balancing the equities and weighing the public interest do not tip the scale in favor of either party.

### III. CONCLUSION

**[23]** For the reasons stated herein, the Court grants the City a preliminary injunction against the Attorney General's imposition of the notice and access conditions on the Byrne JAG grant. The City has established a likelihood of success on the merits as to these two conditions and irreparable harm if an injunction does not issue, and the other two preliminary injunction factors do not sway the analysis. This injunction against imposition of the notice and access conditions is nationwide in scope, there being no reason to think that the legal issues present in this case are restricted to Chicago or that the statutory authority given to the Attorney General would differ in another jurisdiction. *See, Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017).

The Court denies the City's Motion for a Preliminary Injunction with respect to the compliance condition, because the City has failed to establish a likelihood of success on the merits.

**IT IS SO ORDERED.**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**v.**

**RENT–A–CENTER EAST, INC., Defendants.**

**Case No. 16–CV–2222**

United States District Court, C.D. Illinois, Urbana Division.

Signed September 8, 2017

**Background:** Equal Employment Opportunity Commission (EEOC) brought action against employer, alleging that employer violated Title VII when it discharged employee because she was transgender or because of her gender transition from male to female. Employer moved for summary judgment, and EEOC moved for partial summary judgment on employer's affirmative defense of failure to mitigate damages.

**Holdings:** The District Court, Colin S. Bruce, J., held that:

(1) genuine issue of material fact existed as to whether employer terminated employee because she was transgender, and

(2) genuine issue of material fact existed as to whether employee exercised reasonable diligence to find comparable employment after she was terminated.

Motions denied.

**1. Federal Civil Procedure** ⇐2497.1

Genuine issue of material fact existed as to whether employer terminated employee because she was transgender, precluding summary judgment on Equal Employment Opportunity Commission's (EEOC) sex discrimination claim against employer under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**2. Civil Rights** ⇐1192

Discrimination based upon a person's transgender status is a violation of Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**3. Civil Rights** ⇐1573

In a Title VII discrimination action, to establish the affirmative defense of failure to mitigate damages, an employer must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**4. Federal Civil Procedure** ⇐2497.1

Genuine issue of material fact existed as to whether transgender employee exercised reasonable diligence to find comparable employment after she was terminated by employer, precluding summary judgment on employer's affirmative defense of failure to mitigate damages in Equal Employment Opportunity Commission's (EEOC) Title VII sex discrimination action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

———

Justin Mulaire, New York, NY, Miles Ezekiel Shultz, Gregory M. Gochanour,

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE CITY OF CHICAGO,<br><br>               Plaintiff,<br><br>     v.<br><br>JEFFERSON BEAUREGARD<br>SESSIONS III, Attorney<br>General of the United States,<br><br>            Defendant. | Case No. 17 C 5720<br><br>Judge Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

This case involves the overlap, and potential conflict, between core areas of state and federal power: the state's traditional police powers and the federal government's broad, undoubted power over immigration. In order to advance federal immigration policies, the Attorney General attached several new immigration-related conditions to a longstanding federal grant which provides funds to local and state police departments. Those immigration-related conditions conflict with Chicago's policy goals of promoting cooperation between local law enforcement and immigrant communities and ensuring access to essential city services for all city residents regardless of citizenship status. Chicago brought suit to enjoin the Attorney General from attaching those conditions to the grant funds.

Before the Court is the Attorney General's Motion to Dismiss the Complaint in its entirety and the City of Chicago's Partial Motion for Summary Judgment on Counts I, II, and V. The Court addresses both below.

## I. BACKGROUND

In addition to reciting here the most relevant facts, the Court also incorporates those facts previously described in its earlier ruling. *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 937-40 (N.D. Ill. 2017), *aff'd,* 888 F.3d 272 (7th Cir. 2018), *en banc reh'g granted and vacated in part by* Order, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128.

The dispute centers around the Edward Byrne Memorial Justice Assistance Grant (the "Byrne JAG grant"), a federal grant named after a fallen New York City police officer which awards funds to states and local jurisdictions to support criminal justice initiatives for personnel, equipment, training, and other community services. *See* 34 U.S.C. § 10152(a). The Byrne JAG program distributes grant funds by a statutorily-defined formula based on a state's population and the number of violent crimes reported within that jurisdiction in the past year. *See* 34 U.S.C. § 10156. To receive funds under the program, the would-be grantee must submit an application and comply with all conditions outlined

- 2 -

in the Solicitation document provided by the Attorney General.
(*See* 34 U.S.C. § 10153; *see, e.g.*, FY 2017 Local Solicitation,
Ex. T to Pl.'s Request for Judicial Notice, Dkt. No. 157-20.) The
City of Chicago and its neighboring localities have received Byrne
JAG funds every year since 2005. In 2016, Chicago used those funds
to buy police vehicles and to support the efforts of non-profit
organizations working in its high crime communities. (*See* Def.'s
Resp. to Pl.'s Statement of Undisputed Material Facts ("Facts")
¶ 14, Dkt. No. 168; Sachs Decl. ¶ 4, Dkt. No. 154.) The funds at
issue now were originally earmarked to be distributed in 2017, but
this litigation ensued. Should Chicago receive those 2017 funds,
the City intends to expand its use of "SpotShotter" acoustic
surveillance technology, which allows officers to pinpoint the
location of gun shots across the City and thus respond more
quickly. (Def.'s Resp. to Pl.'s Facts ¶ 15, Dkt. No. 168.)

The grant conditions causing Chicago umbrage are related to
federal immigration enforcement. In 2016, the Attorney General
determined that various state and local policies of withholding
information and other cooperation from federal immigration
authorities were frustrating the federal government's immigration-
related goals. (*See* May 31, 2016 Office of Inspector General Mem.,
Ex. H to Def.'s Request for Judicial Notice, Dkt. No. 140-8.)

- 3 -

**SA23**

Citing public safety concerns, the Attorney General announced that the Department of Justice ("DOJ") would award Byrne JAG grants only to localities that: share certain immigration-related information with federal immigration agencies, allow immigration agents access to local detention facilities, and provide notice before releasing certain undocumented individuals. (*See* DOJ Press Release, Ex. B to Compl., Dkt. No. 1-2.) In this suit, Chicago challenges all three of these new conditions (hereafter, "the Conditions"):

1. The "Access Condition" requires that Byrne JAG recipients permit personnel of the U.S. Department of Homeland Security ("DHS") to access any detention facility to meet with undocumented immigrants and inquire as to their right to be or remain in the United States.

2. The "Notice Condition" requires that Byrne JAG recipients provide DHS at least 48 hours advance notice of the scheduled release date and time of an alien in the jurisdiction's custody whenever DHS requests such notice in order to take custody of the alien upon release. The Attorney General later amended this Condition to clarify that "[i]n the event that . . . the scheduled release date and time for an alien are such as not to permit the advance notice [of scheduled release] . . . it shall not be a violation of this condition to provide only as much advance notice as practicable."

3. The "Compliance Condition" requires that Byrne JAG recipients certify compliance with 8 U.S.C. § 1373, a federal statute that bars local governments from restricting the sharing of immigration status information with federal law enforcement.

- 4 -

**SA24**

(*See* FY 2017 Local Solicitation, Ex. T to Pl.'s Request for Judicial Notice, Dkt. No. 157-20; Example Byrne JAG award documents, Exs. F, G to Jennings Decl., Dkt. No. 158.) The Attorney General added the Notice and Access Conditions for the first time in FY 2017, but the Compliance Condition also applied the previous year. (Def.'s Resp. to Pl.'s Facts ¶¶ 17-18.)

According to Chicago, these Conditions conflict with longstanding City policy of ensuring access to essential city services regardless of a resident's citizenship status and of promoting cooperation between local law enforcement and immigrant communities. (*See* Compl. ¶ 1, Dkt. No. 1.) Chicago's local policies protecting immigrant rights date back to 1985, when they were first embodied in executive orders and then eventually codified. (Def.'s Resp. to Pl.'s Facts ¶¶ 4-8, Dkt. No. 168.) The City's Welcoming City Ordinance, enacted in 2012, encapsulates its current policy. (*Id.* ¶¶ 7-8.) Though Chicago's policy and others like it are commonly referred to as "sanctuary city policies," the Seventh Circuit has recognized the inaptness of that term. *See City of Chicago v. Sessions,* 888 F.3d at 281 (noting the term is "commonly misunderstood" and does not accurately describe the effect of such policies).)

