# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

———————————————

THE CITY OF CHICAGO,

*Plaintiff and Appellee*,

v.

MATTHEW G. WHITAKER,
ACTING ATTORNEY GENERAL OF THE UNITED STATES

*Defendant and Appellant*.

———————————————

On Appeal from the United States District Court
for the Northern District of Illinois
No. 17-CV-5720 (Hon. Harry D. Leinenweber)

———————————————

## BRIEF OF AMICI CURIAE LEGAL HISTORIANS IN SUPPORT OF PLAINTIFF AND APPELLEE THE CITY OF CHICAGO

———————————————

Andrew T. Tutt
R. Stanton Jones
Allison Gardner
ARNOLD & PORTER
    KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
andrew.tutt@arnoldporter.com

*Counsel for Amici Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-02885

Short Caption: City of Chicago v. Whitaker

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Amalia Kessler, Robert W. Gordon, Bernadette Meyler, Gregory Ablavsky, Stanley Katz, Hendrik Hartog, and

Kellen Funk

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Arnold & Porter Kaye Scholer LLP

(3)   If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

       N/A

Attorney's Signature: s/ Andrew Tutt      Date: November 15, 2018

Attorney's Printed Name: Andrew Tutt

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** \_\_\_\_\_   **No**  ✕

Address: 601 Massachusetts Ave, NW

Washington, DC 20001

Phone Number: 202-942-5242      Fax Number: (202) 942-5999

E-Mail Address: andrew.tutt@arnoldporter.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-02885

Short Caption: City of Chicago v. Whitaker

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Amalia Kessler, Robert W. Gordon, Bernadette Meyler, Gregory Ablavsky, Stanley Katz, Hendrik Hartog, and

Kellen Funk

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Arnold & Porter Kaye Scholer LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

Attorney's Signature: s/ Robert Stanton Jones      Date: November 15, 2018

Attorney's Printed Name: Robert Stanton Jones

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address: 601 Massachusetts Ave, NW

         Washington, DC 20001

Phone Number: 202-942-5563      Fax Number: (202) 942-5999

E-Mail Address: stanton.jones@arnoldporter.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-02885

Short Caption: City of Chicago v. Whitaker

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Amalia Kessler, Robert W. Gordon, Bernadette Meyler, Gregory Ablavsky, Stanley Katz, Hendrik Hartog, and

Kellen Funk

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Arnold & Porter Kaye Scholer LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Allison Gardner                     Date: November 15, 2018

Attorney's Printed Name: Allison Gardner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ✕

Address: 601 Massachusetts Ave, NW

Washington, DC 20001

Phone Number: 202-942-5150          Fax Number: (202) 942-5999

E-Mail Address: allison.gardner@arnoldporter.com

rev. 01/15 GA

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST ..................................................................1

INTRODUCTION ...................................................................................1

THE ORIGIN AND STRUCTURE OF EQUITY .....................................2

A NOTE ON METHODOLOGY..............................................................4

SUMMARY OF ARGUMENT ................................................................5

ARGUMENT...........................................................................................8

I.      Nothing Inherent to Equity Precludes Nationwide Injunctions......................8

    A.      Equity Courts Have Historically Granted Injunctions Protecting
            the Rights of Non-Parties .....................................................................8

        1.      "Bills of Peace" Were Used to Resolve Claims Where Many
                Individuals Shared a Common Interest ......................................8

        2.      Ordinary Bills for Injunctions Also Frequently Protected
                Individuals with a Common Interest ..........................................12

    B.      Equity Courts Have Historically Granted Broad Injunctions to
            Protect the Rights of Tens or Even Hundreds of Thousands..................15

    C.      Other Limitations on Judicial Power, Not Limitations on
            Equitable Remedies, Explain Why Federal Courts Did Not
            Grant Modern "Nationwide" Injunctions Against the Federal
            Government in the 18th and 19th Centuries .........................................18

        1.      The United States' Sovereign Immunity Prevented Courts From
                Issuing Nationwide Injunctions..................................................20

        2.      Courts Were Unable to Exercise Jurisdiction and Venue Over
                Cabinet-Level Federal Officers Nationwide...............................20

II.     Courts Should Construe "Traditional Remedies" in Equity to Mean Those
        Remedies in Line with Traditional Principles of Equity............................22

A.    Equity Is Not Defined by a Fixed Set of Remedies But Rather a Mandate to Fashion Appropriate Remedies ............................................. 23

B.    Courts Should Hesitate to Overturn Fifty Years of Established Equity Practice on the Basis of Recently Propounded and Highly Specific Historical Claims That May Be Indeterminate or Incomplete ....................................................................................... 26

CONCLUSION ............................................................................................ 28

LIST OF AMICI CURIAE* ........................................................................ 29

CERTIFICATE OF COMPLIANCE ........................................................... 30

CERTIFICATE OF SERVICE ..................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**United States Cases**

*Abe Rafelson Co. v. Tugwell*,
   79 F.2d 653 (7th Cir. 1935)...........................................................................22

*Belknap v. Belknap*,
   2 Johns. Ch. 463, 1817 WL 1598 (N.Y. Ch. 1817)...........................................13

*Bonaparte v. Camden & A.R. Co.*,
   3 F. Cas. 821 (C.C.D.N.J. 1830) ....................................................................14

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011).......................................................................................25

*Cherokee Nation v. Georgia*,
   30 U.S. 1 (1831)...............................................................................6, 14, 15

*Corning v. Lowerre*,
   6 Johns. Ch. 439, 1822 WL 1753 (N.Y. Ch. 1822)...........................................13

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).......................................................................................25

*Ex parte Young*,
   209 U.S. 123 (1908).......................................................................................21

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000).......................................................................................26

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999)....................................................................................4, 28

*In re Debs*,
   158 U.S. 564 (1895)..................................................................................16, 17

*Mayor of Georgetown v. Alexandria Canal Co.*,
   37 U.S. 91 (1838)...........................................................................................12

*Nesbitt Fruit Prods. v. Wallace*,
    17 F. Supp. 141 (S.D. Iowa 1936) ................................... 21

*Osborn v. Bank of United States*,
    22 U.S. 738 (1824) .......................................................... 21

*Phelps v. McDonald*,
    99 U.S. 298 (1878) ............................................................ 3

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ........................................................ 16

*R.R. Retirement Bd. v. Alton R. Co.*,
    295 U.S. 330 (1935) ........................................................ 22

*Smith v. Swormstedt*,
    57 U.S. 288 (1853) .......................................................... 10

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) .......................................... 13

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) (Thomas, J., concurring) ........... 27