The Welcoming City Ordinance reflects both the City's determination that effective police work relies on willing community assistance and its belief that the "cooperation of the city's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire city." Chicago, Ill. Muni. Code § 2-173-005. The City intended the Welcoming City Ordinance to clarify both the communications and enforcement relationship between the City and the federal government as well as the specific conduct City employees are prohibited from undertaking, given the City's view that such prohibited conduct would "significantly harm[] the city's relationship with immigrant communities." *Id.*

Specifically, the Ordinance prohibits all City agents and agencies from: requesting or disclosing information about an individual's immigration status, *id.* §§ 2-173-020, -030; detaining anyone based solely on their immigration status or an ICE detainer, *id.* § 2-173-042(a); and spending on-duty time "responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date," unless the responding City employee is "acting pursuant to a legitimate law enforcement purpose that is unrelated to the enforcement of a civil immigration law," *id.* § 2-173-042(b). Notably, these prohibitions do not apply to certain

- 6 -

**SA26**

classes of potentially dangerous individuals, including known gang members and those with outstanding criminal warrants, felony convictions, or pending felony charges. *Id.* § 2-173-042(c); *see also* Chicago Police Department ("CPD")'s Special Order S06-14-03, Ex. F to Pl.'s Request for Judicial Notice, Dkt. No. 157 (reiterating the policies of the Welcoming City Ordinance and establishing rules for CPD officers in conformance therewith).

Chicago contends that the new Conditions put it in an untenable position, forcing the City either to accept the grant funds with the attached Conditions and—the City believes—lose the trust and cooperation of its immigrant communities *or* decline the grant and forgo much-needed funding for critical police resources and community services. (Compl. ¶ 9.) Chicago argues that the Constitution protects it from making this Hobson's choice.

To that end, Chicago brings a seven-count Complaint, alleging constitutional infirmities and unlawful agency action. (*See generally* Compl., Dkt. No. 1.) Counts I and II allege the Conditions are unconstitutional because the Byrne JAG statute does not provide the Attorney General statutory authority to impose them. Count III alleges the Conditions violate the Spending Clause. *Id.* Chicago's Count IV alleges that, independent of the Byrne JAG grant, Section 1373 is an impermissible federal

- 7 -

**SA27**

conscription of state power and is thus unconstitutional under the anticommandeering doctrine. *Id.* Next, Chicago charges in Count V's declaratory judgment claim that even if Section 1373 is constitutional, the City complies with it and deserves judgment to that effect. *Id.* In Count VI, the City alleges the Attorney General's decision to impose the Conditions was arbitrary and capricious and thus violated the Administrative Procedures Act ("APA"). *Id.* And finally, Count VII alleges violations of the Paperwork Reduction Act. *Id.*

After filing its Complaint, Chicago moved for a preliminary injunction as to all three Conditions. This Court found that Chicago was likely to succeed on its argument that the Attorney General lacked the statutory grant of authority to impose the Notice and Access Conditions and accordingly enjoined those Conditions nationwide. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 943. However, the Court refused to enjoin the third condition, the Compliance Condition, finding the City not likely to succeed in arguing either that the Attorney General lacked the authority to impose it or that Section 1373—again, the statute with which Chicago must certify compliance under this third Condition—is unconstitutional. *Id.* at 945-46. The Attorney General appealed.

The Seventh Circuit panel affirmed, agreeing that Chicago demonstrated a likelihood of success that the Byrne JAG statute does not grant the Attorney General the authority to impose the Notice and Access Conditions and approving this Court's corresponding issuance of the nationwide preliminary injunction. *See City of Chicago v. Sessions*, 888 F.3d 272, 287, 293 (7th Cir. 2018), *en banc reh'g granted and vacated in part by* Order, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128. The Attorney General petitioned the Seventh Circuit for rehearing *en banc*. *See* Def.'s Petition for Rehearing En Banc, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. Apr. 27, 2018), Dkt. No. 120. The Seventh Circuit granted the Attorney General's petition on the limited issue of the injunction's nationwide scope, thus vacating that portion of the panel opinion but leaving intact the finding that the Notice and Access Conditions are likely unlawful. *See En Banc Order, City of Chicago v. Sessions*, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128.

Turning to the matters now before the Court: The Attorney General moves to dismiss Chicago's Complaint in its entirety, and Chicago cross-moves for partial summary judgment. The Attorney General moves to dismiss the Complaint on two grounds, raising challenges to both this Court's subject matter jurisdiction and to

- 9 -

**SA29**

the sufficiency of Chicago's Complaint. *See* FED. R. CIV. P. 12(b)(1), (6). For its part, Chicago moves for summary judgment on only Counts I, II, and V. The City requests, first, a finding that all three Conditions are not authorized by the Byrne JAG statute and are thus *ultra vires* (Count I) and in violation of the separation of powers (Count II). With that request, the City urges the Court to reconsider its earlier-expressed belief that Chicago was not likely to succeed on this argument as to the Compliance Condition. Second, Chicago requests a declaratory judgment that, assuming the Compliance Condition is valid, the City complies with Section 1373 (Count V).

## II.   STANDARDS OF REVIEW

As already described, the Attorney General moves to dismiss both by challenging jurisdiction and by asserting that the Complaint fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(1), (6). To survive a 12(b)(1) motion, the plaintiff must carry the burden of providing sufficient evidence to establish a *prima facie* case for personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). To survive a 12(b)(6) motion, the plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), and "give the

defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation and alteration omitted). On a 12(b)(6) motion, the reviewing court accepts all well-pleaded facts as true, *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013), and draws reasonable inferences in favor of the plaintiff, *Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014) (citation omitted). In doing so, the court may consider the "complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (citations omitted).

Chicago cross-moves for summary judgment, which is proper where the record shows no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the burden of establishing the absence of any genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the Court construes all facts and reasonable inferences in the light most favorable to the nonmovant, *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 874 (7th Cir. 2015) (quotation marks and citation

omitted).   In ruling on summary judgment, courts do not determine the truth of disputed matters.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### III.  DISCUSSION

### A.  Jurisdiction

Before the Court turns to the merits of this dispute, it must address the threshold objection raised by the Attorney General in his 12(b)(1) motion.  In short, the Attorney General argues that because the DOJ has not yet reached a final decision on whether to award Chicago funds under the Byrne JAG grant, the DOJ has not yet consummated any "final agency action" that is ripe for judicial review. 5 U.S.C. § 704; *see Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016) ("In the context of judicial review under the APA, a challenge to agency conduct is ripe only if it is filed after the final agency action.").  Chicago responds that its lawsuit does not challenge the Attorney General's not-yet-finalized decision whether to *award* the funds, but rather the decision to attach the Conditions to the grant in the first instance.  The Court agrees with Chicago that this earlier determination is the one challenged by this suit. (*See* Compl. at 45 (requesting that this Court "[d]eclare that all three

- 12 -

**SA32**

immigration-related conditions for the FY 2017 Byrne JAG are unlawful").)

"[T]wo conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *cf. Shanty Town Assocs. Ltd. v. EPA*, 843 F.2d 782, 788 (4th Cir. 1988) (evaluating EPA's imposition of conditions on a federal grant under the APA). Both of these conditions are clearly met here. The imposition of these Conditions by the Attorney General is far from "tentative"; Alan Hanson, the Acting Assistant Attorney General for the Office of Justice Programs at the DOJ, states in his declaration that every FY 2017 award—presumptively including the award Chicago seeks here—will include conditions identical to those attendant to the grant awards already handed out to Binghamton and Greenville, the only two cities to receive Byrne JAG funds thus far. (*See* Hanson Decl. ¶¶ 1, 5-6, Dkt. 32-1 ("[T]he award documents set[] out the various conditions . . . that *will apply* to the FY 2017 Byrne JAG award" (emphasis added)); *see also* Def.'s Resp. to Pl.'s Facts

- 13 -

**SA33**

¶ 27, Dkt. No. 168.) Both of those awards explicitly require compliance with all three Conditions. (*See* Example Byrne JAG Award Documents, Exs. F, G to Jennings Decl., Dkt. Nos. 158-6, 158-7.) Further, all FY 2017 awards, including Chicago's potential one, are awarded based on applications invited by that year's grant Solicitation, which clearly imposes the Conditions as well. (FY 2017 Local Solicitation, Ex. T to Pl.'s Request for Judicial Notice, Dkt. No. 157-20; *see also* Def.'s Resp. to Pl.'s Facts ¶¶ 27-30, Dkt. No. 168.) Thus, the Attorney General's attachment of the Conditions is the end result of his decision-making process on this score. That satisfies the first requirement for finality under the APA. *See Bennett*, 520 U.S. at 177-78.

The second requirement is met as easily as the first. The Conditions attached to the Byrne JAG funds trigger important legal and practical consequences: They force Chicago to choose between accepting the award with the Conditions or forgoing the award in favor of maintaining the City's policy preferences. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 940 (finding the Notice and Access Conditions irreconcilable with Chicago's Welcoming City Ordinance); *see also Abbs v. Sullivan*, 963 F.2d 918, 926 (7th Cir. 1992) (finding agency action final where plaintiff faced "a dilemma: comply with a rule that harms [it] and that [it]

- 14 -

**SA34**

believe[s] to be invalid or violate the rule at the risk of incurring a heavy penalty" (citation omitted)). The second requirement is met, and the Court accordingly finds that the Attorney General's decision to impose the Conditions constitutes final agency action that is ripe for judicial review.