*United States v. Lee*,
    106 U.S. 196 (1882) ........................................................ 21

*United States v. Ry. Emps.' Dep't of AFL*,
    283 F. 479 (N.D. Ill. 1922) ............................................ 18

*United States v. Ry. Emps.' Dep't of AFL*,
    286 F. 228 (N.D. Ill. 1923) ............................................ 18

*United States v. Ry. Emps.' Dep't of AFL*,
    290 F. 978 (N.D. Ill. 1923) ............................................ 18

**English Cases**

*Brown v. Vermuden*,
    (1676) 22 Eng. Rep. 796, 1 Ch. Cas. 272 ......................... 9

*City of London v. Perkins*
    (1734) 1 Eng. Rep. 1524, 3 Brown P.C. 602 ................... 10

*Hichens v. Congreve*,
(1828) 38 Eng. Rep. 917, 4 Russ. 562 ............................................................10

*How v. Tenants of Bromsgrove*,
(1681) 23 Eng. Rep. 277, 1 Vern. 22 ...............................................................9

*Hughes v. Trustees of Morden College*,
(1748) 27 Eng. Rep. 973, 1 Ves. Sen. 188 .......................................................13

*Lord Tenham v. Herbert*,
(1742) 26 Eng. Rep. 692, 2 Atk. 483 ...............................................................9

*Penn v. Lord Baltimore*,
(1750) 27 Eng. Rep. 1132, 1 Ves. Sen. 444 .....................................................3

## Constitutions

U.S. Const. art. III ...............................................................................25, 26

U.S. Const. amend. I ...................................................................................25

U.S. Const. amend. II ..................................................................................25

## Statutes

8 U.S.C. § 1251(f)(2) .................................................................................25

26 U.S.C. § 7421 (a) ..................................................................................25

28 U.S.C. § 1342 .......................................................................................25

28 U.S.C. § 2283 .......................................................................................25

29 U.S.C. § 52 ...........................................................................................25

29 U.S.C. § 101 .........................................................................................25

1976 Amendments to the Administrative Procedure Act, Pub. L. No.
94-574, 90 Stat. 2721 .................................................... 19, 20, 21, 22

Clayton Antitrust Act of 1914, Pub. L. 63-212, 38 Stat. 730 ................................17

Judiciary Act of 1789, ch. 20, 1 Stat. 73........................................................24, 26

Norris-LaGuardia Act, 47 Stat. 70 (1932) ............................................................17

Sherman Antitrust Act of 1890, 26 Stat. 209....................................................18, 25

**Treatises**

4 Blackstone, Commentaries..............................................................................23

George L. Clark, *Equity* (1928).......................................................................9, 11

1 D. Dobbs, Law of Remedies (2d ed. 1993)..........................................................3

Robert Henley Eden, *A Treatise on the Law of Injunctions* (1821)....................9, 14

1 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* (1881)......8, 9, 11, 12

Gregory C. Sisk, *Litigation With The Federal Government* (2016) .......................20

1 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* (2d ed. 1839)...................................5, 23

2 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* (2d ed. 1839)...................8, 9, 12, 23, 24

Joseph Story, *Commentaries on Equity Pleadings* (2d ed. 1840)..............10, 11, 24

4 C. Wright & A. Miller, *Federal Practice and Procedure* (2d ed. 1987) ...................................................................................................4

**Books**

Edward Berman, *Labor and the Sherman Act*, app. C (1930)...............................18

David Hackett Fischer, *Historians' Fallacies: Toward a Logic of Historical Thought* (1970) .............................................................................27

Owen M. Fiss, *The Civil Rights Injunction* (1978) ..............................................17

Felix Frankfurter & Nathan Greene, *The Labor Injunction* (1930)..................16, 17

1 Julius Goebel, Jr., *History of the Supreme Court of the United States: Antecedents and Beginnings to 1801* (2010).........................................24

John H. Langbein, et al., *The History of the Common Law* (2009) .....................2, 3

William E. Leuchtenburg, *The Supreme Court Reborn* (1995)..............................19

William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (1996) .................................13

**Articles**

Spencer E. Amdur & David Hausman, *Nationwide Injunctions and Nationwide Harm*, 131 Harv. L. Rev. F. 49 (2017). ...........................8

Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L.J. 908 (2017)............................................19

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017) ..........................2, 8, 26, 28

Samuel L. Bray, *The Supreme Court and the New Equity*, 68 Vand. L. Rev. 997 (2015) ............................................................4, 5

Clark Byse & Joseph V. Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action*, 81 Harv. L. Rev. 308 (1967) ........................21

John F. Duffy, *Administrative Common Law in Judicial Review*, 77 Tex. L. Rev. 113 (1998).......................................................4

William E. Forbath, *The Shaping of the American Labor Movement*, 102 Harv. L. Rev. 1109 (1989) ..................................16, 17

Kellen Funk, *The Union of Law and Equity: The United States, 1846–1938*, in Equity and Law: Fusion and Fission (John Goldberg, Henry Smith, & P.G. Turner, eds., forthcoming 2019)....................27

Michelle Johnson & James Oldham, *Law versus Equity—As Reflected in Lord Eldon's Manuscripts,* 58 Am. J. Legal Hist. 208 (2018) ......................23

Suzette M. Malveaux, *Class Actions, Civil Rights, and the National Injunction*, 131 Harv. L. Rev. F. 56 (2017). ......................................24

Raymond B. Marcin, *Searching for the Origin of the Class Action*, 23 Cath. U. L. Rev. 515 (1974)............................................11

William H. McNeill, *Mythistory, or Truth, Myth, History, and Historians*, 91 Am. Hist. Rev. 1 (1986)............................................27

Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939 (2011)............................................19

Robert F. Nagel, *Separation of Powers and the Scope of Federal Equitable Remedies*, 30 Stan. L. Rev. 661 (1978)............................................24

Jonathan R. Siegel, *ACUS and Suits Against Government*, 83 Geo. Wash. L. Rev. 1642 (2015)............................................20

Stephen N. Subrin, *How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective*, 135 U. Pa. L. Rev. 909 (1987)............................................2

Charles Warren, *Federal and State Court Interference*, 43 Harv. L. Rev. 345 (1930)............................................21

Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governanc*e, 40 Stan. L. Rev. 1371 (1988)............................................14

**Other Authorities**

*Text of the Rail Strike Injunction Defining the Acts Now Restrained*, N.Y. Times, Sept. 2, 1922............................................18

Amici are professional legal historians who have taught courses and published scholarship on the history of equity and legal and constitutional history more generally. We file this brief in support of the City of Chicago. Based on our study as historians, we explain that preventive injunctions protecting the rights of non-parties, of which nationwide injunctions are a special case, are traditional equitable remedies. Courts of equity have long granted injunctions protecting the rights of non-parties, and have long granted injunctions against governments and their officers. The history of equity also includes injunctions of comparable scope to nationwide injunctions.