Finally, the Court notes that all of its sister courts in parallel cases have reached the same conclusion. *See, e.g.*, *City of Philadelphia v. Sessions,* No. 17-3894, 2018 WL 1305789, at *18-19 (E.D. Pa. Mar. 13, 2018) (finding the Attorney General's imposition of the Conditions on the Byrne JAG grant was final); *California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1030-31 (N.D. Cal. 2018) (same).

For reasons that will become clear, the Court considers Chicago's claims out of order.

### B. Anticommandeering Doctrine (Count IV)

The Attorney General moves to dismiss Count IV, in which Chicago alleges that Section 1373 unconstitutionally tramples upon the Constitution's anticommandeering doctrine by robbing local policymakers of the option to decline to administer the federal immigration programs Section 1373 supports. *See New York v. United States*, 505 U.S. 144, 177 (1992) (applying the anticommandeering doctrine to claims involving New York's forced participation in a

- 15 -

**SA35**

federal program); *see generally Printz v. United States*, 521 U.S. 898 (1997) (applying the anticommandeering doctrine to claims involving conscription of local officials). This Court previously held that Chicago was unlikely to succeed on this argument given that under then-current case law, "only affirmative demands" on states—as opposed to proscriptions—transgressed the Tenth Amendment. *City of Chicago v. Sessions*, 264 F. Supp. 3d at 949. Section 1373 imposes no affirmative demand on local governments, even though, in practical effect, the statute "may effectively thwart policymakers' ability to extricate their state or municipality from involvement in a federal program." *Id.* As such, this Court hesitated to expand the anticommandeering doctrine to a terrain that no higher court had yet seen fit to cover. But then, eight months after this Court's preliminary injunction ruling, the Supreme Court navigated that ground in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).

*Murphy* concerned the Professional and Amateur Sports Protection Act ("PASPA"), a federal law that prevented states both from legalizing sports gambling and from repealing existing state laws prohibiting it. *Id.* at 1470-71. New Jersey passed a law partially repealing its gambling prohibition anyway, claiming it could do so because PASPA's edict to the contrary violated the

- 16 -

**SA36**

Constitution's anticommandeering principle. *Id.* at 1472. Before the Supreme Court, the *Murphy* respondents argued PASPA could not violate the Tenth Amendment because—much like this Court observed in its preliminary injunction ruling—the Supreme Court had only found such violations in cases where Congress went "beyond precluding state action and affirmatively command[ed] it." *Id.* at 1478. But the Court rejected this argument, finding the "distinction . . . empty." *Id.* It reasoned that regardless whether a federal law commands state action or precludes it, "[t]he basic principle that Congress cannot issue direct orders to state legislatures" still applies. *Id.* (alteration omitted). The reasoning highlights the Supreme Court's reluctance to rely on a distinction more reflective of sophisticated draftsmanship than substantive effect. Thus, PASPA, which "unequivocally dictate[d] what a state legislature may and may not do," was held to be unconstitutional. *Id.* That holding pulls the lynchpin from this Court's earlier Section 1373 constitutionality analysis and demands that this Court reconsider that statute with fresh eyes.

But before delving further into the anticommandeering analysis, the Court must first dispose of a threshold argument. The Attorney General argues that no anticommandeering claim exists here because compliance with Section 1373 is merely a condition on

- 17 -

**SA37**

grant funds which Chicago is free to refuse.  This argument ignores that Section 1373 is an extant federal law with which Chicago must comply, completely irrespective of whether or not the City accepts Byrne JAG funding.  And the City's Count IV clearly recites Chicago's anticommandeering challenge to the law *itself*, not to the law as a condition imposed on the grant.  (*See Compl.* ¶¶ 132-135 "Section 1373 is . . . facially unconstitutional").)  This distinction is important.  No Tenth Amendment problem exists when a federal agency imposes grant conditions, because the Spending Clause empowers the federal government to offer funds in exchange for state action it could not otherwise demand.  *See NFIB v. Sebelius*, 567 U.S. 519, 537 (2012) (observing that the federal government may award grant funding that "may well induce the States to adopt policies that the Federal Government itself could not impose" (citation omitted)); *South Dakota v. Dole*, 483 U.S. 203, 210 (1987) (finding a "Tenth Amendment limitation on congressional regulation of state affairs did not concomitantly limit the range of conditions legitimately placed on federal grants").  But Section 1373 is not a grant condition which Chicago may freely shirk.  It is a federal law and as such may be challenged on an independent ground, as Chicago has here, notwithstanding that certifying

- 18 -

**SA38**

compliance with Section 1373 appears as a condition for Byrne JAG funding.

The Court now turns to the statute itself: Section 1373. Congress enacted Section 1373 in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (included as part of the Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat 3009 (1996)). The Act is part of a comprehensive federal statutory scheme to regulate immigration. *See Arizona v. United States*, 567 U.S. 387, 401 (2012); *DeCanas v. Bica*, 424 U.S. 351, 353 (1976). In relevant part, Section 1373 provides:

(a) In general

Notwithstanding any other provision of Federal, State, or local law, **a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information** regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, **no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following** with respect to information regarding the immigration status, lawful or unlawful, of any individual:

- 19 -

**SA39**

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

8 U.S.C. § 1373.

The Court's inquiry "begin[s] with the time-honored presumption that [a statute] is a constitutional exercise of legislative power." *Reno v. Condon*, 528 U.S. 141, 148 (2000) (internal quotation marks and citation omitted). But this presumption has limits. "While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York,* 505 U.S. at 162 (applying anticommandeering doctrine). Not all laws prohibiting state action are constitutionally problematic. In *Reno*, for example, the Court denied a Tenth Amendment challenge to a federal law restricting both state and private actors from disclosing or disseminating personal information provided in applications for driver's licenses. 528 U.S. at 151. That law did not "require the States in their sovereign capacity to regulate their own citizens," but rather permissibly regulated the States "as the

owners of data bases." *Id.* In contrast stands *Printz,* wherein the Court struck down a statute requiring state officials to perform background checks on prospective handgun purchasers. 521 U.S. at 935. There, the federal scheme did not apply with equal force to State and private actors; instead, the law commanded state officers—and only state officers—to administer and enforce a federal regulatory program. *Id.; see Travis v. Reno*, 163 F.3d 1000, 1003-04 (7th Cir. 1998).

The question under *Murphy, Reno,* and *Printz* is whether Section 1373 "evenhandedly regulates an activity in which both States and private actors engage," as opposed to regulating activities undertaken by government entities only, thus conscripting state action in the implementation of a federal scheme. *Murphy*, 138 S. Ct. at 1478. In other words, although the federal government may "pervasively regulate[] the states as marketplace participants," it may not "call[] on the states to use their sovereign powers as regulators of their citizens." *Travis v. Reno*, 163 F.3d 1000, 1004-05 (7th Cir. 1998). Section 1373 imposes two overlapping regulations: First, subsection (a) prohibits any "government entity or official" from restricting any other "government entity or official" from exchanging immigration status information with INS. As is apparent, subsection (a) is

directed exclusively to state actors. Second, subsection (b) prohibits any "person or agency" from doing the same. 8 U.S.C. § 1373. Subsection (b) does not meaningfully expand the statute's scope by including "person[s]": Who but a government actor can restrict the activities of a government entity or official? *See id.*

The import is clear: Section 1373 does not evenhandedly regulate activities in which both private and government actors engage. Thus, the saving grace of *Reno* does not apply here. Rather, this statute mandates that local government employees have the option of furnishing immigration information to the INS while acting in their official, state-employed capacities. Unlike in *Reno,* the anticommandeering doctrine applies, and here it is offended in four ways.

First, Section 1373 supplants local control of local officers; the statute precludes Chicago, and localities like it, from limiting the amount of paid time its employees use to communicate with INS. This weighs heavily on the constitutionality analysis. A state's ability to control its officers and employees lies at the heart of state sovereignty: "To say that the Federal Government cannot control the State, but can control all of its officers, is to say nothing of significance. Indeed, it merits

- 22 -

**SA42**

the description 'empty formalistic reasoning of the highest order.'" *Printz*, 521 U.S. at 931 (citation omitted). Adding credence to this constitutional objection is the fact that the information at issue is state-owned and only accessible to city employees in their official capacities. *Id.* at 932 n.17 (noting that a constitutionally-impermissible statute required state employees "to provide information that belongs to the State and is available to them only in their official capacity"). To illustrate further, it is clear under *Printz* that an explicit federal directive to state employees is unconstitutional. *See Murphy*, 138 S. Ct. at 1477 (characterizing *Printz*). Given the pre-*Murphy* command-versus-proscription dichotomy, Congress, perhaps cautious of running afoul of the Tenth Amendment by demanding that states share immigration-status information, drafted Section 1373 to avoid the potential *Printz* problem by framing it as a prohibition on, rather than a directive to, state employees. Rather than requiring state employees to share immigration information with federal authorities, Section 1373 prohibits state policymakers from *preventing* their employees from sharing. *See* 8 U.S.C. § 1373. Yet as *Murphy* demonstrates, this draftsmanship does not diminish the infringement on state sovereignty. To analogize to *Printz*: the Brady Act considered

- 23 -

**SA43**

there would still be unconstitutional even if, rather than affirmatively requiring state employees to complete background checks, the Act instead prohibited state policymakers from preventing state employees from doing the same.