Amici's names are set forth in the "List of Amici Curiae" following the Conclusion. Historical and other sources cited in this brief, such as English cases, may be found at the following link: http://bit.ly/2qOYJQh.

## INTRODUCTION

Nationwide injunctions—that is, injunctions that restrain the federal government from enforcing an invalid law against non-parties[2]—are unusual

---

[1] Counsel for all parties have consented to this filing. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person (other than amici curiae, their counsel, or their members) contributed money that was intended to fund the preparation or submission of this brief.

remedies, but they are not beyond the historical powers of an equity court. Courts of equity have historically issued relief protecting non-parties by means of injunction, and have issued injunctions that run against governments and government officials.

## THE ORIGIN AND STRUCTURE OF EQUITY

American law grew out of English law, which had two primary court systems, the common law courts and the equity courts (of which the most important—for future U.S. development—was Chancery). Stephen N. Subrin, *How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective*, 135 U. Pa. L. Rev. 909, 914, 918-19 (1987). The common law courts used "writs" (e.g., trespass, mandamus, prohibition, quo warranto, certiorari) where equity used "bills" (e.g., quia timet, creditors' bills, bills of peace). *See id.* at 914-16, 918; *see also* John H. Langbein, et al., *History of the Common Law* 268 (2009). Equity arose because of the inflexibility and formalism of the common law writ system. Subrin, *supra*, at 918-21. Equity's purpose was to look beyond forms and do right and justice where the law courts gave inadequate relief. *Id.*

---

Footnote continued from previous page

[2] *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 419-20 & n.5 (2017) (defining nationwide injunctions in this manner).

"Equity acts *in personam*."  Langbein et al., *supra*, at 286.  Equity can command a person to do a thing on pain of contempt, such as convey title to property, cease a trespass, or even refrain from suit in another court.  *See id.* Equity and law complement each other.  *See id.* at 287.  A trustee holds *legal* title to trust property, and may resort to a law court to protect it.  A beneficiary holds *equitable* title, and may resort to equity to enjoin the trustee to act for his benefit. The *in personam* character of equity means that it can control the conduct of a party notwithstanding where the party's actions might take place.  "Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy … is beyond the territorial jurisdiction of the tribunal.  It has the power to compel the defendant to do all things necessary … which he could do voluntarily, to give full effect to the decree against him."  *Phelps v. McDonald*, 99 U.S. 298, 308 (1878).  In *Penn v. Lord Baltimore*, the Chancellor decreed specific performance of a contract respecting lands lying in North America, outside the original jurisdiction of the English Chancery court.  (1750) 27 Eng. Rep. 1132, 1 Ves. Sen. 444, 448-49.

Because of its power, equity is for extraordinary situations where legal remedies are inadequate.  1 D. Dobbs, Law of Remedies § 2.5(1), at 123-24 (2d ed. 1993).  In the United States, federal courts administered law and equity separately until the 20th century, when the two systems merged with the adoption of the

Federal Rules of Civil Procedure.  *See* John F. Duffy, *Administrative Common Law in Judicial Review*, 77 Tex. L. Rev. 113, 147-48 & n.173 (1998).

As a result of merger, federal "courts now can give specific relief without being concerned about potential interference with another independent system of courts or the niceties of equity jurisdiction." 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1043, at 143 (2d ed. 1987).  "[T]he merger of law and equity and the abolition of the forms of action furnish a single uniform procedure by which a litigant may present his claim in an orderly manner to a court empowered to give him whatever relief is appropriate and just." *Id.* at 138 & n.1.

## A NOTE ON METHODOLOGY

The Supreme Court has said that federal courts may only issue equitable relief "traditionally accorded by courts of equity."  *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  We write this brief, however, aware that in determining which remedies were traditionally available, the Supreme Court has "constructed an idealized history" of equity; "not something that most historians would recognize, for it does not reflect the complexity and contingency of equity's past."  Samuel L. Bray, *The Supreme Court and the New Equity*, 68 Vand. L. Rev. 997, 1000-01 (2015).  "[T]he Court has sometimes made clear errors," and the sources the Court consults are not primarily pre-constitutional English cases, but equity treatises ("as recent as Dobbs

(1993) and as old as Story (1836)") and "its own decisions from the nineteenth century or the early twentieth century." *Id.* at 1000, 1015. "[T]he bulk of the authorities (especially the authorities that are not current treatises and restatements) [come] from the middle and late nineteenth and early twentieth centuries." *Id.*; *see also id.* at 1016-19 (discussing the Court's approach). Thus, the Supreme Court's approach is "artificial, for it smooths over centuries of disparate practices in equity." *Id.* at 1001. In this brief, we acknowledge the difficulties of the historical project of reconstructing equity's past, and attempt to provide the best account of this past for the court in recognition of those difficulties.

## SUMMARY OF ARGUMENT

Nationwide injunctions against the federal government were not issued in 1789. But that is the result of historical accident and not because of any inherent limitations on the remedies available in equity. Equity courts in 1789 could "adapt their decrees to all the varieties of circumstances …, and adjust them to all the peculiar rights of all the parties in interest." 1 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 28 (2d ed. 1839) [hereinafter Story, C. Eq.]. Courts of equity existed to decide upon and settle the rights of all persons interested in the subject matter of the suit. Courts of equity, it was said, do complete justice—not justice by halves.

5

To that end, early American equity courts could fashion injunctions that protected the rights of non-parties and that even ran against non-parties. Courts of equity could also issue injunctions against government officials, and by doing so, functionally restrain the actions of governments at the municipal, state, and federal levels. No case from the early republic casts that proposition in starker light than *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831). The Court dismissed the case for lack of jurisdiction. But Justice Joseph Story, dissenting, would have entered an injunction enjoining the State of Georgia and all of its officers and agents from enforcing any Georgia laws in Cherokee territory against anyone.

Not only did equity courts have the equitable power to grant injunctions that look like modern nationwide injunctions (save they did not run against the federal government itself), but they in fact issued injunctions of astonishing scope. In the late 1800s and early 1900s, federal courts sitting in equity issued labor injunctions restraining hundreds of thousands of workers to protect the free flow of commerce nationwide. While we doubt the lawfulness of similar injunctions today, and Congress limited the federal courts' power to issue such injunctions in the 1930s, they show the power of traditional equity.