Second, the statute indirectly constrains local rule-making by precluding city lawmakers from passing laws, like the Welcoming City Ordinance, that institute locally-preferred policies which run counter to Section 1373. This was the concern squarely addressed in *Murphy*, where the Court observed that a "more direct affront to state sovereignty is not easy to imagine" than in a federal law that "dictates what a state legislature may and may not do." *Murphy*, 138 S. Ct. at 1478. True, the statute in *Murphy*, which explicitly forbade local lawmaking, presented a clearer case than the one at bar. *See id.* But the spirit of *Murphy* is not diminished here, where Section 1373 imposes a blanket, if indirect, prohibition on certain local lawmaking. *See id.; see also Printz*, 521 U.S. at 928 ("It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority."); *United States v. California*, No. 2:18 CV 490, 2018 WL 3301414, at *13 (E.D. Cal. July 5, 2018) ("Section 1373 does just what *Murphy* proscribes: it tells States they may not prohibit (i.e., through legislation) the

- 24 -

**SA44**

sharing of information regarding immigration status with the INS or other government entities.")

Third, Section 1373 redistributes local decision-making power by stripping it from local policymakers and installing it instead in line-level employees who may decide whether or not to communicate with INS. This effects a federally-imposed restructuring of power within state government. *See* Spencer E. Amdur, *The Right of Refusal: Immigration Enforcement and the New Cooperative Federalism*, 35 Yale L. & Pol'y Rev. 87, 136 (2016). The Supreme Court tussled with a similar problem in *Printz*. In that case, the background-check law required local officials to make "reasonable efforts" within five days of receiving information regarding a prospective gun purchase to determine whether the sales therein described were lawful. 521 U.S. at 905. The government argued unsuccessfully that the anticommandeering doctrine prohibits only federal statutes compelling states to make certain law, but not statutes that simply require local officials to provide "limited, non-policymaking help in enforcing [federal] law." *Id.* at 927. The Supreme Court did not agree with that distinction, pointing out that the decision concerning what "reasonable efforts" should be expended in conducting a background check is "preeminently a matter of policy." *Id.* at 927-28. In

- 25 -

SA45

this case, Section 1373 prohibits the City from restricting its employees' communications with federal immigration authorities. As such, the degree of discretion afforded to each City employee or police officer is broad indeed. Beyond simply determining what constitutes "reasonable efforts," as in *Printz*, City employees may decide for themselves whether to communicate with federal authorities *at all*. *See id*. This is certainly a matter a policy, and yet it is a matter that, under Section 1373, state policymakers are not allowed to touch.

Finally, because Section 1373 eliminates the City's ability to control its employees' communications with INS, the statute prevents Chicago from extricating itself from federal immigration enforcement. Section 1373 thus impermissibly forecloses *New York*'s "critical alternative": the option of non-participation in a federal program. *New York*, 505 U.S. at 176.

Beyond this, the policy rationales undergirding the anticommandeering principle further counsel its application in this case. *Murphy* articulated three such rationales: First, the principle protects individual liberty by dividing authority between federal and state governments; second, it promotes political accountability by clarifying whether laws and policies are promulgated by federal or state actors; and third, it prevents

- 26 -

**SA46**

Congress from shifting the costs of regulation to the states. *Murphy*, 138 S. Ct. at 1477. Section 1373 flouts these rationales; the statute makes it difficult for citizens to distinguish between state and federal policy in the immigration context by barring states from adopting policies contrary to those preferred by the federal government. The statute also forces states to allow their employees to participate in the federal scheme, shifting employee time—and thus corresponding costs—to federal initiatives and away from state priorities.

Despite all this, the Attorney General contends that Section 1373 does not pose nearly the regulatory imposition Chicago claims. Instead, he says, the dictates of Section 1373 boil down to mere information sharing, which the Attorney General believes to be exempt from Tenth Amendment scrutiny. To that end, the Attorney General opines that "the analysis in *Murphy* would likely have been very different if PASPA had only required States to share information regarding sports betting operations to facilitate federal regulation." (Def.'s Resp. at 4, Dkt. No. 176.) This Court is not so sure.

The Attorney General contends that information sharing is immune from challenge under the anticommandeering doctrine. From the Attorney General's view, Congress could constitutionally

- 27 -

**SA47**

*require* states to provide the federal government with immigration-related information. And if that is constitutional, then surely a statute merely requiring that states *allow* their employees to provide immigration-related information is also constitutional. *Cf. Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 213-14 (4th Cir. 2002) (finding no Tenth Amendment violation where state medical boards were required to share doctors' licensure information). The Attorney General rests his argument in favor of an information sharing carve-out on *Printz*. It is true that *Printz*'s dicta signals that such an exception might exist, but the opinion neither states an exception conclusively nor provides any guidance as to its contours. In *Printz*, the Supreme Court distinguished the unconstitutional Brady Act from a law "requir[ing] only the provision of information to the Federal Government," but declined to elaborate on the distinction. 521 U.S. at 917-18. Justice O'Connor's concurrence echoed the distinction, remarking that "the Court appropriately refrains from deciding whether other purely ministerial reporting requirements imposed by Congress on state and local authorities pursuant to its Commerce Clause powers are similarly invalid." *Id.* at 936 (O'Connor, J., concurring). Justice O'Conner cited 42 U.S.C. § 5779(a) as an example of such a federal statute, which requires

- 28 -

**SA48**

state and local law enforcement agencies to report cases of missing children to the DOJ. *Id.* In this way, the Supreme Court left open whether a federal law demanding "only the provision of information to the Federal Government" or else imposing "purely ministerial reporting requirements" violates the anticommandeering doctrine. *Id.* at 918, 936. Now, the Attorney General wants this Court to go further than the Supreme Court has and hold that information sharing is constitutionally unique. Though this Court acknowledges the open question, the Attorney General's request is a stretch too far. This Court will not, in the face of clear guidance from *Murphy* and *Printz*, hang its hat on a possible information sharing carve-out derived solely from dicta.

Still, the Attorney General argues that policy rationales bolster his argument: Federal immigration efforts could be frustrated if localities may prohibit their employees from sharing immigration-related information with federal authorities. But these rationales do not advance his position. First, the Seventh Circuit has already rejected the Attorney General's argument that finding the Conditions unlawful allows the City to "thwart federal law enforcement," characterizing such argument as a "red herring." *See City of Chicago v. Sessions*, 888 F.3d at 282 ("[N]othing in this case involves any affirmative *interference* with federal law

- 29 -

**SA49**

enforcement at all, nor is there any interference whatsoever with federal immigration authorities. The only conduct at issue here is the refusal of the local law enforcement to aid in civil immigration enforcement . . . ."); *see also United States v. California*, No. 2:18 CV 490, 2018 WL 3301414, at *18 (E.D. Cal. July 5, 2018) ("Standing aside does not equate to standing in the way.").

Granted, the concern that federal enforcement efforts will be impeded obviously extends to other federal initiatives that depend upon state information. *See, e.g.*, Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 806, 84 Stat. 922, 939-40 (creating commission to evaluate national gambling policy, which was "authorized to call upon . . . States to furnish . . . statistical data, reports, and other information as the Commission deems necessary"). Yet this Court has found no controlling authority holding that such information sharing provisions are constitutionally impervious, and a mere policy rationale does not empower the Court to craft a constitutional exception heretofore unidentified in Tenth Amendment jurisprudence. Put more finely: A federal need for state information does not automatically free the federal government of the sometimes laborious requirement to acquire that information by constitutional means. *See Printz*, 521

U.S. at 932-33 (rejecting the application of a balancing analysis even where the federal law at issue served important purposes); *New York*, 505 U.S. at 181 ("State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting))). In short, the federalist diffusion of power necessarily creates political barriers and inefficiencies. But these inefficiencies are part of federalism's intended structure, not imperfections to be remedied by judicially-wrought consolidation of power. *See New York*, 505 U.S. at 187 ("[T]he Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.").

Furthermore, Section 1373 is more than just an information-sharing provision. As described above, Section 1373 prohibits certain rule making by state policymakers. In doing so, Section 1373 presents more like the statute in *Murphy* and less like the innocuous missing-children law mentioned in Justice O'Connor's *Printz* concurrence. *Compare Murphy*, 138 S. Ct. at 1478, *with Printz*, 521 U.S. at 936 (O'Connor, J., concurring) (citing 42

- 31 -

**SA51**

U.S.C. § 5779(a)). Whether a different federal law merely requiring the submission of information but not explicitly prohibiting any state policymaking would be permissible under an information sharing carve-out is irrelevant; that is not the law before the Court now.