Thus, equity courts had the equitable powers to issue nationwide injunctions in the early republic. There are likely a variety of reasons that no modern-style nationwide injunctions issued. At the threshold, very few federal laws were held

unconstitutional in the 18th and 19th centuries. Moreover, the federal government was structured in a fundamentally different fashion than it is today. And federal courts lacked their modern broad federal question jurisdiction.

But the likeliest explanations for the absence of nationwide injunctions before the 20th century relate to sovereign immunity, jurisdiction, and venue—not the nature of the federal courts' equity powers. First, the United States did not waive its sovereign immunity from suit in a general way until 1976. A nationwide injunction against the United States could not have issued before 1976. Second, restrictions on venue and personal jurisdiction meant litigants needed to sue cabinet-level officers in Washington, D.C. if they wanted something approximating a modern nationwide injunction. Geography and expense, not the powers of courts of equity, were the practical obstacles to nationwide injunctions for much of American history. (Though as we point out, as early as 1935, railroads were financially able and willing to join together to sue in Washington, D.C. to enjoin laws on a nationwide basis.)

In any event, it makes no sense to ask whether a remedy is a traditional equitable remedy by referring to the parties enjoined and the persons protected. Whether an equitable remedy is proper should be determined by equity's historical principles (e.g., whether the remedy grants complete relief, whether the remedy runs *in personam* against a party). The history of equity is a complex and

contradictory one, characterized by flexibility and discretion; rarely by unyielding rules. Especially where, as here, the history is inexact and the practice of granting nationwide injunctions is already entrenched, the proper body to pare back nationwide injunctions, should it be necessary, is Congress, not the courts.

## ARGUMENT

## I. Nothing Inherent to Equity Precludes Nationwide Injunctions

### A. Equity Courts Have Historically Granted Injunctions Protecting the Rights of Non-Parties

Courts of equity have long issued injunctions that protect the interests of non-parties. The most direct mechanism by which courts of equity did this in the 18th and 19th centuries was through "bills of peace."[3] But courts of equity have also crafted injunctions that, by dint of their scope or subject-matter, clearly protected non-plaintiffs.

#### 1. "Bills of Peace" Were Used to Resolve Claims Where Many Individuals Shared a Common Interest

Equity courts used "bills of peace" to "prevent multiplicity of suits." 2 Story, C. Eq., *supra*, § 853, at 147-48; 1 John Norton Pomeroy, *A Treatise on*

---

[3] In a recent article, Sam Bray has questioned the historical pedigree of nationwide injunctions, see Bray, *Multiple Chancellors*, *supra* at 437-45. But Bray concedes that bills of peace existed in historical equity, and admits that courts of equity have always had the power to order remedies to protect nonparties. *Id.* at 426; *see also* Spencer E. Amdur & David Hausman, *Nationwide Injunctions and Nationwide Harm*, 131 Harv. L. Rev. F. 49, 53 & n.29 (2017) ("Bray explains that traditional equity sometimes extended relief to 'nonplaintiffs' whose claims were 'identical' to the plaintiffs.'").

*Equity Jurisprudence* § 243, 246, at 255-57 (1881); Robert Henley Eden, *A Treatise on the Law of Injunctions* 359 (1821). Bills of peace could be like class actions, and the earliest were, involving suits between tithe-owners and parishioners, *Brown v. Vermuden* (1676) 22 Eng. Rep. 796, 1 Ch. Cas. 272; or tenants and their lords, *How v. Tenants of Bromsgrove* (1681) 23 Eng. Rep. 277, 1 Vern. 22; or tenants of one manor and the tenants of another, *Lord Tenham v. Herbert* (1742) 26 Eng. Rep. 692, 2 Atk. 483.[4] It is a conceptual mistake to think of bills of peace as mere class action devices, however, because the "prevent[ion of] multiplicity of suits" was the criterion for obtaining one. 2 Story, C. Eq., *supra*, § 853, at 148; 1 Pomeroy, *supra*, §§ 246, 251, at 257, 263, Eden, *supra*, at 359-62; *see* George L. Clark, *Equity*, § 437, at 578 (1928) ("[T]o prevent … either repeated actions between one plaintiff and one defendant or numerous actions between several plaintiffs and one defendant or between one plaintiff and several defendants.").

Bills of peace were adaptable tools. They could be used to sue numerous defendants, or sue on behalf of numerous plaintiffs, even if not all interested

---

[4] These cases were like class actions insofar as they involved plaintiffs suing on behalf of similarly situated individuals to resolve common questions of law or fact. In our view, these early cases offer a ready analogy to modern nationwide injunctions. The Court extended its relief to the unnamed parties in these cases because they were "similarly situated" or had "some right in common." Many nationwide injunctions are issued for the same reason.

parties—plaintiff or defendant—were joined in the action.[5]  *See* Joseph Story,

*Commentaries on Equity Pleadings* §§ 120-124 (2d ed. 1840) [hereinafter Story,

Eq. Pl.]; *Smith v. Swormstedt*, 57 U.S. 288, 302-03 (1853) (holding that in cases

involving a "common interest or a common right," a "court of equity permits a

portion of the parties in interest to represent the entire body, and the decree binds

all of them the same as if all were before the court").  For example, if several

parties have "distinct rights against a common fund," a small group of them could

bring suit on behalf of the group in order to enforce those mutual rights.[6]  Story,

Eq. Pl., *supra*, § 121 n.2; *Hichens v. Congreve* (1828) 38 Eng. Rep. 917, 922-23, 4

Russ. 562, 576-77.  Similarly, a bill of peace was permitted to establish the right of

the City of London to collect a toll despite naming only a few proprietors subject to

the toll as defendants.  Story, Eq. Pl., *supra*,§ 124 (citing *City of London v. Perkins*

(1734) 1 Eng. Rep. 1524, 3 Brown P.C. 602).  Bills of peace could protect

thousands of non-parties at a time.  For instance, a bill brought in the Queen's

Privy Council by a single plaintiff in 1565 established "on behalf of the inhabitants

---

[5] The "general rule, in Courts of Equity" was that unnamed parties "ought to be" joined in a suit if they could be.  Story, Eq. Pl., *supra* §§ 76a, 76c.  But where the interests of justice weighed in favor of permitting a suit with fewer than all the parties, equity permitted it.  *See id.* §§ 76c, 77.  For example, if a group of plaintiffs is "very numerous" or "if some of them are unknown," then requiring them all to become parties to the suit would be "impracticable" or "exceedingly inconvenient."  *Id.* § 122.