In sum, Section 1373 impermissibly directs the functioning of local government in contravention of Tenth Amendment principles, and the Attorney General's reliance on the purported information sharing carve-out—which is not confirmed in *Printz* nor in any other controlling case—cannot save it. Section 1373 is thus unconstitutional on its face. *See United States v. California*, No. 2:18 CV 490, 2018 WL 3301414, at *14 (E.D. Cal. July 5, 2018) (finding the constitutionality of Section 1373 "highly suspect"); *City of Philadelphia v. Sessions*, No. 17-3894, 2018 WL 2725503, at *31-33 (E.D. Pa. June 6, 2018) (holding Section 1373 unconstitutional under the anticommandeering doctrine).

In so holding, this Court must respectfully disagree with *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999). In that case, New York City implemented an executive order prohibiting City employees from providing federal immigration authorities with information concerning the immigration status of any individual unless certain circumstances applied. *Id.* at 31-33. The City

then sued, challenging the constitutionality of Section 1373 under the Tenth Amendment. *Id.* at 33. The Second Circuit upheld the statute's constitutionality, refusing to permit the City to engage in what the court of appeals called "passive resistance" to federal programs. *Id.* at 35. For several reasons, this Court declines to follow that decision's lead.

First, the Supreme Court has explicitly approved of the type of passive resistance criticized in *City of New York*, finding that states have the prerogative to "not yield[] to federal blandishments when they do not want to embrace the federal policies as their own." *NFIB*, 567 U.S. at 579 (internal quotation marks and citation omitted). Second, as this Court has noted once before, the balancing applied in *City of New York* is not the appropriate analysis in weighing encroachments on federalism. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 947 (citing *Printz*, 521 U.S. at 932; *Travis v. Reno*, 163 F.3d 1000, 1003 (7th Cir. 1998) (both opinions disavowing use of balancing analysis in Tenth Amendment challenges)). And yet, the strongest rationale for departing from *City of New York* is the same reason this Court took up reconsideration of Section 1373's constitutionality in the first place. *City of New York*'s outcome ultimately does not depend on the balancing test it employs, but rather the distinction it

- 33 -

SA53

draws between affirmative obligations and proscriptions. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 947-48 (characterizing *City of New York*). This is the same distinction that motivated this Court's earlier finding that Chicago was not likely to succeed on its anticommandeering argument, and it is the same distinction the Supreme Court has since deemed "empty." *See Murphy*, 138 S. Ct. at 1478. For the same reasons explained above, the Court believes that *Murphy*'s holding deprives *City of New York* of its central support and thus provides the Attorney General little counterweight to Chicago's argument against this statute's constitutionality. *See id.* In the end, Section 1373 requires local policymakers to stand aside and allow the federal government to conscript the time and cooperation of local employees. This robs the local executive of its autonomy and ties the hands of the local legislature. Such affronts to State sovereignty are not countenanced by the anticommandeering principle of the Constitution. Section 1373 is unconstitutional and cannot stand.

### C. *Ultra Vires* and Separation of Powers (Counts I and II)

In Counts I and II, Chicago claims that Congress did not confer authority on the Attorney General to impose the Conditions, so his imposition treads upon the separation of powers and is *ultra vires*. *City of Arlington v. FCC*, 569 U.S. 290, 317 (2013)

("Agencies are creatures of Congress; 'an agency literally has no power to act . . . unless and until Congress confers power upon it." (internal quotation marks and citation omitted)).

### 1. Notice and Access Conditions

The Attorney General moves to dismiss Counts I (*ultra vires*) and II (separation of powers), arguing that the Byrne JAG statute provides authority to impose the Conditions, and Chicago moves for summary judgment on the same counts. This Court previously granted Chicago a preliminary injunction as to the Notice and Access Conditions, finding that Chicago was likely to succeed on its argument that the Byrne JAG statute does not authorize them. *City of Chicago v. Sessions*, 264 F. Supp. 3d at 937-40. A panel of the Seventh Circuit affirmed that decision. *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *en banc reh'g granted on other grounds, vacated in part by* Order, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128.

In affirming, the Seventh Circuit found Chicago likely to succeed in arguing that neither Byrne JAG nor any other statute grants the Attorney General "the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for the failure to comply with those conditions." *Id.* at 284. In so

- 35 -

SA55

holding, the court rejected the Attorney General's "untenable" contention that 34 U.S.C. § 10102(a)(6), which sets forth the functions of the Assistant Attorney General for the Office of Justice Programs, provides the Attorney General an expansive, stand-alone grant of authority to impose *any* conditions on grant recipients. *Id.* at 284-85. The court added that the structure of § 10102 and the Byrne JAG statute supported that conclusion, as § 10102 would be "an odd place indeed" for Congress to have squirreled away a sweeping grant of authority. *Id.* The Seventh Circuit concluded that "[t]he Attorney General in this case used the sword of federal funding to conscript state and local authorities to aid in federal civil immigration enforcement. But the power of the purse rests with Congress, which authorized the federal funds at issue and did not impose any immigration enforcement conditions on the receipt of such funds." *City of Chicago v. Sessions*, 888 F.3d at 277.

In light of the Seventh Circuit's reasoning and considering that the Attorney General has not mustered any other convincing argument in support of greater statutory authority, nothing has shaken this Court from the opinion it expressed at the preliminary injunction stage. As such, for the same reasons stated in this Court's preliminary injunction ruling and the Seventh Circuit's

- 36 -

SA56

opinion, the Court holds that the Notice and Access Conditions are unlawful.  The Attorney General's Motion to Dismiss is denied, and Chicago's Motion for Summary Judgment is granted on Counts I and II as to the Notice and Access Conditions.

### 2.  Compliance Condition

The Attorney General's authority to impose grant conditions extends only as far as Congress allows.  *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself.").  Whether the Attorney General has authority to impose the third and final condition turns on the meaning of the phrase "all other applicable Federal laws" as it appears in the Byrne JAG statute.  Because this issue was not considered on appeal, the Court must proceed without the benefit of the Seventh Circuit's guidance.  *See City of Chicago v. Sessions*, 888 F.3d at 280 (expressing "no opinion" as to the denial of the Compliance Condition).

We start with the text:

(A) . . . To request a grant under this part, the chief
executive officer of a State . . .  shall submit an
application to the Attorney General . . . in such form
as the Attorney General may require.  **Such application
shall include** the following:
[. . .]
    (5) **A certification . . . that--**
        (A) the programs to be funded by the grant
        meet all the requirements of this part;

- 37 -

**SA57**

> (B) all the information contained in the
> application is correct;
> (C) there has been appropriate coordination
> with affected agencies; and
> (D) **the applicant will comply with all
> provisions of this part and** ***all other
> applicable Federal laws***.

34 U.S.C. § 10153(A)(5)(D) (emphasis added). The parties offer competing interpretations of this language. The Attorney General argues that the word "applicable" refers to laws applicable to the grantee—here, the City—and thus covers any federal law that applies to Chicago; it follows that because Section 1373 plainly applies to "local government entit[ies]," Section 1373 falls within that broad sweep. 8 U.S.C. § 1373. Chicago offers a far narrower interpretation, comprising just those federal laws applicable to federal grantees generally. That is, according to Chicago, the "applicable Federal laws" countenanced by the Byrne JAG statute include only those laws that "by their express terms govern recipients of federal funds," such as 42 U.S.C. § 2000d, which prohibits discrimination in "any program or activity receiving Federal financial assistance." (Pl.'s Mem. in Supp. of Summ. J. at 6, Dkt. No. 152.) Chicago concludes that because Section 1373 does not expressly apply to federal grants, it is not an "applicable law" under the Byrne JAG statute.