[6] To the extent that this case involves federal grantees' mutual right to a common fund, such cases are analogous.

of the Isles of Jersey and Guernsey" that "all suits commenced there … [or

between] subjects of those isles, should be heard, ordered, and adjudged in the

same isles, and not [in England]." Raymond B. Marcin, *Searching for the Origin

of the Class Action*, 23 Cath. U. L. Rev. 515, 523-24 (1974). Justice Story's 1840

treatise on equity pleading provides an extensive accounting of additional equity

suits involving unnamed parties. *See* Story, Eq. Pl., *supra*, §§ 77-135, at 77-136.

Pomeroy in his *Treatise on Equity Jurisprudence* explains just how powerful

bills of peace became as tools to restrain unlawful government action on a broad

scale. Wrote Pomeroy in 1881,

> In a large number of the States the rule has been settled
> … that a suit in equity will be sustained when brought …
> even by a single taxpayer suing on his own account, to
> enjoin the enforcement and collection, and to set aside
> and annul any and every kind of tax or assessment laid by
> county, town, or city authorities, either for general or
> special purposes, whether it be entirely personal in its
> nature and liability or whether it be made a lien on the
> property of each taxpayer, whenever such tax is illegal….

1 Pomeroy, *supra*, § 260, at 277. Not only could "a single taxpayer suing on his

own account" enjoin the collection of a tax against anyone, but a taxpayer could, in

many States, enjoin any government action that would merely result in higher

taxes. *See id.*; *accord* Clark, *supra*, § 443, at 589-91. Wrote Pomeroy, "[t]he

courts have … sustained these equitable suits, and have granted the relief, and have

uniformly placed their decision upon the inherent jurisdiction of equity to interfere

for the prevention of a multiplicity of suits." 1 Pomeroy, *supra*, § 260, at 278.

Later in the chapter, Pomeroy admits that equity courts did not uniformly agree

about such suits. *See id.* § 266, at 286. Some courts held "that, as a general rule,

or except under very special circumstances, a court of equity will not exercise its

jurisdiction" to issue such broad injunctions. *Id.* But Pomeroy's precedents

demonstrate that, if the question is whether, as a historical matter, a court of equity

would have awarded injunctive relief restraining the government and protecting the

rights of thousands of similarly situated non-parties without requiring that they be

joined together in a class action, the answer is indisputably yes.

> ## 2. Ordinary Bills for Injunctions Also Frequently Protected Individuals with a Common Interest

In addition to bills of peace, equity courts granted injunctions that, by virtue

of the restraint they placed on the actions of defendants, effectively enjoined the

defendant's actions with respect to many individuals all at once.

Injunctions to abate nuisances fall into this category. In *Mayor of

Georgetown v. Alexandria Canal Co.*, the Supreme Court recognized that a "court

of equity … will now take jurisdiction in case of a public nuisance, at the instance

of a private person; where he is in imminent danger of suffering a special injury,

for which, under the circumstances of the case, the law would not afford an

adequate remedy." 37 U.S. 91, 98 (1838); *see* 2 Story, C. Eq., *supra*, §§ 921-924a

at 201-04. Pursuant to that principle, in 1822 Chancellor Kent permitted a private

plaintiff to enjoin the obstruction of Vestry Street. *Corning v. Lowerre*, 6 Johns. Ch. 439, 1822 WL 1753 (N.Y. Ch. 1822). Indeed, "American judges invoked the injunctive remedy to restrain all kinds of encroachments on public lands and ways." *See* William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* 128 (1996). These suits, by abating public nuisances, affected the rights of the entire public.[7]

Early officer suits functioned similarly. In *Belknap v. Belknap*, Chancellor Kent enjoined state inspectors from draining certain swamps because they would have acted in excess of their statutory authority. 2 Johns. Ch. 463, 1817 WL 1598 (N.Y. Ch. 1817). Kent noted that draining the swamp would not only destroy the plaintiffs' mill, but would "affect[], more or less, all the others which are supplied by its waters." *Id.* at 472. Kent cited, among other cases, *Hughes v. Trustees of Morden College* (1748) 27 Eng. Rep. 973, 1 Ves. Sen. 188, wherein Lord Hardwicke allowed an injunction to restrain turnpike commissioners from continuing construction of a turnpike. These and other injunctions against public

---

[7] The public nuisance cases correspond to an important class of nationwide injunctions, namely, those in which a court cannot grant a plaintiff complete relief without affecting the rights of hundreds or thousands of others. For example, in a desegregation case brought by a single African American child, the court can only give that child relief by ordering the school to admit all otherwise eligible African American children; admitting only the plaintiff will not alleviate the injury. In many cases, a claim could be made that a nationwide injunction is needed to provide complete relief to the plaintiff. *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 768–69 (5th Cir. 2015).

improvements had significant impacts on the rights of the public at large—*i.e.* hundreds or perhaps thousands of non-parties. *See Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821, 827 (C.C.D.N.J. 1830) (collecting cases enjoining public officers).

Courts sitting in their "law" jurisdiction could also issue writs like mandamus, prohibition, quo warranto, and certiorari that operated like universal injunctions. These writs could command officers to act (or refrain from acting) against the whole world. *See* Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governanc*e, 40 Stan. L. Rev. 1371, 1396-1409 (1988). Eden notes in his chapter on public nuisance that equity had denied at least one officer suit because a writ of certiorari could have been had from King's Bench, *see* Eden, *supra*, at 230, and also notes that "[a writ of] prohibition lay at common law to restrain a public nuisance," *id.* at 224 note (e).

If any case gives lie to the notion that a court of equity could not protect the rights of non-parties against the government, and at a massive scale, it is *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831). The Cherokee Nation sued in the Supreme Court's original jurisdiction

> for an injunction, to restrain the state of Georgia, the governor, attorney-general, judges, justices of the peace, sheriffs, deputy sheriffs, constables, and others the officers, agents, and servants of that state, from executing and enforcing the laws of Georgia or any of these laws, or serving process, or doing any thing towards the

> execution or enforcement of those laws, within the
> Cherokee territory, as designated by treaty between the
> United States and the Cherokee nation.

*Id.* at 2.  The Supreme Court dismissed the case on jurisdictional grounds, holding

that the Cherokee Nation could not invoke the Supreme Court's original

jurisdiction.  *Id.* at 19-20.  Justice Thompson, joined by Justice Story, dissented.