The Court already dealt with this question once, in its preliminary injunction ruling, and sees no convincing reason to depart from the analysis conducted there. Simply put, this statute is most consistent and coherent when "all other applicable Federal laws" is "read to mean what it literally says." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008) (citation omitted). The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254-55 (1992) (citations omitted). Here, the language is unambiguously expansive, the prefatory "all other" indicating a broad reading in line with the Attorney General's interpretation. *Cf. Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991) ("By itself, the phrase 'all other law' indicates no limitation."). Had Congress intended to limit § 10153(A)(5)(D)'s reach to only a specific body of federal grant-making laws, as Chicago argues, it easily could have. But Congress opted not to include additional, limiting language; instead, it used the capacious phrase "all other applicable Federal laws." The Court is unpersuaded by Chicago's attempt to create ambiguity where a plain reading of the Byrne JAG statute suggests none. *See id.*

- 39 -

If the Court were conducting this *ultra vires* inquiry in a vacuum, it would conclude that because Section 1373 is generally applicable to Chicago, Section 1373 falls within the "applicable Federal laws" described in the Byrne JAG statute and thus counts among those statutes with which the Attorney General may lawfully demand compliance as a condition for funding. 34 U.S.C. § 10153(A)(5)(D). Instead, the Court concludes this analysis in light of its earlier finding that Section 1373 violates the anticommandeering principle and is unconstitutional. As an unconstitutional law, Section 1373 automatically drops out of the possible pool of "applicable Federal laws" described in the Byrne JAG statute. *Cf. Branch v. Smith*, 538 U.S. 254, 281-82 (2003) (observing that adherence to an unconstitutional state law is not mandated by a federal statute requiring congressional redistricting "as state law requires"). Thus, it makes no difference that the Court reads "all other applicable Federal laws" broadly; no matter the breadth of this provision, it will never capture an unconstitutional statute. *See id.* Accordingly, the Attorney General has no authority to demand compliance with Section 1373, hereby deemed unconstitutional, under the Byrne JAG statute.

- 40 -

SA60

It is worth emphasizing a key constitutional distinction between Section 1373 and the Compliance Condition. Even though the Compliance Condition is substantively the same as Section 1373 because the Condition was designed to reinforce Section 1373's requirements, the two are constrained by different constitutional limitations. The former is a federal statute carrying the force the law, while the latter is merely a condition imposed on a federal grant that Chicago may freely decline. This distinction matters because, as already described, the anticommandeering doctrine does not limit the conditions agencies may attach to federal grants. *See Dole*, 483 U.S. at 210 (reciting that the Tenth Amendment's limit on congressional regulation of state affairs does not equally limit the conditions attachable to federal grants). Thus, the Compliance Condition does not fail because it violates the anticommandeering doctrine. It fails because the statutory authority on which it depends sanctions only the imposition of "applicable" federal laws; because Section 1373 no longer falls within that category, the authority for the Compliance Condition has been stripped away. *Cf. Branch*, 538 U.S. at 281-82.

- 41 -

**SA61**

Accordingly, the Attorney General's Motion to Dismiss must be denied, and Chicago's Motion for Summary Judgment must be granted on Counts I and II as to the Compliance Condition.

*        *        *

Granting Chicago summary judgment on Counts I and II affects the balance of Chicago's claims. It renders the remaining counts— Counts III, V, VI, and VII—moot. The Court dismisses them as such.

### D.  Injunctive Relief

#### 1.  *Permanent Injunction*

As discussed above, this Court grants Chicago's Motion for Partial Summary Judgment on Counts I and II as to all three Conditions. With the merits decided, Chicago asks the Court to issue a permanent nationwide injunction. The Court may issue permanent injunctive relief if the moving party demonstrates:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The permanent injunction standard is essentially the same as the standard for a preliminary injunction except that the plaintiff must in fact succeed on its claims rather than merely show a

- 42 -

SA62

likelihood of success. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987); *compare id.*, *with Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). This Court discussed in detail how Chicago met the four factors in its preliminary injunction ruling and now incorporates that analysis here. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 949-51. The material facts have not changed since that earlier ruling and adding the Compliance Condition to the mix does not change the Court's evaluation of the harm caused by the unlawful Conditions. All three Conditions undermine Chicago's ability to protect its relationship with its immigrant communities which the City contends is vital to effective law enforcement. As reflected by a fresh consideration of the four injunction factors, the circumstances here continue to demand equitable relief.

First, Chicago's harm is irreparable and cannot be compensated by monetary damages. Chicago submits an affidavit from Lieutenant Kevin Hannigan, a longtime Chicago police officer, explaining that if the City complies with the Conditions, undocumented immigrants will be less likely to interact and cooperate voluntarily with local police, believing that such contacts could put them or their families at risk of deportation. (Def.'s Resp. to Pl.'s Facts ¶¶ 7, 11, Dkt. No. 168; Hannigan Decl.

¶¶ 2, 5, Dkt. No. 155.)  In Lieutenant Hannigan's view, informed by twenty-nine years of experience, "requiring Chicago's police officers to request immigration status would drive a wedge between [the CPD] and the local communities."  (Hannigan Decl. ¶ 5, Dkt. No. 155.)  Doing so "would run the risk of alienating portions of the Chicago population; could increase hostility toward law enforcement in vulnerable areas of the City; and could deprive officers of valuable sources of information." *Id.*  If Chicago were to adopt such a policy, he avers "that the type of cooperation [the CPD is] able to achieve with immigrant communities would be materially damaged." *Id.*  Chicago adopted this view in its Welcoming City Ordinance, which the City clearly intended to protect against such harms: The Ordinance itself states that "[t]he cooperation of the City's immigrant communities is *essential* to prevent and solve crimes and maintain public order, safety and security in the entire City" because the "assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all . . . residents." § 2-173-005 (emphasis added).

The Attorney General takes the contrary view, arguing that so-called sanctuary policies increase crime and make cities that implement them less safe.  Of this the Court is not convinced.

- 44 -

**SA64**

Chicago points out that not only are there no peer-reviewed studies supporting the AG's proposed correlation, the scholarship on the subject actually suggests that such policies do not affect, and might even lower, crime rates. (*See* Def.'s Resp. to Pl.'s Facts ¶¶ 24-25 (noting University of California Riverside study found "no support" for proposition that "sanctuary policies lead to increased crime" and Center for American Progress study found "crime [] statistically significantly lower in sanctuary counties compared to nonsanctuary counties").) But the Court need not delve into this factual determination. *Cf. City of Chicago v. Sessions*, 888 F.3d 272, 277 (7th Cir. 2018) ("Our role in this case is not to assess the optimal immigration policies for our country."). The key point here is that the Attorney General offers no facts or affidavits belying Chicago's declarations concerning the connections between its policies and the effectiveness of its police force. The Attorney General never addresses the above-discussed harm to Chicago's immigrant communities or considers that such harm may affect the CPD's ability to prevent and solve crimes. (*See* Def.'s Resp. to Pl.'s Facts ¶¶ 5, 7, 11; May 31, 2016 Office of Inspector General Mem., Ex. H to Def.'s Request for Judicial Notice, Dkt. No. 140-8; July 25, 2017 DOJ Press Release, Ex. R to Pl.'s Request for Judicial Notice, Dkt. No. 157-18.) As

such, this Court finds that Chicago's compliance with the Conditions would damage local law enforcement's relationship with immigrant communities and decrease the cooperation essential to prevent and solve crimes both within those communities and Chicago at large. Trust once lost is not easily restored, and as such, this is an irreparable harm for which there is no adequate remedy at law. *Cf. Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (finding that loss of goodwill can qualify as an irreparable harm for which there is no adequate remedy at law). Beyond that, the Hobson's choice that now confronts the City—whether to suffer this injury or else decline much-needed grant funds—is not a choice at all and is itself sufficient to establish irreparable harm. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding injunctive relief available where plaintiffs faced choice between continually violating state law and facing huge liability or violating the law once as a test case but suffering the injury of obeying the allegedly unconstitutional law during the pendency of review); *see also City of Chicago v. Sessions*, 264 F. Supp. 3d at 950. Additionally, a constitutional injury alone can constitute irreparable harm. *See* 11A Wright & Miller, Federal Practice & Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of

- 46 -

**SA66**

a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *see also Ezell v. City of Chicago,* 651 F.3d 684, 698-700 (7th Cir. 2011); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017), *appeal dismissed as moot*, *sub nom. City & County of San Francisco v. Trump*, No. 17 16886, 2018 WL 1401847, at *1 (9th Cir. Jan. 4, 2018). Chicago faces such an injury here, where the Attorney General subjects the City's receipt of grant funds to unconstitutionally imposed Conditions. For all of those reasons, Chicago demonstrates irreparable harm and lacks an adequate remedy at law.

The balance of hardships weighs in Chicago's favor as well. As already explained, Chicago will suffer irreparable harm if the Attorney General's imposition of the Conditions is not enjoined. If Chicago accepts the Byrne JAG funds and its Conditions, the City's relationship with its immigrant communities will be degraded, making the City's task of preventing and prosecuting crime more difficult. (Def.'s Resp. to Pl.'s Facts ¶¶ 5, 7, 11.) The picture is no brighter if Chicago declines the funds. If it does so, it will do so only to avoid the Conditions which the Attorney General has no authority or right to impose. Chicago intends to use the FY 2017 funds to expand its use of the

- 47 -

ShotSpotter acoustic-surveillance technology into two communities plagued by high rates of gun violence. (*Id.* ¶ 15.) According to Chicago's submissions, implementing this technology has a direct and positive effect on public safety. (*See id.*; Sach Decl. ¶ 15 (reciting that Chicago had 302 fewer shootings compared to the equivalent period in 2016 and that more than half of the reduction came from areas that recently deployed ShotSpotter).) But without the already-budgeted FY 2017 Byrne JAG funds, Chicago will not be able to expand its use of that technology as planned. (Sach Decl. ¶ 11.) Thus, the Conditions' continued application causes Chicago hardship by unlawfully blocking it from funds it could otherwise accept without grievance.