*Id.* at 50, 80  (Thompson, J., dissenting).  On the question of remedy, the dissenters

concluded that an injunction was "fit and proper … and ought therefore to be

awarded."  *Id.* at 77-80.  The injunction sought in *Cherokee Nation* would have

prevented the State of Georgia from enforcing any Georgia laws within the

Cherokee territory.  Justice Story, one of the nation's preeminent equity scholars,

thought it within a court of equity's power to grant that injunction.

### B.   Equity Courts Have Historically Granted Broad Injunctions to Protect the Rights of Tens or Even Hundreds of Thousands

Courts of equity have issued massive injunctions enjoining hundreds of

thousands of non-parties to protect the rights of hundreds of thousands of others.  If

it seems remarkable that a court of equity might issue an injunction to *protect* non-

parties, it would seem even more extraordinary that it would *enjoin* non-parties.

An injunction to protect a non-party does not subject that party to the court's

coercive powers but merely protects the right the non-party shares with the

plaintiff in a suit.  Indeed, in the context of a nationwide injunction to restrain the

federal government, a non-party is not even collaterally estopped from reasserting the same claims should the plaintiff lose.

Yet, equity courts in the latter half of the 19th century and into the 20th century routinely issued injunctions enjoining non-parties. To be clear, we do not believe that those courts should have issued those injunctions. Modern notions of due process may limit the ability of a court of equity to issue an injunction against non-parties today. The point is that *equity* allowed broad injunctions even if there is real reason to doubt that such injunctions would be permissible now. As a matter of "traditional equity," they were clearly deemed permissible. *See In re Debs*, 158 U.S. 564, 582-600 (1895). And, as noted above, an injunction to protect a non-party, such as the modern nationwide injunction, raises no due process concerns similar to an injunction against a non-party. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810-14 (1985).

Specifically, in the late 19th century, federal courts began granting "labor" injunctions to enjoin labor unions from striking against corporations like railroads. *See* William E. Forbath, *The Shaping of the American Labor Movement*, 102 Harv. L. Rev. 1109 (1989). So many injunctions were issued, of such enormous scope, that the era came to be known as the era of "government by injunction." *See* Felix Frankfurter & Nathan Greene, *The Labor Injunction* 1 (1930). These injunctions were so broad they were called "omnibus injunctions" and "Gatling-gun

injunctions." Frankfurter & Greene, *supra* at 87; Forbath, *supra*, at 1177, 1184. The Supreme Court repeatedly upheld these injunctions over protests that the federal courts lacked authority to issue them. *See, e.g.*, *Debs*, 158 U.S. at 582-600. Eventually, Congress—not the Court—used its power to regulate the remedial authority of the federal courts to restrain issuance of the labor injunctions in carefully crafted provisions found in Section 20 of the Clayton Act in 1914 and Section 4 of the Norris-LaGuardia Act in 1932.

Labor injunctions were not strictly addressed to the parties to the suit; often they were "addressed to anyone who happened to get actual notice" of them. Owen M. Fiss, *The Civil Rights Injunction* 16 (1978); *see* Frankfurter & Greene, *supra*, at 89, 123-25. "It was not uncommon for such decrees to address ten thousand workers and 'whomsoever' would aid and abet them." Forbath, *supra*, at 1184. In an article in the *Harvard Law Review*, William Forbath documents numerous such injunctions: "in 1896, all the trade unionists of Kansas City"; "in 1905, California's scores of thousands of union women and men"; again in 1905, "all the printers in Chicago and thirty other cities"; in 1919, "all the nation's bituminous coal miners." *Id.* "In West Virginia and southwestern Pennsylvania, whole mining counties came under permanent injunctions." *Id.*

An exemplary injunction from the era is the "Rail Strike Injunction" issued by a single Chicago Federal District Judge on September 1, 1922. The order

enjoined "all railway employees, attorneys, servants, union agents, associates and members and all persons acting in aid or in conjunction with them" nationwide—at least 400,000 people—from doing anything that could possibly support the then-ongoing railroad strike, including "loitering," "picketing," and "encouraging" anyone to interfere with the functioning of the railroads. *Text of the Rail Strike Injunction Defining the Acts Now Restrained*, N.Y. Times, Sept. 2, 1922. The judge maintained the order for months. *See United States v. Ry. Emps.' Dep't of AFL,* 283 F. 479 (N.D. Ill. 1922); *see also* 286 F. 228 (N.D. Ill. 1923); 290 F. 978 (N.D. Ill. 1923). Edward Berman outlines 85 Sherman Act labor injunctions in Edward Berman, *Labor and the Sherman Act*, app. C, at 284-325 (1930).

In sum, to protect the rights of the public at large federal courts exercised their equity powers at nationwide scale in the 19th and early 20th centuries, to enjoin the activities of hundreds of thousands of individuals, including thousands of non-parties.

### C. Other Limitations on Judicial Power, Not Limitations on Equitable Remedies, Explain Why Federal Courts Did Not Grant Modern "Nationwide" Injunctions Against the Federal Government in the 18th and 19th Centuries

Injunctions restraining the "United States" from nationwide enforcement of an invalid law could not have happened until after 1976. That is not because equity courts, as equity courts, could not have issued such injunctions. In fact, as early as the 1930s, and perhaps even earlier, functionally equivalent (but hard to

bring) suits against top federal officers did happen. Instead, there are two especially noteworthy reasons that nationwide injunctions (and their functional equivalents) were rare in American law before 1976. First, the United States enacted its first general waiver of sovereign immunity in 1976 in amendments to the Administrative Procedure Act. Second, officer suits to restrain high ranking executive branch officials like the Attorney General and the Heads of the various Departments (the only officials against whom an injunction approximating a nationwide injunction could run) were difficult to bring. In the absence of the modern venue statute, and because of other doctrinal barriers that no longer exist, a modern nationwide injunction could only have been brought in Washington, D.C. Those two factors contribute substantially to the absence of nationwide injunctions before the mid-20th century.[8]

---

[8] Additional factors likely also contributed to the absence of nationwide injunctions before the mid-20th century. For example, Congress enacted general federal question jurisdiction in 1875, which some scholars credit for changing the culture of judicial review of executive branch action. *See* Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L.J. 908, 913, 947-58 (2017); Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939, 947 (2011). The New Deal's expansion of the federal administrative state also fundamentally altered the relationship between Congress, the courts, and the Executive Branch and prompted more aggressive judicial oversight of Executive Branch action. *See* William E. Leuchtenburg, *The Supreme Court Reborn*, 213-36 (1995).