On the other side of the scale, the Attorney General experiences little hardship from the imposition of this injunction. First, as the Seventh Circuit recognized, Chicago, "like other 'welcoming' or 'sanctuary' cities or states, does not interfere in any way with the federal government's lawful pursuit of its civil immigration activities, and presence in such localities will not immunize anyone to the reach of the federal government. The federal government can and does freely operate in 'sanctuary' localities." *City of Chicago v. Sessions*, 888 F.3d at 281 (citation omitted). True, the corresponding downturn in

- 48 -

**SA68**

cooperation from local jurisdictions could, as the Attorney General fears, decrease the effectiveness of federal immigration enforcement. (*See* May 31, 2016 Office of Inspector General Mem., Ex. H to Def.'s Request for Judicial Notice, Dkt. No. 140-8; July 25, 2017 DOJ Press Release, Ex. R to Pl.'s Request for Judicial Notice, Dkt. No. 157-18.) Yet while the Attorney General would prefer to avoid that outcome, his present attempt to steer around it relies upon unlawfully imposing unauthorized grant Conditions. Though the Attorney General has many tools at his disposal to increase such local cooperation, conditioning the Byrne JAG grant as he has here is not one of them. The Attorney General thus suffers little hardship here because the injunction does not strip away any option he could otherwise exercise. In the end, the weight of the hardships rests with Chicago.

Finally, the public interest is served by issuing a permanent injunction. The Attorney General must administer the Byrne JAG grant program in conformance with the limited statutory authority Congress affords him. As explained at length, Congress provided the Attorney General no authority to impose the Conditions. The role of the judiciary to enjoin conduct by the executive that crosses its constitutionally-imposed limits is as essential to our form of government as it is well-established:

- 49 -

> The founders of our country well understood that the concentration of power threatens individual liberty and established a bulwark against such tyranny by creating a separation of powers among the branches of government. If the Executive Branch can determine policy, and then use the power of the purse to mandate compliance with that policy by the state and local governments, all without the authorization or even acquiescence of elected legislators, that check against tyranny is forsaken. . . . It falls to us, the judiciary, as the remaining branch of the government, to act as a check on such usurpation of power. We are a country that jealously guards the separation of powers, and we must be ever-vigilant in that endeavor.

*City of Chicago v. Sessions*, 888 F.3d at 277. By enjoining the unlawful Conditions, the Court acts as a check on the executive's encroachment of congressional power and thus serves the public interest by constraining the Attorney General's authority in order to preserve the Byrne JAG program as Congress envisioned. *Cf. Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest." (citations omitted)).

In conclusion, Chicago has demonstrated all four requirements for permanent injunctive relief: (1) Chicago's harm is irreparable; (2) such harm cannot be fully remedied by monetary damages; (3) the balance of hardships favors Chicago; and (4) a permanent injunction will not undermine the public interest. *See eBay,* 547 U.S. at 391; *accord City of Philadelphia v. Sessions*, No. 17-3894, 2018 WL 2725503, at *40-43 (E.D. Pa. June 6, 2018)

(granting permanent injunctive relief in analogous factual circumstances); *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1100-01 (C.D. Cal. 2018) (same). Accordingly, the Court finds permanent injunctive relief warranted as to all three Conditions.

## 2. Scope of the Permanent Injunction

The scope of the preliminary injunction is currently on appeal before the Seventh Circuit sitting *en banc*. This Court entered the preliminary injunction on September 15, 2017, enjoining the Attorney General from imposing Conditions nationwide. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 951-52. On appeal, the Seventh Circuit panel unanimously affirmed this Court's ruling that the Attorney General lacks the statutory authority to impose the Conditions and a divided panel affirmed this Court's corresponding issuance of a nationwide preliminary injunction. *See City of Chicago v. Sessions*, 888 F.3d at 293. The Attorney General petitioned for rehearing *en banc* solely as to the nationwide scope of the injunction, and the Seventh Circuit granted that request. *See En Banc Order*, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128. While the *en banc* rehearing is pending, the Seventh Circuit stayed the nationwide scope of the preliminary injunction, thus limiting it,

- 51 -

**SA71**

for now, to Chicago. *See* Order, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. June 26, 2018), Dkt. No. 134. The eventual *en banc* ruling may well shed much-needed light on the proper scope of such injunctions, which is at present a matter of some debate. *See City of Chicago v. Sessions*, No. 17 C 5720, 2017 WL 4572208, at *4 (N.D. Ill. Oct. 13, 2017) (discussing the advantages and disadvantages of nationwide injunctions); *see, e.g.*, *Trump v. Hawaii,* 138 S. Ct. 2392, 2425-29 (2018) (Thomas, J., concurring) (questioning the legality and historical underpinnings of universal or nationwide injunctions); *id.* at 2446 n.13 (Sotomayor, J., dissenting) (finding the district court did not abuse its discretion by granting nationwide relief); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 469 (2017) (arguing injunctions should only constrain defendant's conduct against the plaintiff); Spencer E. Amdur and David Hausman, *Nationwide Injunctions and Nationwide Harm*, 131 Harv. L. Rev. Forum 49 (2017) (responding to Bray's criticisms of nationwide injunctions); Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. (forthcoming 2018) (defending the use of nationwide injunctions); Getzel Berger, Note, *Nationwide Injunctions Against the Federal Government: A Structural Approach*, 92 N.Y.U. L. Rev. 1068, 1100 (2017) (arguing injunctions against

- 52 -

SA72

the federal government should extend only to the circuit where the district court sits).

And yet, though the *en banc* rehearing is pending, these district court proceedings do not freeze in place. When a preliminary injunction goes up on appeal, the district court retains the power to reach the merits of a case and, in fact, is duty-bound to do so. *See* 16 Wright & Miller, *Federal Practice & Procedure* § 3921.2 (3d ed.) (collecting cases and recognizing "cases involving injunctive relief are apt to present an urgent need for action"); *Staffa v. Pollard*, 597 F. App'x 893, 895 (7th Cir. 2015) ("[A]n appeal from an interlocutory decision—here, the denial of a preliminary injunction—does not divest a district court of jurisdiction or prevent the court 'from finishing its work and rendering a final decision.'" (quoting *Wis. Mut. Ins. Co. v. United States*, 441 F.3d 502, 504 (7th Cir. 2006)) (citations omitted)); *qad. Inc. v. ALN Assocs., Inc.*, 974 F.2d 834, 837 (7th Cir. 1992) (finding the district court "on solid legal ground" where it dissolved an injunction even while appeal of the injunction was pending). Federal Rule of Civil Procedure 62(c) specifically contemplates this circumstance and specifies that the trial court retains power to "suspend, modify, restore, or grant an injunction" during the pendency of the interlocutory appeal.

FED. R. CIV. P. 62(c); *see also State v. Trump*, 263 F. Supp. 3d
1049, 1056 (D. Haw. 2017) ("Federal Rule of Civil Procedure 62(c)
allows this Court to issue further orders with respect to an
injunction it issued, notwithstanding appeal, in order to preserve
the status quo or ensure compliance with its earlier orders."),
*aff'd,* 871 F.3d 646 (9th Cir. 2017). District courts routinely
enter summary judgment and convert injunctions from preliminary to
permanent while such appeals are pending. *See, e.g., FTC v.
Assail, Inc.*, 98 F. App'x 316, 317 (5th Cir. 2004) ("[I]t is
settled that a district court has jurisdiction to proceed with the
merits of the case and to grant a permanent injunction while an
appeal of a preliminary injunction order is pending." (citations
omitted)); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171,
1174 (6th Cir. 1995) (same); *cf. United States v. City of Chicago*,
534 F.2d 708, 711 (7th Cir. 1976) (recognizing that "an order
granting or denying an interlocutory or preliminary injunction is
merged in a decree or order granting or denying the permanent
injunction, and that when both orders are appealed from, the appeal
from the former will be dismissed").

Even so, the weight of practice and respect for both judicial
efficacy and higher authorities dictate that district courts
should use such power only in a manner that preserves the status

- 54 -

**SA74**

quo and thus the integrity of the appeal. *See Aljabri v. Holder*, 745 F.3d 816, 820 (7th Cir. 2014) (noting that a district court should not modify an order up on interlocutory appeal because to do so is "at best wasteful of resources and at worst chaotic"); *Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 819-20 (5th Cir. 1989) (finding that district courts should not act in a way that could divest the court of appeals from jurisdiction during the pendency of an interlocutory appeal); *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962) (same); *cf. N.W. Enters. Inc. v. City of Houston*, 372 F.3d 333, 338 (5th Cir. 2004) (per curiam) (holding district court lacked jurisdiction to reverse injunctive relief already on appeal). Beyond this, the Court notes that there have been no intervening changes in facts or law since the preliminary injunction ruling that would shift this Court's understanding of the original injunction's propriety. A Seventh Circuit reversal *en banc* would, of course, be such a change, but until such a ruling comes down, this Court will not depart from its earlier analysis, which will preserve the status quo and the integrity of the pending appeal. As such, the Court now orders a permanent nationwide injunction as to all three Conditions, consistent with the Court's earlier ruling enjoining

- 55 -

SA75

the Attorney General from imposing the Notice and Access Conditions nationwide.