### 1. The United States' Sovereign Immunity Prevented Courts From Issuing Nationwide Injunctions

The United States did not waive its sovereign immunity from suit in a general way until the enactment of Amendments to the Administrative Procedure Act in 1976. *See* Gregory C. Sisk, *Litigation with the Federal Government* § 4.10(b) (2016). "Before 1976, a lawsuit asserting unlawful action by a federal agency generally had to be framed as a suit against the individual government official responsible for the action, because the United States had not waived its sovereign immunity to be sued directly." *Id.* Moreover, an officer suit "would be treated as against the Government itself and, thus, barred by sovereign immunity, unless: (1) the official had acted outside of his statutorily delegated authority, or (2) the official had acted contrary to constitutional command." *Id.* Before the 1976 amendments to the Administrative Procedure Act, it was difficult to frame a lawsuit against government policy that did not trespass on the United States' sovereign immunity. *See* Jonathan R. Siegel, *ACUS and Suits Against Government*, 83 Geo. Wash. L. Rev. 1642, 1649 (2015).

### 2. Courts Were Unable to Exercise Jurisdiction and Venue Over Cabinet-Level Federal Officers Nationwide

As noted above, before the Administrative Procedure Act's general waiver of sovereign immunity, plaintiffs sued federal officers for injunctions. Officer suits against state and federal officials have been used throughout American

history to restrain or compel Executive Branch officers to comply with the law. *See* Charles Warren, *Federal and State Court Interference*, 43 Harv. L. Rev. 345, 373 nn.136-37 (1930) (collecting dozens of cases dating back to 1838); *see also Ex parte Young*, 209 U.S. 123, 155-68 (1908); *United States v. Lee*, 106 U.S. 196, 212-23 (1882); *Osborn v. Bank of United States*, 22 U.S. 738, 846-47 (1824).

But officer suits have an important limitation, namely, the powers of the officer enjoined dictate the scope of the injunction issued. An officer suit against the local United States Attorney can only restrain prosecutions in the local district. Thus, to obtain a nationwide injunction before the Administrative Procedure Act, a litigant would have needed to sue not the local U.S. Attorney, but the Attorney General.

To get an injunction of nationwide scope, a plaintiff needed to sue to enjoin a cabinet-level official. But for much of American history, an officer suit could not be instituted against an officer over whom the Court could not obtain personal jurisdiction and venue. Thus, the only place that a plaintiff could have obtained a nationwide injunction was Washington, D.C. *See* Clark Byse & Joseph V. Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action*, 81 Harv. L. Rev. 308 (1967) (explaining venue limitations); *see also, e.g.*, *Nesbitt Fruit Prods. v. Wallace*, 17 F. Supp. 141, 142-43 (S.D. Iowa 1936) (holding that the Secretary of Agriculture

could only be sued for injunction in Washington, D.C.); *Abe Rafelson Co. v. Tugwell*, 79 F.2d 653, 654 (7th Cir. 1935) (discussing similar district court holding). The difficulty and expense of maintaining a lawsuit in Washington, D.C., deterred plaintiffs from seeking nationwide injunctions when injunctions against local federal officials would achieve adequate results.

Notwithstanding these practical impediments, during the New Deal era, large corporations, like the railroads, *did* sue in Washington, D.C., and they *did* secure the functional equivalent of nationwide injunctions in officer suits. For example, in *Railroad Retirement Board v. Alton R. Co.*, "134 class I railroads, two express companies, and the Pullman Company," sued the Railroad Retirement Board and its individual members in the Supreme Court of the District of Columbia, "praying an injunction against [the Railroad Retirement Act's] enforcement." 295 U.S. 330, 340 (1935). The court "granted the decree," and the Supreme Court affirmed. *See id.*

## II. Courts Should Construe "Traditional Remedies" in Equity to Mean Those Remedies in Line with Traditional Principles of Equity

Courts should apply a simple test to determine whether a remedy is a traditional equitable remedy. Namely, they should ask whether the remedy is in line with equity's traditional principles. That test best effectuates the historical purpose of equity and minimizes the likelihood of error in interpreting the historical record.

**A.      Equity Is Not Defined by a Fixed Set of Remedies But Rather a Mandate to Fashion Appropriate Remedies**

The purpose of the equity power, as traditionally understood, was to make right and just (*ex aequo et bono*) those instances where the general law was lacking.  1 Story, C. Eq., *supra*, §§ 2-3; *see* 4 Blackstone, Commentaries *50 (original purpose of equity was "to give remedy in cases where none was before administered").  Common law courts were "compelled to limit their inquiry to the very parties in the litigation before them, although other persons may have the deepest interest in the event of the suit"; equity courts, in contrast, "can adapt their decrees to all the varieties of circumstances, which may arise, and adjust them to all the peculiar rights of all the parties in interest."  1 Story, C. Eq., *supra*, at § 28. Equity is thus a system that, by the very nature of its principles, is designed to adapt to the needs of a changing society.  *See, e.g.*, Michelle Johnson & James Oldham, *Law versus Equity—As Reflected in Lord Eldon's Manuscripts*, 58 Am. J. Legal Hist. 208, 224 (2018).  As Story wrote in his treatise on Equity Pleading:

> It is the constant aim of Courts of Equity to do complete justice, by deciding upon and settling the rights of all persons interested in the subject-matter of the suit, so that the performance of the decree of the Court may be perfectly safe to those, who are compelled to obey it, and also, that future litigation may be prevented.  Hence, the common expression, that Courts of Equity delight to do justice, and not by halves.

Story, Eq. Pl., *supra*, § 72.  As Story wrote specifically of injunctions, though the issuance of injunctions "ought … to be guarded with extreme caution and applied only in very clear cases," they are nonetheless "manifestly indispensable for the purposes of social justice in a great variety of cases, and therefore should be fostered and upheld by a steady confidence."  2 Story, C. Eq., *supra*, § 959a; s*ee* Suzette M. Malveaux, *Class Actions, Civil Rights, and the National Injunction*, 131 Harv. L. Rev. F. 56, 56 (2017).

Moreover, in granting courts "equity" jurisdiction in the Judiciary Act of 1789, the First Congress did not intend to freeze the courts' equity jurisdiction for all time.  *See, e.g.,* 1 Julius Goebel, Jr., *History of the Supreme Court of the United States: Antecedents and Beginnings to 1801*, at 502 (2010) ("The [Senate] Committee's bill [to enact the Judiciary Act] at various junctures reveals an anticipation that federal judges would exercise the familiar and traditional function of molding the law [of remedies] by judicial decision.").  To be sure, many equitable remedies courts grant today are identical to their 18th century counterparts.  But many are not.  *See, e.g.*, Robert F. Nagel, *Separation of Powers and the Scope of Federal Equitable Remedies*, 30 Stan. L. Rev. 661, 661–63 (1978) (discussing federal courts' use of structural injunctions and expansive use of supervisory receivers and monitors).