However, recognizing and deferring to the Seventh Circuit's stay of the preliminary injunction as to all parts of the country beyond Chicago, this Court stays the nationwide scope of the permanent injunction in the same fashion. "Stays, like preliminary injunctions, are necessary to mitigate the damage that can be done during the interim period before a legal issue is finally resolved on its merits. The goal is to minimize the costs of error." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). Courts use four factors to determine whether a stay is appropriate: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In weighing the factors, "a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A & F Enters.*, 742 F.3d at 766.

Here, those factors weigh in favor of staying the nationwide scope of the injunction. First, as illustrated above, the scope of the injunction involves novel issues upon which reasonable minds could differ, as evidenced by the disagreement between the majority and dissenting opinions in the Seventh Circuit's now-vacated panel opinion. *See City of Chicago v. Sessions*, 888 F.3d at 288-300. And, while certainly not determinative, the fact that the court of appeals granted rehearing *en banc* and stayed the injunction in the first place makes Chicago's nationwide-scope argument less auspicious than it had otherwise been. The first factor thus tilts the scales toward granting the stay, and the other factors do not reset the balance. The second and third factors weigh neutrally. The Attorney General faces no great harm absent a stay because he has no authority to impose the Conditions, and Chicago will not be directly affected by the stay. Finally, the fourth factor weighs in favor of granting the stay. The public interest will be best served by allowing the court of appeals time to issue its ruling. Noting that this complex issue is currently pending, prudence dictates waiting for guidance before effectuating such broad relief. Given the *en banc* stay already in place, mimicking that stay now will keep these scope issues streamlined and, if the *en banc* ruling were to overturn the panel's affirmance, reduce the

judicial whiplash to which Byrne JAG applicants nationwide will be subjected. In sum, the required elements for a stay of the nationwide scope of the permanent injunction are satisfied.

### IV.  <u>CONCLUSION</u>

For the reasons stated herein, the Court grants the City of Chicago's Motion for Summary Judgment on Counts I and II and correspondingly denies the Attorney General's Motion to Dismiss Counts I, II, and IV. The Court enters and immediately stays permanent injunctive relief as detailed above. The remaining claims are dismissed as moot.

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

Dated: 7/27/2018

- 58 -

**SA78**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE CITY OF CHICAGO,

                   Plaintiff,

        v.                           Case No. 17 C 5720

JEFFERSON BEAUREGARD            Judge Harry D. Leinenweber
SESSIONS III, Attorney
General of the United States,

               Defendant.

## FINAL JUDGMENT AND ORDER

Now, this 15th day of August, for the reasons set forth in the Court's Memorandum Opinion dated July 27, 2018 (Dkt. 198), it is hereby **ORDERED** that final judgment be entered in favor of Chicago and against the Attorney General. Consistent with Federal Rule of Civil Procedure 65 and 5 U.S.C. § 706, the Court grants the City injunctive relief as set forth below.

Through this lawsuit, the City challenges Attorney General's decision to attach three Conditions to the FY 2017 Edward Byrne Memorial Justice Assistance Grant, specifically:

1. The "Access Condition" requires that Byrne JAG recipients permit personnel of the U.S. Department of Homeland Security to access any detention facility to meet with undocumented immigrants and inquire as to their right to be or remain in the United States.

**SA79**

2.    The "Notice Condition" requires that Byrne JAG recipients provide DHS at least 48 hours advance notice of the scheduled release date and time of an alien in the jurisdiction's custody whenever DHS requests such notice in order to take custody of the alien upon release. The Attorney General later amended this Condition to clarify that "[i]n the event that . . . the scheduled release date and time for an alien are such as not to permit the advance notice [of scheduled release] . . . it shall not be a violation of this condition to provide only as much advance notice as practicable."

3.    The "Compliance Condition" requires that Byrne JAG recipients certify compliance with 8 U.S.C. § 1373.

## I.  <u>DECLARATORY RELIEF</u>

In accordance with the analysis presented in the Court's aforementioned Memorandum Opinion, the Court declares that 8 U.S.C. § 1373 violated the Tenth Amendment's anticommandeering principle and is therefore facially unconstitutional. (Dkt. 198.) The Court further declares that the Attorney General exceeded the authority delegated by Congress in the Byrne JAG statute, 34 U.S.C. § 10151 *et seq.,* and in 34 U.S.C. 10102(a)(6) in attaching the challenged Conditions to the FY 2017 Byrne JAG grant. Finally, the Court declares that the Attorney General's decision to attach the Conditions to the FY 2017 Byrne JAG grant violated the constitutional principle of separation of powers.

- 2 -

SA80

## II.  **PERMANENT INJUNCTION**

For the reasons stated above and in the Court's Memorandum Opinion, it is hereby **ORDERED** that the Attorney General's decision to attach the Conditions to the FY 2017 Byrne JAG grant is set aside and shall have no legal effect.  The Attorney General is enjoined from denying or delaying issuance of any FY 2017 Byrne JAG award insofar as that denial or delay is based on the Conditions.  Prohibited conduct includes: using the Conditions in any FY 2017 Byrne JAG award document, delaying the processing or approval of a recipient's requests to draw upon the FY 2017 Byrne JAG funds based on the Conditions, and enforcing the Conditions against FY 2017 Byrne JAG recipients, regardless of whether those Conditions appeared in FY 2017 Byrne JAG award documents. No recipient's acceptance of its FY 2017 award may be construed as acceptance of the Conditions. For purposes of this injunction, "delay" means the failure or refusal to take an action that the Attorney General has taken for any other FY 2017 Byrne JAG recipient, if that failure or refusal is based in any way on an applicant's compliance or lack of compliance with the Conditions or the litigation involving the Conditions, including if such failure or refusal is based on the Attorney General's seeking to

- 3 -

**SA81**

preserve the ability to impose or enforce the Conditions in the future.

This Order applies to the Attorney General's imposition of the Challenged Conditions on the Byrne JAG grant program as a whole. Its effects run to the benefit of all Byrne JAG applicants and recipients are not limited to the City of Chicago and its sub-grantees. Further, for the reasons set forth in Court's Memorandum Opinion (Dkt. 198), the Court enters a stay of the injunction as to all areas of the country beyond Chicago. This stay is as merited now as it was when the Court published its Opinion in July, given that in remanding this case, the court of appeals took care to leave its own stay—which is a reflection of the one this Court enters now—in place.

### III.  <u>FINAL JUDGMENT</u>

The only remaining Count in this case is Count IV, which the Attorney General earlier moved to dismiss. The Court denied that effort. In court on August 15, 2018, Chicago's counsel conceded that because the Court's July 28, 2017 Opinion found the City entitled to injunctive relief (Dkt. 198), Count IV became moot. The Court accordingly dismissed that Count. There being no Counts remaining to be decided on the merits, the Court now enters final judgment in this case. FED. R. CIV. P. 58.

## IV.   <u>PERSEVERATION OF RIGHTS</u>

The City preserves its rights to seek reasonable costs, including attorneys' fees, for this matter and any future related proceeding.  The Attorney General preserves his rights to object to or to oppose any attempt by the City to recover the same.

**IT IS SO ORDERED.**

_____

        Harry D. Leinenweber, Judge
        United States District Court

Dated:    8/15/2018

- 5 -

ILND 450 (Rev. ...: Judgment in a Civil Action)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

The City of Chicago et al ,

Plaintiff(s),

v.

Jefferson Beauregard Sessions III ,

Defendant(s).

Case No. 17 C 5720
Judge Harry D. Leinenweber

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $ ,

which ☐ includes    pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

_____

☐    in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

_____

☒    other: Now, this 15th day of August, for the reasons set forth in the Court's Memorandum Opinion dated July 27, 2018 (Dkt. 198), it is hereby ORDERED that final judgment be entered in favor of Chicago and against the Attorney General. Consistent with Federal Rule of Civil Procedure 65 and 5 U.S.C. § 706, the Court grants the City injunctive relief as set forth in the Courts August 15, 2018 order.

_____

This action was *(check one)*:

☐ tried by a jury with Judge Harry D. Leinenweber presiding, and the jury has rendered a verdict.
☐ tried by Judge Harry D. Leinenweber without a jury and the above decision was reached.
☒ decided by Judge Harry D. Leinenweber on a motion.

Date:   8/15/2018                                Thomas G. Bruton, Clerk of Court

SA84

Melanie A. Foster, Deputy Clerk