The mere fact that some aspects of equity practice remain unchanged cannot foreclose adapting equity to modern circumstances. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (holding that the First Amendment protects videogames); *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (noting that the argument that the Second Amendment only protects those arms in existence in the 18th century "border[s] on the frivolous"). Article III's grant of "equity" jurisdiction must be understood by reference to its "basic principles" even as "new and different" circumstances for its application arise. *Brown*, 564 U.S. at 790.

Congress has delegated enormous power to the Executive Branch over the last century. As the price of that delegation, Congress has permitted the federal courts to assume greater equitable power to rein in unlawful Executive Branch action. Congress has the power to limit or restrict the ability of a federal court to grant injunctive relief and has exercised that power in a number of statutes.[9] Congress has revisited the power of the federal courts to issue injunctive relief over the past half century, but has not withdrawn the authority to issue nationwide

---

[9] *See* 8 U.S.C. § 1251(f)(2) (altering the standard for granting an injunction in limited circumstances); 26 U.S.C. § 7421 (a) (prohibiting suits to restrain assessment or collection of taxes); 28 U.S.C. § 1342 (limiting federal court power to enjoin, suspend or restrain the operation of state rate orders); 28 U.S.C. § 2283 (limiting power of federal courts to enjoin state court proceedings); 29 U.S.C. § 52 (exempting labor organizations from the Sherman Act and prohibiting courts from enjoining certain labor activities); 29 U.S.C. § 101 (limiting injunctive relief arising from labor disputes); 42 U.S.C. § 1983 (limiting injunctive relief against judicial officers).

injunctions.  Congress's decision *not* to limit courts' ability to issue nationwide injunctions is persuasive evidence that Congress approves of their use.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155-56 (2000).

### B. Courts Should Hesitate to Overturn Fifty Years of Established Equity Practice on the Basis of Recently Propounded and Highly Specific Historical Claims That May Be Indeterminate or Incomplete

Injunctions materially similar to the injunction issued in this case have been in use for more than fifty years.  *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 437-45 (2017).  Moreover, both Section 11 of the Judiciary Act of 1789, 1 Stat. 73, 78, and Article III of the United States Constitution grant the federal courts equity jurisdiction.  A holding that nationwide injunctions are beyond a court's equity powers would be tantamount to a constitutional holding that Congress cannot, even if it wishes, grant federal courts the authority to issue nationwide injunctions.  *See* Bray, *Multiple Chancellors*, *supra*, at 471-72.  That would be an awesome conclusion.  It would forever constrain Congress's power to confer on Article III courts the capacity to oversee the Executive Branch.

Set against longstanding practice, and the potential magnitude of a reversal of such practice, is a recent work of legal scholarship questioning whether nationwide injunctions are consistent with historical equity, *see* Bray, *Multiple Chancellors*, *supra*, and a recent concurrence by Justice Thomas calling them

"legally and historically dubious," *Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring).  In *Hawaii*, however, the Court did not have before it the history of broad injunctions described in this brief.  Nor did eight of the nine justices see fit to consider the constitutionality of nationwide injunctions in that case.

History is a notoriously difficult subject.  Despite their commitment to objectivity, historians understand that historical "facts" or "truths" rarely exist, that any exploration into history is necessarily selective, and all good accounts of history are interpretive.  *See* William H. McNeill, *Mythistory, or Truth, Myth, History, and Historians*, 91 Am. Hist. Rev. 1, 2-3, 7-8 (1986); David Hackett Fischer, *Historians' Fallacies: Toward a Logic of Historical Thought* 314-17 (1970).  The problem is especially acute for the history of American equity which is understudied and underwritten.  Notions of "traditional" equity can easily become distorted if only one or another facet is explored.  Many accounts of equity leave out or skip over the (unsavory, but historically important) railroad litigation.  Equity has always been multifaceted, remedially creative, and the subject of a contested history.  *See* Kellen Funk, *The Union of Law and Equity: The United States, 1846–1938*, in Equity and Law: Fusion and Fission 296-300, 327-29 (John Goldberg, Henry Smith, & P.G. Turner, eds., forthcoming 2019).

Courts should tread carefully, where, as here, a practice is long established, where the consequences of decision would forever restrain the political branches of government, and where new historical claims have only recently come to light. *See Grupo Mexicano*, 527 U.S. at 322 ("[F]or a wrenching departure from past practice, Congress is in a much better position than we … to design the appropriate remedy."); Bray, *Multiple Chancellors, supra* at 481 ("Imagine that legal questions were resolved quickly, comprehensively, and with immediate finality.  That system would be criticized as rash, perhaps even as an illegitimate exercise of authority.").

## CONCLUSION

For the foregoing reasons, the district court did not exceed its constitutional or statutory authority by issuing a nationwide injunction.

Dated:  November 15, 2018

Respectfully submitted,

/s/  Andrew T. Tutt
Andrew T. Tutt
R. Stanton Jones
Allison Gardner
ARNOLD & PORTER
    KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
andrew.tutt@arnoldporter.com

*Counsel for Amici Curiae*

# LIST OF AMICI CURIAE*

Amalia Kessler
*Stanford Law School, Lewis Talbot and Nadine Shelton Professor of International Legal Studies; Director, Stanford Center for Law and History*

Robert W. Gordon
*Stanford Law School, Professor of Law; Chancellor Kent Professor of Law & Legal History, Emeritus, Yale Law School*

Bernadette Meyler
*Stanford Law School, Carl and Sheila Spaeth Professor of Law*

Gregory Ablavsky
*Stanford Law School, Assistant Professor of Law*

Stanley Katz
*Princeton University, Lecturer with rank of Professor of Public and International Affairs; Director, Center for Arts and Cultural Policy Studies*

Hendrik Hartog
*Princeton University, Class of 1921 Bicentennial Professor in the History of American Law and Liberty; Professor of History*

Kellen Funk
*Columbia Law School, Associate Professor of Law*

* Amici sign in their personal capacity; titles and employer affiliations are provided for identification purposes only.

29

**CERTIFICATE OF COMPLIANCE**

1.      The foregoing Brief of Amici Curiae complies with the type-volume limitations of Seventh Circuit Rule 29 because the brief contains 6,890 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Dated:  November 15, 2018               /s/  Andrew T. Tutt      
                                                Andrew T. Tutt

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2018, I electronically filed the foregoing document with the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  November 15, 2018                     /s/  Andrew T. Tutt
                                              Andrew T. Tutt